IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KIM L. HARRIS,

       Plaintiff,                           CASE NO.:   4:13-CV-171-RH/CAS

v.

TAYLOR COUNTY SCHOOL DISTRICT,

       Defendant.

_____/

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiff initiated this action on April 1, 2013, by filing a two count complaint, contending that Defendant discriminated against her based on her handicap or disability and claiming that Defendant retaliated against her because she reported Defendant's "race-based" practices. (Docs. 1, 9). Defendant, Taylor County School District ("Defendant"), moves this Court for an order granting summary judgment in its favor because Plaintiff was dismissed from Defendant's cosmetology program solely for failing to follow school rules and disturbing the educational environment, there are no genuine issues of material fact, and thus, Defendant is entitled to summary judgment as a matter of law.

### I. FACTUAL BACKGROUND[1]

Plaintiff, an African American, initially enrolled in the cosmetology program at Taylor Technical Institution ("TTI"), a secondary and post-secondary school, which is part of the Taylor County School District in August 2009. (P's 2d Dep., at 118:7-14; Brannan Aff., at ¶22; Little Aff., at ¶8). Shortly into the program, on October 13, 2009, Plaintiff was reprimanded for using

---

[1] The following facts are undisputed for the purposes of this Motion. Defendant cites this background only for the purposes of this Motion, and the recitation of these facts is not an admission by Defendant.

profanity and threatening to beat a classmate. (Brannan Aff., at ¶22). Mr. James Brannan, TTI Vocational Director, did not suspend Plaintiff because it was her first incident, but rather counseled Plaintiff, advising her that the behavior would not be tolerated. (Brannan Aff., at ¶22). The following day, on October 14, 2009, Plaintiff was involved in a serious car accident where both of her ankles and pelvis were severely injured. (Doc. 9, at ¶8; P's 2d Dep., at 118:7-9). As a result, Plaintiff was unable to complete the cosmetology program that year, but her participation hours for 2009-2010, were banked and an invitation was extended to return to school as soon as she became physically able. (Brannan Aff., at ¶¶22-23; Little Aff., at ¶¶8-9; P's 2d Dep., at 38:21-23). Stemming from the accident, on October 29, 2010, she received a determination of disability by the Social Security Administration ("SSA").[2] (ALJ Op., at 3-4).

Subsequently, in August 2011, with the assistance of the Department of Education Division of Vocational Rehabilitation ("Voc. Rehab."), Plaintiff re-enrolled in the cosmetology program at TTI. (Doc. 9, at ¶9). Voc. Rehab. is a State of Florida program that assists individuals who have physical or mental disabilities acquire or keep a job. (Interrog. No. 11; McKay Aff., at Ex. A., p. 8). Voc. Rehab. is an entity separate and apart from TTI and Defendant. (P's 2d Dep., at 45:9-16). Mr. Carl Schorr, although no longer employed by Voc. Rehab., was an employee of Voc. Rehab. during the relevant time in this action. (*See generally* Voc. Rehab. Notes).

---

[2] Importantly, Plaintiff was also born with a slight left arm defect (P's 1st Dep., at 5:10-17; P's 2d Dep., at 68:7-9); however, her arm is not the cause of her disability. (P's 2d Dep., at 125-126). Rather, the SSA found that Plaintiff had the following severe impairments: "pelvis fracture; left ankle fracture; right ankle fracture with Achilles tendon rupture; [and] sacroiliac facture/dislocation." (ALJ Op., at 3). The SSA determined that Plaintiff met listing 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), but further noted that "medical improvement [wa]s expected with appropriate treatment [and] a continuing disability review [wa]s recommended in 24 months." (ALJ Op., at 3-4). While it is unknown to Defendant whether Plaintiff's disability was reviewed at 24 months, Defendant does not dispute that Plaintiff was disabled (as referenced in the ALJ's opinion) during the time at issue in this action.

Plaintiff met with Mr. Schorr, a Voc. Rehab. counselor, on May 4, 2011, to obtain disability and child care assistance in order for her to be able to attend the cosmetology program at TTI. (Voc. Rehab. Notes, 5/4/11; P's 2d Dep., at 47:10-19; Interrog. No. 9). Plaintiff did not make any requests for a disability accommodation to TTI or Defendant. (Interrog. No. 9). Rather, she made her requests for a special chair and station directly to Voc. Rehab. and Mr. Schorr. (Interrog. No. 9; Apalachee Center Notes, 8/31/11).

Over the next few months, Plaintiff continued to work with Voc. Rehab. and Mr. Schorr to obtain daycare for her minor child and receive disability assistance. (*See generally* Voc. Rehab. Notes, 5/4/11 – 11/4/11; P's 2d Dep., at 47:10-19). Mr. Schorr assisted Plaintiff with the location of child care services; and, on August 10, 2011, noted that she would require rehabilitation engineering services to assist with the modification of her work station. (Voc. Rehab. Notes, 8/10/11).

Subsequently, on September 19, 2011; October 13, 2011; and October 18, 2011, Voc. Rehab. and Mr. Schorr worked with Plaintiff to provide her with ankle compression stockings to assist her with the pain and discomfort associated with her disability. (Voc. Rehab. Notes, 9/19/11; 10/13/11; 10/18/11). Ultimately, she received the stockings with the assistance of Voc. Rehab. (Voc. Rehab. Notes, 10/18/11; P's Dep., at 102:7-22; Apalachee Center Notes, 10/11/11).

Additionally, a Voc. Rehab. Engineer met with Plaintiff and visited TTI to assess what type of work station Plaintiff needed and to take measurements to accommodate the station. (*See generally* Voc. Rehab. Notes). On November 8, 2011, Voc. Rehab. noted that it had received financial authorization to order Plaintiff a salon station and stool. (Voc. Rehab. Notes, 11/8/11).

Prior to the arrival of the work station, however, Plaintiff was dismissed from the cosmetology program.

Importantly, Plaintiff does not contend that Defendant was responsible for obtaining the salon station or stool; nor does Plaintiff contend that Defendant failed to accommodate Plaintiff's disability while a student at TTI.  (Interrog. Nos. 9-11).

Plaintiff points to two specific events as the basis for her claims in this action, along with some more general claims.  (Doc. 9, at ¶¶10-12).  Generally, Plaintiff claims that Ms. Deborah Little, her TTI cosmetology instructor, treated white students differently than African American students, that she had favorites, and that she was more social with white students.  (Doc. 9, at ¶12).

With regard to the two specific events, first, Plaintiff claims that on November 3, 2011, Ms. Little clocked her out approximately twenty minutes early even though she was still in the salon.  (P's Affirmative Action Compl; Doc. 9, at ¶10).  TTI's records and Ms. Little's account of this incident vary slightly from Plaintiff's version of the events; however, the end-result of Defendant's Motion for Summary Judgment is unaffected.[3]

Consequently, Ms. Little completed a Discipline Referral and Student Incident Report.  (Little Aff., at ¶24).  On the Discipline Referral, Ms. Little noted that Plaintiff was being

---

[3] On November 3, 2011, around 2:00 p.m., Ms. Little noticed Plaintiff was not in class. (Little Aff., at ¶17).  Ms. Little asked the class whether they had seen Plaintiff, then Ms. Little proceeded to check the parking lot for Plaintiff's vehicle. (Little Aff., at ¶17).  Plaintiff was not present, so Ms. Little clocked Plaintiff out for the day. (Little Aff., at ¶17).  Ms. Little was later informed by another student that Plaintiff had asked that student to clock her out at 3:30 p.m. (Little Aff., at ¶18).  Later that day, while Ms. Little was reviewing the students' time cards for the week, she also noticed that Plaintiff had stricken through the ink-stamped time and had hand-written on her time card, making it very difficult for Ms. Little to accurately track Plaintiff's attendance. (Little Aff., at ¶20).  The class had been instructed that it is improper for a student to scratch through their time and make changes. (Little Aff., at ¶19).  If there was an error, students were supposed to report it to Ms. Little and she would make the changes. (Little Aff., at ¶19; Eakins Dep., at 27:1-12; Simmons Dep., at 28:7-25).  The following day, November 4, 2011, when Plaintiff reported to class, Plaintiff confronted Ms. Little in the hallway, asking Ms. Little why she clocked her out at 2:00 p.m. (Little Aff., at ¶21).  Plaintiff continued to escalate the situation, challenging Ms. Little's authority. (Little Aff., at ¶21).  Plaintiff was extremely rude, hostile, and argumentative. (Little Aff., at ¶22; Eakins Dep., at 33:12-19).  Ultimately, fellow-cosmetology student, Devera Eakins, left the cosmetology area for help and obtained administrative assistance to calm the situation. (Little Aff., at ¶22; Eakins Dep., 33:25-34:14).

4

disciplined for "disruptive behavior" and "failure to follow rules." (Little Aff., at Ex. A). In the narrative, Ms. Little explained that Plaintiff "is not following time card procedures." (Little Aff., at Ex. A). In fact, "[s]he became loud and disruptive when [Ms. Little] tried to talk to her about her time." (Little Aff., at Ex. A). In addition, "[s]he was confrontational and [Ms. Little], as well as the other students in the class felt threatened." (Little Aff., at Ex. A). The Student Incident Report provides further that Plaintiff "became very loud and disruptive when told to clock in and out each day[,]" so Ms. Little and the class were "afraid of what was going to happen." (Little Aff., at Ex. A).

The second incident for which Plaintiff complains as a basis for this action, occurred the following Monday, on November 7, 2011. (Doc. 9, at ¶11). Plaintiff contends that on November 7, 2011, Plaintiff objected to a white janitor, Ms. Mary Asher, watching or staring at her; however, Ms. Asher was there simply to obtain salon services (i.e., a manicure). (Doc. 9, at ¶11; P's 2d Dep., at 22:6-21; Asher Aff., at ¶5). Plaintiff responded to Ms. Asher's "stare" by rudely saying something to the effect that Ms. Asher needed to go pick up trash or do something else, instead of making Plaintiff work. (Doc. 9, at ¶11; P's 2d Dep., at 22:11-14; Interrog. No. 14; Asher Aff., at ¶¶8-9; Little Aff., at ¶28). Plaintiff claims this incident resulted in Ms. Little telling her "you don't have the right to talk to my staff like that." (Doc. 9, at ¶11; P's 2d Dep., at 23:11-16; Interrog. No. 14; Little Aff., at ¶28). Next, Ms. Little called TTI Director, Jim Brannan, to the cosmetology area to address the situation. (Doc. 9, at ¶11; Brannan Aff., at ¶7; Clayton Aff., at ¶7; Little Aff., at ¶28).

Mr. Brannan and TTI Industry Services Coordinator, Mr. George Clayton, arrived. (Doc. 9, at ¶¶11-13; Little Aff., at ¶28; Brannan Aff., at ¶7; Clayton Aff., at ¶7). At the direction of Mr. Brannan, Ms. Little asked Plaintiff to come into the hallway to discuss the issue. (Little

Aff., at ¶29; Brannan Aff., at ¶9; Clayton Aff., at ¶9).  Plaintiff flatly refused, stating that if Mr. Brannan wanted to speak with her, then he could come into the classroom.  (Little Aff., at ¶29; Brannan Aff., at ¶9; Clayton Aff., at ¶9).  However, when Mr. Brannan entered the classroom and repeated his request, Plaintiff complied and met with Ms. Little, Mr. Brannan, and Mr. Clayton in the hallway.  (Little Aff., at ¶29; Brannan Aff., at ¶9; Clayton Aff., at ¶9; P's 2d Dep., at 29:17-22).  Both the time card incident and the Ms. Asher incident were addressed.  (P's 2d Dep., at 28:1-5; Little Aff., at ¶32; Brannan Aff., at ¶12).  Plaintiff grew increasingly upset, including talking loudly over the administrators.  (Little Aff., at ¶31; Brannan Aff., at ¶11; Clayton Aff., at ¶13).  Therefore, the conversation was continued outside of the building in order to avoid disruption to other classes.  (P's 2d Dep., at 29:17-22; Little Aff., at ¶31; Brannan Aff., at ¶11; Clayton Aff., at ¶13).  The administrators were unable to reason with Plaintiff. Ultimately, Mr. Brannan made the decision to dismiss Plaintiff from the cosmetology program due to Plaintiff's rude and disruptive behavior.  (Little Aff., at ¶35; Brannan Aff., at ¶21).  Mr. Brannan invited Plaintiff to enroll in another program the following semester, but Plaintiff declined the offer.  (Little Aff., at ¶35; Brannan Aff., at ¶16; Clayton Aff., at ¶18, P's 2d Dep., at 34:24-35:6).  Plaintiff, however, claims that she was not dismissed until she "objected to preferential treatment on the basis of race . . . ."  (Doc. 9, at ¶13; Interrog. Nos. 5, 15).  While, Mr. Brannan, Ms. Little, and Mr. Clayton recall Plaintiff making a remark about race, when they asked her about it further, she quickly recanted her remark.  (Little Aff., at ¶33; Brannan Aff., at ¶13; Clayton Aff., at ¶16).

The following day, on November 8, 2011, Plaintiff filed an affirmative action complaint with TTI, wherein she complained about these two incidents.  (*See generally* P's Affirmative Action Compl).  As a result of TTI's investigation, Mr. Paul Dyal, the Superintendent,

determined that no "Board Policy or TTI Student Handbook directives ha[d] been violated" and that "[t]he actions taken by TTI over the incident [were] within the scope of both Board Policies on student management and the expectation of student behavior in the TTI student handbook." (*See* Resp. to Affirmative Action Compl). Mr. Brannan, Ms. Little, and Mr. Clayton not only complied with the TTI Student Handbook and Rules of Conduct in administering the discipline to Plaintiff, but also TTI's other policies on the prohibition of harassment, unlawful discrimination, and others during Plaintiff's tenure at TTI. (Little Aff., at ¶6; Brannan Aff., at ¶¶5, 24; Clayton Aff., at ¶5; Ex. R., at pp. 45, 49).

Notably, Plaintiff has a long history of drug and mental health treatment, dating back to at least 2007.[4] (P's 2d Dep., at 16:9-19:1; 58:4-22; 67:15-68:18; 74:1-75:23; Cushman Dep., 41:15-42:4). At some point, Plaintiff was diagnosed with bipolar disorder (or a mixed disorder). (P's 2d Dep., at 16:9-19:1; 58:4-22; 67:15-68:18; 74:1-75:23; Blue Dep., 39:6-7; Cushman Dep., 36:25-40:18). Plaintiff received treatment for her diagnoses at Apalachee Center, including medication and counseling services from Willhelmenia Blue, her counselor, and Dr. Phillip Cushman, her psychiatrist. (P's 2d Dep., at 16:9-19:1; 58:4-22; 67:15-68:18; 74:1-75:23). Plaintiff's mental health treatment is important with regard to the incidents that Plaintiff complains of in this action because, on October 11, 2011 – just a few weeks prior to the incidents that Plaintiff contends were discrimination and retaliation – Plaintiff reported that she was "back in the cosmetology school" and "doing well." (Apalachee Center Notes, 10/13/11; P's 2d Dep., at 102:19-104:17). She further reported that she was "feeling good," "enjoying what [she] like[s] doing," that she liked school, and that she had received a "brace for [her] leg just in case [she was] standing on it too much." (Apalachee Center Notes, 10/11/11; P's 2d Dep., at 102:19-

---

[4] While in Plaintiff's deposition testimony, she states that she has only been receiving mental health treatment since 2007, some records report treatment dating back to at least 1999. (*See* McKay Aff., at Ex. A., p. 5).

104:17). She also said that she was "allowed to sit down at school" and the school does not give her any "flack about [it] as long as [she] [could] get [her] work done." (Apalachee Center Notes, 10/13/11; P's 2d Dep., at 102:19-104:17).

Following these events, Plaintiff filed her two-count Amended Complaint, claiming that: [1] she was discriminated against by TTI based on her handicap or disability, pursuant to 29 U.S.C. § 794 (The Rehabilitation Act) and 42 U.S.C. § 12131 (Title II of the Americans with Disabilities Act); and [2] claiming that she was subject to retaliation because she reported unlawful race-based practices adversely affecting her, pursuant to 42 U.S.C. § 2000d (Title VI of the Civil Rights Act of 1964); 42 U.S.C. § 1981 (Civil Rights Act of 1866); and Fla. Stat. § 1000.05 (the Florida Educational Equity Act). (Doc. 9).

Defendant, however, is entitled to summary judgment as a matter of law because Plaintiff's allegations – and the evidence in support thereof – do not support a determination of discrimination and retaliation; rather, the record demonstrates that Voc. Rehab. was solely responsible for providing Plaintiff with a special work station. Indeed, even though Defendant was not required to do so, Defendant in fact accommodated Plaintiff's disability in other ways (addressed herein); and, Defendant dismissed Plaintiff from the cosmetology program due to her inappropriate behavior, violation of school rules, and to preserve the educational environment, inviting her to return to another course of study the following semester.

## II. MOTION FOR SUMMARY JUDGMENT: STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine

issues of material fact that should be decided at trial. *See Celotex Corp.*, 477 U.S. at 330. A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325. When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. *Id.* at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *See Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988).

## III. ARGUMENT

Defendant will first address Plaintiff's claim of disability or handicap discrimination, then her claim of race-based retaliation. Importantly, a careful reading of Plaintiff's Amended Complaint, specifically, regarding Count I, reveals that Count I *solely* contains allegations based on disability or handicap discrimination (and makes no allegations regarding race-based discrimination). (*See* Doc. 9, at ¶¶15-22). Accordingly, Defendant is responding to the allegations in Plaintiff's Amended Complaint (as written), and will *not* address any claims of race-based discrimination, except as they may pertain to Plaintiff's claim of race-based retaliation in Count II.

### A. *Voc. Rehab. was solely responsible for providing Plaintiff a special work station; and, by Plaintiff's own admission and other evidence, Defendant <u>did</u> provide Plaintiff other accommodations.*

Plaintiff attempts to state claims for relief from discrimination on the basis of handicap or disability, pursuant to 29 U.S.C. § 794 (The Rehabilitation Act) and 42 U.S.C. § 12131 (Title II of the Americans with Disabilities Act).  (Doc. 9, at ¶16).  This Court has stated that "the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et. seq.*, prohibit discrimination against persons with disabilities in specified programs or activities."  *C.P. v. Leon County Sch. Bd.*, No. 4:03-cv-65-RH/WCS, 2005 WL 2133699, at *2 (N.D. Fla. Aug. 27, 2005).  And, "[t]he standards for determining liability under the two statutes are the same." *Id.*

To establish a prima facie case of discrimination under the Rehabilitation Act or the ADA, Plaintiff must show that she (1) "has a disability;" (2) is "otherwise qualified for the position;" and (3) was "subject to unlawful discrimination" *solely* because of her disability (e.g., excluded from the participation in, denied the benefits of, or subject to discrimination under any program or activity receiving Federal financial assistance).[5]  29 U.S.C. § 794(a); 42 U.S.C. § 12132; *Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999) (*citing Gordon v. E.L. Hamm & Assocs.*, 100 F.3d 907, 910 (11th Cir. 1996)).  Significantly, this Court has stated that "a school district that seeks in good faith to provide an appropriate education for a disabled student does not violate the Rehabilitation Act or the ADA, even if . . . it turns out that the district's educational judgments were incorrect." *C.P. v. Leon County Sch. Bd.*, No. 4:03-cv-65-RH/WCS, 2005 WL 6074568, at *4 (N.D. Fla. Aug. 27, 2005) (*citing Sellers v. Sch. Bd. of City of Manassas*, 141 F.3d 524, 529 (4th Cir. 1998) (*holding* that "either bad faith or gross misjudgment

---

[5] Defendant does not dispute that Plaintiff has a disability.  (ALJ Op., at 3-4).  Nor does Defendant dispute that it receives federal financial assistance (e.g., in the form of Pell grants) for the purpose of providing its students with future employment opportunities.

should be shown before a [Rehabilitation Act] violation can be made out, at least in the context of education of handicapped children")).

Plaintiff's claim for disability or handicap discrimination under the ADA and Rehabilitation Act arises primarily, if not entirely, from the same conduct; thus, Defendant will address these together. (*See generally* Doc. 9). Primarily, Plaintiff alleges that "Defendant . . . because of Plaintiff's handicap/disability or Defendant's perception of Plaintiff as handicap[ped]/disabled, terminated her from the cosmetology program and took other actions against her leading up to her removal from [the] program." (Doc. 9, at ¶17). More specifically, Plaintiff claims that she "was required to stand for approximately two to three hours per day."[6] (Doc. 9, at ¶9).

To establish that Plaintiff was "otherwise qualified," she must be able to "perform 'the essential functions' of the job in question with or without reasonable accommodation." *Sutton*, 185 F.3d at 1210 (*citing* 29 C.F.R. § 1630.2(m) (*defining* "qualified" as "an individual with a disability . . . that . . . satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position.")).

Here, due to Plaintiff's disability and behavioral issues, and despite any reasonable accommodations, Plaintiff was *not* otherwise qualified to be a cosmetologist. On October 29, 2010, approximately one year before Plaintiff's termination from TTI's cosmetology program (and within the relevant time period of this action), the SSA found Plaintiff completely disabled. (ALJ Op., at 4). This implies "that [Plaintiff] was not employable in any available position in her area where she could expect to earn substantial gainful income." (McKay Aff., at Ex. A., p.

---

[6] *But see* Apalachee Progress Notes, 10/13/11; P's 2d Dep., at 102:19-104:17 (noting that Plaintiff says she was "allowed to sit down at school" and the school did not give her any "flack about [it] as long as [she] [could] get [her] work done.").

11).  She also had severe limitations regarding "standing and walking[,]" and these limitations are "inconsistent with successful employment as a hairdresser." (McKay Aff., at Ex. A., p. 11; *see generally* Little Aff., at ¶11; P's 2d Dep., at 102:23-104:17; Apalachee Center Notes, 10/11/11).  For example, the cosmetology program required "3.5 hours of continuous instruction and activity," which was clearly not tolerated by Plaintiff. (McKay Aff., at Ex. A., p. 10).  Ms. Little even expressed that it was not "uncommon for [Plaintiff] to decline the opportunity to perform services on a client when it was her turn, or be unable to perform the required services . . . due to her physical disability." (Little Aff., at ¶¶15-16).

Plaintiff also struggled behaviorally.  Indeed, she was "not temperamentally suited to function as a hairdresser." (McKay Aff., at Ex. A., p. 10).  Plaintiff's pattern of rude, confrontational behavior is wholly inconsistent with a personal services career (e.g., threatening to beat a classmate, failing to follow time card procedures, disrespecting Ms. Asher, and apparent problems with authority due to the escalating nature of the conversation with Mr. Brannan, Ms. Little, and Mr. Clayton). (*See* Brannan Aff., at ¶¶ 11, 22; Little Aff., at ¶31 & Ex. A.; Clayton Aff., at ¶13; Asher Aff., at ¶8; P's 2d Dep., at 19:2-10; 58:1-18).

Plaintiff's mental disability, including bipolar disorder, as documented in her psychiatric records also support this. (*See* P's 2d Dep., at 16:9-19:1; 58:4-22; 67:15-68:18; 74:1-75:23; Blue Dep., 39:6-7; Cushman Dep., 36:25-40:18).  Indeed, Plaintiff's "mental impairment[s] and exertional limitations [are] *inconsistent* with the target occupation[,]" and the Voc. Rehab. plan "was destined to fail[]." (McKay Aff., at Ex. A., p. 11)(emphasis added).  For example, Plaintiff *admittedly* has a "bad temper," struggles "to cope with anger," and will go "off on people." (P's 2d Dep., at 19:2-10; 58:1-18).

12

Simply, Plaintiff's "handicapping conditions" are *too* limiting and "would have prevented her from successful training and employment as a hairdresser." (McKay Aff., at Ex. A., p. 12). Ultimately, and regardless of Plaintiff's "qualifications" (or lack thereof), TTI administrators were fully within the rules of conduct with terminating her, as discussed more fully below.

Finally, there is simply *no* evidence of discrimination by Defendant. With regard to Plaintiff's request for a special work station to assist her with her disability, *not only* had Plaintiff's requests for an accommodation *not* been denied by Defendant, but Plaintiff *admits* that Voc. Rehab. was the sole responsible party for supplying Plaintiff with this accommodation. (Interrog. Nos. 9, 11; P's 2d Dep., at 45:9-16).

Specifically, Plaintiff worked directly with Voc. Rehab. and Mr. Schorr to receive an accommodation, and Voc. Rehab. and Mr. Schorr are separate from Defendant. (Interrog. No. 11; P's 2d Dep., at 45:9-16). Moreover, Plaintiff "did not make any accommodation request to the School District." (Interrog. No. 9). Rather, Plaintiff "made [a request for] an accommodation for a special chair and station . . . to Carl Schorr with the Department of Education, Division of Vocational Rehabilitation in 2010/2011 when [she] started the [c]osmetology [p]rogram." (Interrog. No. 9).

While Plaintiff did not request Defendant to provide any specific accommodations (Interrog. No. 9) and Defendant was not the responsible entity for providing Plaintiff with the special work station, Defendant, in fact, consistently provided Plaintiff with other accommodations. By Plaintiff's own testimony, TTI allowed her to "sit down in school" and the school did not give her any "flack" for sitting. (P's 2d Dep., at 102:23-104:17; Apalachee Center Notes, 10/11/11). Additionally, Ms. Patricia Ratliff-Hoffman, a fellow student, stated that "Ms. Little made accommodations for Kim Harris as needed to accommodate her medical conditions."

(Hoffman Aff., at ¶7). And, Ms. Ratliff-Hoffman, "witnessed Ms. Little allow Kim Harris to sit or take breaks as needed while in the classroom to accommodate her." (Hoffman Aff., at ¶7). Ms. La'Untrice Simmons, another fellow student, stated that Plaintiff never requested any kind of help with her procedures in the salon and that Ms. Little did not treat Plaintiff differently because of her disability. (Simmons Dep., at 10:6-8). Ms. Simmons also stated that while Plaintiff needed assistance carrying her books and moving around, the class assisted her with those needs. (Simmons Dep., at 10:6-8).

More specifically, Ms. Little provided Plaintiff the following accommodations to help her fully participate in the program: she allowed Plaintiff to sit at the gazebo instead of walking across the street (as required) during fire drills; she allowed Plaintiff to use the school wheelchair (and other students to push her in the wheelchair); she was often allowed to sit; if Plaintiff needed products, towels, or other salon items, Ms. Little allowed other students to get her what she needed so that she could remain seated; and, when Plaintiff began the 2011 school year, her cosmetology kit was missing numerous supplies totaling approximately $400.00, that Ms. Little provided to Plaintiff from the cosmetology storage at no charge. (Little Aff., at ¶11).

Because Plaintiff was not terminated from TTI solely because of her disability, she cannot state a claim for handicap or disability discrimination. *See e.g., Lewin v. Med. Coll. of Hampton Roads*, 910 F. Supp. 1161 (E.D. Va. 1996), *aff'd*, 131 F.3d 135 (4th Cir. 1997). Her termination for failure to follow school policies and disturbing the student environment, for which TTI had the full right to do, is discussed further below.

### B. *Plaintiff was dismissed from TTI solely for failing to follow school rules.*

With regard to Plaintiff's race-based retaliation claim, the *sole* fact on which Plaintiff relies is that as "soon as [she] objected to preferential treatment on the basis of race . . . she was

dismissed from the program." (Doc. 9, at ¶13).  However, in Plaintiff's deposition testimony and responses to interrogatories, she states that up until the day that she was dismissed from the cosmetology program, she thought that she had "the perfect student and teacher relationship" with Ms. Little (P's 2d Dep., at 118:15-25), she thought that Ms. Little was there to help students (P's 2d Dep., at 121:5-8), and she did not believe that Ms. Little was picking on her because she was an African American (P's 2d Dep., at 122:2-20).  (*See generally* Interrog. No. 5).  Further, Plaintiff stated that no one directed any racial slurs, derogatory remarks, or profanity toward her while she was enrolled at TTI.  (*See* P's 2d Dep., at 36, 42-44, 120-21).  Testimony of various other students enrolled in the cosmetology program at TTI with Plaintiff supports this fact (i.e., that neither racial slurs nor profanity were used toward Plaintiff during her tenure at TTI).  (*See* Hoffman Aff., at ¶¶4-5; Simmons Dep., at 8:9-20; Murphy Dep., at 9:17-25; Eakins Dep., 45:5-8).

Plaintiff's allegation (i.e., that she was terminated as soon as she objected to preferential treatment based on race) is not only unsupported by the undisputed facts, but also insufficient to state a prima facie claim of retaliation.  In this regard, Plaintiff attempts to state claims for race-based retaliation under each of the following: 42 U.S.C. § 2000d (Title VI of the Civil Rights Act of 1964); 42 U.S.C. § 1981 (Civil Rights Act of 1866); and Fla. Stat. § 1000.05 (the Florida Educational Equity Act).  (Doc. 9, at ¶24).  Defendant will address Plaintiff's claims under 42 U.S.C. § 2000d and 42 U.S.C. § 1981 together, then Plaintiff's claim under the Florida Educational Equity Act.

<u>Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) and<br>the Civil Rights Act of 1866 (42 U.S.C. § 1981)</u>

Title VI of the Civil Rights Act of 1964, provides that "[n]o person . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[7]  42 U.S.C. § 2000d.  And, the Civil Rights Act of 1866, provides equal rights "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."[8]  42 U.S.C. § 1981.

To establish a prima facie case of retaliation, Plaintiff must show that (1) she "engaged in a statutorily protected activity;" (2) she suffered an "adverse action;" and (3) there is some causal connection between the two.  *Ellis v. Morehouse School of Medicine*, 925 F. Supp. 1529, 1549 (N.D. Ga. 1996) (*citing Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)).

Here, as best Defendant can surmise, the "activity" for which Plaintiff claims that she suffered retaliation is her allegation of "preferential treatment on the basis of race."  (Doc. 9, at ¶13).  And, the "adverse action" to which Plaintiff claims that she suffered is that she was terminated from the cosmetology program; and, "[h]ad she been able to finish the program[,]" she could be earning up to "$1,000.00" per week and made "$104,000.00" from "July 2011 – July 2013."[9]  (Interrog. No. 6).  While the salary that Plaintiff may have received – had she completed the cosmetology program – is in dispute, there is simply *no* causal connection between her one statement and being removed from the program.  Rather, Plaintiff was removed

---

[7] Defendant does not dispute that it receives federal financial assistance.

[8] *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (*finding* that 42 U.S.C. § 1981 encompasses retaliation claims).

[9] Defendant disputes the salary to which Plaintiff contends she would receive.  (*See* McKay Aff., Ex. A., at pp. 7-8, 12) (*noting* that "the annualized earnings of the typical hairdresser in rural northeast Florida would be about $23,120.00 per year.").

from the program for failing to follow TTI rules and disturbing the educational environment, and Defendant was justified in its decision.

In this regard, Plaintiff points to two disciplinary situations involving her at TTI; ultimately, leading to her termination. First, with regard to the time clock issue, Plaintiff was aware of Rules of Conduct, requiring "[a]ny adult student leaving or returning to [TTI] . . . to sign in/out[,]" and Plaintiff understood it was against the rules for someone else to clock her in or out. (Ex. R., at p. 45; P's 2d Dep., at 30-33). As a result of Plaintiff's failure to follow the time clock rules, on November 4, 2011, Ms. Little, following the Attendance Policy, cited Plaintiff for "disruptive behavior" and "failure to follow rules." (Ex. R., at pp. 45, 49; Little Aff., at Ex. A).

Second, with regard to the situation where the janitor was seeking a manicure and Plaintiff's rude and inappropriate response to her, Plaintiff was apparently unable to accept the reprimand.[10] During her meeting with Ms. Little, Mr. Brannan, and Mr. Clayton, Plaintiff made some sort of objection to "preferential treatment on the basis of race . . . ."[11] (Doc. 9, at ¶13; Interrog. Nos. 5, 15). While these administrators recall Plaintiff making a remark about race, when they asked her about it further, she quickly recanted her remark. (Little Aff., at ¶33; Brannan Aff., at ¶13; Clayton Aff., at ¶16).

Although Plaintiff may now dispute the tone or words that she exchanged with Ms. Asher, Ms. Little, Mr. Brannon, and Mr. Clayton, Plaintiff *admittedly* has a "bad temper," struggles "to cope with anger," and will go "off on people." (P's 2d Dep., at 19:2-10; 58:1-18). Moreover, regardless of the exact words exchanged, TTI is an adult education program where

---

[10] Plaintiff's rude response to Ms. Asher, using profanity is unprofessional conduct, not allowed in the cosmetology area, and against school rules. (*See* Asher Aff., at ¶ 8; Eakins Dep., at 57:16-21; Ex. R.; *but see* P's 2d Dep., at 22:25-23:10).

[11] Furthermore, even if Plaintiff's claim that Ms. Little had favorites (or had lunch with some students and not others) was true, such an allegation does not raise any genuine issue of fact as to Plaintiff's race-based retaliation claim.

students are expected to treat schooling as preparation for future employment. (*See* Ex. R., at p. 1). As such, the Rules of Conduct provide that "[p]rofanity and rudeness will not be allowed." (*See* Ex. R., at p. 45). And, the Attendance Policy allows the administration to *immediately* dismiss a student for a "[d]iscipline referral, and/or [b]ehavior or act that endangers students, staff, and/or faculty, or other inappropriate actions as determined by the administration[.]" (*See* Ex. R., at p. 49; Brannan Aff., at ¶20).

TTI followed these rules and policies in disciplining Plaintiff. Because of Plaintiff's rude, unprofessional, and aggressive behavior with regard to the Ms. Asher incident and the conversation with the administrators that followed, Mr. Brannan determined that Plaintiff's behavior was a "gross violation" of the code of conduct, warranting dismissal from the cosmetology program. (Brannan Aff., at ¶ 24). While Plaintiff attempts to establish that she was not terminated until she expressed inequality based on race, the decision to dismiss Plaintiff was based solely on her inability to follow TTI rules.

<u>The Florida Educational Equity Act (Fla. Stat. § 1000.05)</u>[12]

"The Florida Educational Equity Act, § 1000.05, Florida Statutes, prohibits disability discrimination in public education." *C.P.*, 2005 WL 2133699, at *4. Specifically, it "prohibits discrimination based on race, national origin, sex, handicap, or marital status against any student or employee in the state system of public education." *Id.* (*citing Hawkins v. Sarasota County Sch. Bd.*, 322 F.3d 1279, 1286 (11th Cir. 2003)). A plaintiff must at least establish "deliberate indifference" to recover under FEEA." *Id.* at n. 9 (*citing Hawkins*, 322 F.3d at 1284). Deliberate indifference occurs where, for example, a "school official act[s] or fail[s] to act to remedy any

---

[12] The Florida Educational Equity Act is the Florida state counterpart to the Individuals with Disabilities Education Act ("IDEA"). *C.P.*, 2005 WL 2133699, at *1. Here, Plaintiff has not attempted to state a claim under IDEA; rather, she only references the Florida counterpart.

acts of discrimination" thus exhibiting "deliberate indifference." *Palmer ex rel. Palmer v. Santa Rosa County, Fla. Sch. Bd.*, No. 3:05-cv-218-MCR, 2005 WL 3338724, at *4 (N.D. Fla. Dec. 8, 2005).

Here, by Plaintiff's own testimony, she states that she never even complained about Ms. Little until November 7, 2011.  (P's 2d Dep., at 29:7-10).  And, while Plaintiff states that she complained of "preferential treatment on the basis of race," school administrators – Mr. Brannan, Ms. Little, and Mr. Clayton – all state that they inquired into her comment regarding race, but she recanted it.  (Little Aff., at ¶33; Brannan Aff., at ¶13; Clayton Aff., at ¶16).  Thus, there was nothing for the administration to remedy, and there can be no deliberate indifference.[13]  Indeed, even if the November 7, 2011, event is viewed in isolation, Plaintiff was ultimately dismissed from TTI for failing to follow the school's rules of conduct (addressed above) and disturbing the educational environment.  (Brannan Aff., at ¶18).

Finally, to the extent Plaintiff seeks damages under FEEA (Doc. 9, at ¶28), her claim must be dismissed as a matter of law under the plain language of the statute.  Fla. Stat. § 1000.05(7).  FEEA does not provide a cause of action for damages, but rather states that an individual aggrieved by a violation of FEEA has "a right of action for such equitable relief as the court may determine."  *Id.*

## IV. CONCLUSION

Based on the foregoing, Defendant respectfully requests that this Court enter an order granting summary judgment in Defendant's favor.  Plaintiff was dismissed from the cosmetology program solely for her own unprofessional behavior, failing to follow school rules, and for

---

[13] While Plaintiff does not address it in her Amended Complaint, sometime during her tenure in the program, Plaintiff expressed to Ms. Little that she felt a female client was racist because the client did not speak to Ms. Harris, but spoke to others.  (Little Aff., at ¶13).  Ms. Little quickly addressed Ms. Harris' concerns and spoke with the client to resolve any issues.  (Little Aff., at ¶13).

disturbing the educational environment (i.e., legitimate non-discriminatory reasons). Plaintiff cannot state a claim for handicap or disability discrimination, because TTI sought in good faith to provide Plaintiff an appropriate education; and, the sole reason for Plaintiff's termination was her inappropriate behavior. Further, Plaintiff cannot state a claim for race-based retaliation, because Defendant's discipline of Plaintiff (i.e., Plaintiff's termination from the cosmetology program), was completely independent of race, and well-founded in accordance with TTI rules and Plaintiff's behavior.

### Certificate of Service

**I HEREBY CERTIFY** that on January 31, 2014, a true and correct copy of the foregoing was served via the Court's CM/ECF system to Jami Kimbrell, Esquire of Marie A. Mattox, P.A. at 310 East Bradford Road, Tallahassee, Florida 32303.

**DELL GRAHAM, P.A.**

David M. Delany (Trial Counsel)
Florida Bar No.: 121060
ddelaney@dellgraham.com
Jamie Lynn Shideler
Florida Bar No.: 100018
jshideler@dellgraham.com
203 N.E. First Street
Gainesville, FL 32601
Telephone: (352) 372-4381
Facsimile: (352) 376-7415
Attorneys for Defendant

20

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KIM L. HARRIS,

      Plaintiff,                       CASE NO.:      4:13-CV-171-RH/CAS

v.

TAYLOR COUNTY SCHOOL DISTRICT,

      Defendant.

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
## INCORPORATED MEMORANDUM OF LAW
## INDEX OF EXHIBITS

| | |
|---|---|
| Affidavit of Mary Asher | EXHIBIT A |
| Affidavit of James Brannan | EXHIBIT B |
| Affidavit of George Clayton | EXHIBIT C |
| Affidavit of Patricia Hoffman | EXHIBIT D |
| Affidavit of Deborah Little | EXHIBIT E |
| Affidavit of John McKay, Ph.D. | EXHIBIT F |
| Affirmative Action Complaint directed at TTI, 11/8/11 | EXHIBIT G |
| ALJ's Opinion (Social Security Administration),  10/29/10 | EXHIBIT H |
| Answers to Interrogatories, 7/5/13 | EXHIBIT I |
| Apalachee Center Progress Notes (excerpts) | EXHIBIT J |
| Deposition transcript (excerpts) of Wilhelmenia Blue, 12/4/13 | EXHIBIT K |
| Deposition transcript (excerpts) of Phillip Cushman, M.D., 1/10/14 | EXHIBIT L |
| Deposition transcript (excerpts) of Devera Eakins, 12/4/13 | EXHIBIT M |

| | |
|---|---|
| Deposition transcript (excerpts) of Plaintiff, 9/13/13 | EXHIBIT N |
| Deposition transcript (excerpts) of Plaintiff, 10/25/13 | EXHIBIT O |
| Deposition transcript (excerpts) of Tabitha Murphy, 1/7/14 | EXHIBIT P |
| Deposition transcript (excerpts) of La'Untrice Simmons, 1/7/14 | EXHIBIT Q |
| Policies (excerpts) from Taylor Technical Institute's Course Catalog and Student Handbook for the 2011-2012 School Year | EXHIBIT R |
| Response to Plaintiff's Affirmative Action Complaint, 12/8/11 | EXHIBIT S |
| Vocational Rehabilitation Case Notes | EXHIBIT T |

# EXHIBIT

# A

## AFFIDAVIT OF MARY ASHER

STATE OF FLORIDA

COUNTY OF TAYLOR

BEFORE ME, the undersigned notary public, duly commissioned and qualified in the aforesaid state, personally came and appeared, MARY ASHER, who, after being duly sworn, deposes and states as follows:

1.     My name is Mary Asher.  I am a resident of the State of Florida and, am over the age of 21, and competent to give this Affidavit.

2.     The statements made in this Affidavit are based on my personal knowledge of the facts set forth herein and are true and correct.

3.     I am a white female having American Indian origins.

4.     I have been employed by the Taylor County School Board ("TCSB") since August 1990.  I was employed by the TCSB as a custodian at Taylor Technical Institute ("TTI") during the 2011-2012 school year and was employed in that capacity since July 30, 2010. Effective the 2013-2014 school year, I became the Secretary to Student Services at TTI.

5.     On November 7, 2011, I was working at TTI.  In between my morning and afternoon cleaning duties, I had off-duty break time.  I decided to stop into the cosmetology department to see if one of the students could give me a manicure.  Having a manicure done by TTI cosmetology students during work breaks is permitted by my employer.

6.     When I entered the classroom I asked Debbie Little, the cosmetology instructor, if the students were performing manicures that day.  Ms. Little replied that they were and started to

walk towards the reception desk to check to see which student was next in line to receive a client.

7.     It was determined that Kim Harris, one of the students in the cosmetology program, was up next to receive a client.

8.     While I was waiting by Ms. Little's desk, Kim Harris then made a rude and hostile remark towards me to the effect that I should "take my ass" to empty garbage cans or something instead of making her work.  These statements bothered and upset me.  I was intimidated by Ms. Harris' angry tone and hostile attitude towards me.

9.     I recall that I then began to head towards the door to exit the classroom.  Ms. Little stopped me to ask what had happened.  I relayed to her the statement that was made to me by Ms. Harris and told Ms. Little that I would come back for a manicure another time.

AFFIANT FURTHER SAYETH NAUGHT.

_Mary Asher_
MARY ASHER

STATE OF FLORIDA

COUNTY OF _Taylor_

     I HEREBY CERTIFY      that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, personally appeared Mary Asher, who is personally known to me or who has produced _____ as identification and who execute the foregoing _____, and he acknowledged before me that the matters contained therein are true.

     WITNESS my hand and official seal in the County and State last aforesaid, this _14th_ day of _January_, 2014.

Notary Public
Commission Number:

LEEANN TOMLINSON
Notary Public - State of Florida
My Comm. Expires Jan 24, 2018
Commission # FF 079567

# EXHIBIT B

## AFFIDAVIT OF JAMES BRANNAN

STATE OF FLORIDA

COUNTY OF TAYLOR

BEFORE ME, the undersigned notary public, duly commissioned and qualified in the aforesaid state, personally came and appeared, JAMES BRANNAN, who, after being duly sworn, deposes and states as follows:

1.      My name is James Brannan. I am a resident of the State of Florida and, am over the age of 21, and competent to give this Affidavit.

2.      The statements made in this Affidavit are based on my personal knowledge of the facts set forth herein and are true and correct.

3.      I am a white male.

4.      I was employed by the Taylor County School Board from 1988 to 2012, when I voluntarily retired.  I was the Director of Taylor Technical Institute ("TTI") during the 2011-2012 school year.

5.      I affirm that I am aware of, have read, have complied with, and have enforced throughout the duration of my employment with the TCSB the following policies:

      a.   TCSB Policy No. 2.18 Prohibition of Harassment;

      b.   TCSB Policy No. 2.19 Unlawful Discrimination Prohibited;

      c.   TCSB Policy No. 5.101 Student Bullying and Harassment; and

      d.   TTI's Sexual Harassment Policy.

6.      In addition, I did not witness any violations of these policies by any TTI employee in their dealings with Kim Harris.

7.     On November 7, 2011, I was meeting with TTI's Industry Services Coordinator, George Clayton, in my office when I received a call from cosmetology instructor Debby Little requesting that I come to her classroom to assist with a situation. I asked Mr. Clayton to accompany me and headed to the cosmetology department.

8.     When I arrived, Ms. Little was waiting for me along with TTI Custodian Mary Asher. Ms. Asher relayed to me that while attempting to get a manicure in between her morning and afternoon cleaning duties, there was an incident with cosmetology student Kim Harris. Specifically, Ms. Asher relayed to me that while waiting to receive a manicure; Ms. Harris made a hostile remark towards her to the effect that she should take her ass to empty garbage cans or something instead of making Ms. Harris work. Ms. Asher appeared to be bothered and upset while describing Ms. Harris' remarks to her.

9.     I then requested that Ms. Little ask Ms. Harris to step out of the cosmetology department so Mr. Clayton and I could speak with her. Ms. Little returned to the hallway where I was waiting and informed me that Ms. Harris had told her that if I wanted to speak with her, then I could meet her at her work station. I then entered the classroom, called out Ms. Harris' name and requested that she step into the hallway. Ms. Harris eventually complied with my request.

10.     I asked Ms. Harris what the issue was and Ms. Harris began speaking loudly and with a rude attitude. She began to raise her voice and would not let me, Mr. Clayton, or Ms. Little speak. I recall that Mr. Clayton attempted to calm Ms. Harris down to no avail. There were several nearby classrooms full of students trying to learn. The yelling by Ms. Harris appeared to be interfering with the teaching and learning going on in those nearby classrooms.

11.     As Ms. Harris was continuing to yell, I asked everyone to step outside of the building to prevent further disruptions to other classes in the building. Once outside, Ms. Harris remained very loud and argumentative.

12.     When I was able to ask Kim about the statement she purportedly made to TTI Custodian Ms. Asher, Ms. Harris denied it while using aggressive body language, including waiving her arms up in the air.

13.     Ms. Harris continued to make loud and unfounded statements such as accusing Ms. Little of being a racist. Ms. Harris then tried to deny that she had made that statement moments prior. Mr. Clayton corrected Ms. Harris and let her know that we all had heard the statement she made. Nevertheless, Ms. Harris retracted what she had said and confirmed she did not feel that Ms. Little treated her unfairly.

14.     I reminded Ms. Harris that TTI would not tolerate this type of behavior from its students. Mr. Clayton advised Ms. Harris that if she wanted to remain in class, she would have to follow TTI rules and respect her teacher. However, Ms. Harris was unable to accept this discipline action and continued to remain loud and disruptive.

15.     Ms. Little informed me at that time that she has had problems with Ms. Harris throughout the duration of the program and that on occasions she felt threatened by Ms. Harris' aggressive behavior.

16.     At that point, I made the decision that Ms. Harris would be dropped from the cosmetology program due to her rude and disruptive behavior. I invited her to participate in another program at TTI and Ms. Harris declined my offer.

17.     I then asked Ms. Harris to retrieve her belongings and exit the building. I allowed Ms. Harris to take with her the school provided supplies.

18.     During the first week of each school year, a school-wide assembly is conducted where the administrative team is introduced and students are reminded that they are to conduct themselves as adults in a professional working environment. Further, every student is provided with

a Handbook and Course Catalog upon enrollment which they are to read and sign that they have received and read same.

19.     All the students, including Ms. Harris, are reminded that failure to adhere to proper conduct will result in a student being withdrawn from their respective program.

20.     The Rules of Conduct contained within the Student Handbook provide that "profanity and rudeness" will not be allowed.  In addition, the Handbook also states that the campus Administrator has the authority to remove an adult student for behaviors or acts "that endanger students, staff, and/or faculty, or other inappropriate actions as determined by the administration."

21.     Based on the foregoing rules of conduct and the disruptive behavior displayed by Ms. Harris, I made the decision to dismiss Ms. Harris from the program.

22.     The November 2001 incident was not Ms. Harris' first behavior problem at TTI.  I met Ms. Harris when she was first enrolled in TTI's cosmetology program during the 2009-2010 school year.  On October 13, 2009, I responded to a disruptive behavior incident in the hallway.  On that date, Ms. Harris had threatened to beat a girl's "mother fucking ass" because she had bumped into Ms. Harris in the hallway.  At that time, I informed Ms. Harris that this type of behavior would not be accepted at TTI.  Since this was Ms. Harris' first incident, I decided only to reprimand her, and not to remove her from the program.  The following date, October 14, 2009, Ms. Harris was involved in a motor vehicle accident and therefore no longer able to complete the program that year.  I extended an invitation to her to return to school as soon as she was physically able.

23.     Ms. Harris re-enrolled in the cosmetology program for the 2011-2012 school year, and was credited the salon hours that she had completed during her prior 2009 enrollment.

24.     With regard to the incident occurring on November 7, 2011, it was my opinion as the TTI Director that Ms. Harris' rude, unprofessional, and aggressive behavior was a gross violation of TTI's code of conduct.  After observing Ms. Harris' behavior on November 7, 2011, I had a clear

understanding as to why Ms. Little expressed that she was in fear of this student and knew that it warranted dismissal from the cosmetology program for no reason other than Ms. Harris' own actions and behavior.

AFFIANT FURTHER SAYETH NAUGHT.

JAMES BRANNAN

STATE OF FLORIDA

COUNTY OF _Taylor_

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, personally appeared James Brannan, who is personally known to me or who has produced _Known to me_ as identification and who execute the foregoing _____, and he acknowledged before me that the matters contained therein are true.

WITNESS my hand and official seal in the County and State last aforesaid, this _31_ day of _January_, 2014.

Notary Public
Commission Number:
EE 009954
exp. July 13, 2014

CHRIS B. OLSON
Commission # EE 009954
Expires July 13, 2014
Bonded Thru Troy Fain Insurance 800-385-7019

# EXHIBIT

# C

### AFFIDAVIT OF GEORGE CLAYTON

STATE OF FLORIDA

COUNTY OF TAYLOR

BEFORE ME, the undersigned notary public, duly commissioned and qualified in the aforesaid state, personally came and appeared, GEORGE CLAYTON, who, after being duly sworn, deposes and states as follows:

1.      My name is George Clayton. I am a resident of the State of Florida and, am over the age of 21, and competent to give this Affidavit.

2.      The statements made in this Affidavit are based on my personal knowledge of the facts set forth herein and are true and correct.

3.      I am an African-American male.

4.      I was the Industry Services Coordinator at the Taylor Technical Institute during the 2011-2012 school year. I was employed by the Taylor County School Board from November 1978 to _6/18/2013_

5.      I affirm that I am aware of, have read, have complied with, and have enforced throughout the duration of my employment with the TCSB the following policies:

        a.   TCSB Policy No. 2.18 Prohibition of Harassment;

        b.   TCSB Policy No. 2.19 Unlawful Discrimination Prohibited;

        c.   TCSB Policy No. 5.101 Student Bullying and Harassment; and

        d.   TTI's Sexual Harassment Policy.

6.      In particular, I did not witness any violations of these policies by any TTI employee in their dealings with Kim Harris.

7.     On November 7, 2011, I was meeting with TTI's Director, James Brannan, in his office when he received a call from cosmetology instructor Debbie Little, requesting that he come to the cosmetology department to assist with a situation.  Mr. Brannan asked me to accompany him and we headed to the cosmetology department.

8.     When we arrived, Ms. Little was waiting for us, along with TTI Custodian, Mary Asher.  Ms. Asher relayed to us that while attempting to get a manicure in between her morning and afternoon cleaning duties, there was an incident with cosmetology student, Kim Harris. Specifically, Ms. Asher relayed that while waiting to receive a manicure; Ms. Harris made a hostile remark towards her, something to the effect that she should take her ass to empty garbage cans or something instead of making Ms. Harris work.

9.     Mr. Brannan then requested that Ms. Little ask Ms. Harris to step out of the cosmetology department so we could speak with her.  Ms. Little returned to the hallway and informed us that Ms. Harris had told her that if Mr. Brannan wanted to speak with her, then he could meet her at her work station.  Mr. Brannan then entered the classroom, called out Ms. Harris' name and requested that she step into the hallway.  Ms. Harris complied with his request.

10.     Mr. Brannan asked Ms. Harris what the issue was and she began speaking loudly and with an uncooperative attitude.  She began to raise her voice and would not let me, Mr. Brannan, or Ms. Little speak.

11.     I asked Ms. Harris to give Ms. Little a chance to finish speaking and told her that she would be given the same opportunity.  However, I was unsuccessful in my attempts to prevent Ms. Harris from speaking over Ms. Little and Mr. Brannan.  Ms. Harris was yelling at myself, Mr. Brannan, and Ms. Little in the hallway.  Ms. Harris was disturbing several other occupied classrooms with her loud voice.

12.     I then asked Mr. Brannan and Ms. Little to give Ms. Harris a chance to speak.

13.     As Ms. Harris was continuing to yell, Mr. Brannan asked everyone to step outside of the building to prevent further disruption to other classes in the building. Once outside, Ms. Harris remained very loud and argumentative. Ms. Little came with us, and she had to leave her class unsupervised and without instruction to continue to deal with this situation with Ms. Harris.

14.     When Mr. Brannan was able to ask Ms. Harris about the statement she purportedly made to TTI Custodian, Ms. Asher, Ms. Harris denied it while using aggressive body language, including waiving her arms up in the air.

15.     Mr. Brannan reminded Ms. Harris that TTI would not tolerate this type of behavior from its students.

16.     Ms. Harris continued to make loud and unfounded statements such as accusing Ms. Little of being a racist. Ms. Harris then tried to deny that she had made that statement moments prior. I corrected Ms. Harris and let her know that we all had heard the statement she made. Nevertheless, Ms. Harris retracted what she had said and confirmed she did not feel that Ms. Little treated her unfairly.

17.     I advised Ms. Harris that if she wanted to remain in class, she would have to follow TTI rules and respect her teacher. However, Ms. Harris was unable to accept this discipline action and continued to remain loud and disruptive.

18.     At that point, Mr. Brannan made the decision that Ms. Harris would be dropped from the cosmetology program due to her rude and disruptive behavior. He invited her to participate in another program at TTI and Ms. Harris declined his offer.

19.     Mr. Brannan then asked Ms. Harris to retrieve her belongings and exit the building.

AFFIANT FURTHER SAYETH NAUGHT.

GEORGE CLAYTON

STATE OF FLORIDA

COUNTY OF _Taylor_

    I HEREBY CERTIFY    that on this day, before me, an officer duly authorized in

the State aforesaid and in the County aforesaid to take acknowledgments, personally appeared

George Clayton, who is personally known to me or who has produced _Known to me_

as identification and who execute the foregoing _____, and he acknowledged

before me that the matters contained therein are true.

    WITNESS my hand and official seal in the County and State last aforesaid, this _21_

day of _January_, 2014.

_Chris Olson_

Notary Public
Commission Number:

CHRIS B. OLSON
Commission # EE 009954
Expires July 19, 2014
Bonded Thru Troy Fain Insurance 800-385-7019

EXHIBIT

D

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KIM L. HARRIS,

     Plaintiff,

vs.                            Civil Action No. 4:13-CV-171-RH/CAS

TAYLOR COUNTY SCHOOL DISTRICT

     Defendant.

_____/

## AFFIDAVIT OF PATRICIA RATLIFF-~~HUFFMAN~~ Huffman

STATE OF FLORIDA

COUNTY OF _Taylor_

     BEFORE ME, the undersigned notary public, duly commissioned and qualified in the aforesaid state, personally came and appeared, PATRICIA RATLIFF-HUFFMAN, who, after being duly sworn, deposes and states as follows:

1.     My name is Patricia Ratliff-Huffman. I am a resident of the state of Florida and, am over the age of 21, and competent to give this Affidavit.

2.     The statements made in this Affidavit are based on my personal knowledge of the facts set forth herein and are true and correct.

3.     I was a student enrolled in Taylor Technical Institute's ("TTI") Cosmetology Program in the fall of 2011. Kim Harris was also a student in the same program with me.

4.     During my time in the cosmetology program, I did not witness any discrimination based on race or disability by any of TTI's employees.

5.     During my time in the cosmetology program, I did not witness any TTI employees including instructor Ms. Little express favoritism towards white students over black students.

6. During my time in the cosmetology program, I did not witness any TTI employees including instructor Ms. Little express favoritism towards non-diabled students over disabled students.

7. Ms. Little made accommodations for Kim Harris as needed to accommodate her medical conditions. I witnessed Ms. Little allow Kim Harris to sit or take breaks as needed while in the classroom to accommodate her.

8.

AFFIANT FURTHER SAYETH NAUGHT.

PATRICIA RATLIFF-HUFFMAN

STATE OF FLORIDA

COUNTY OF _____Taylor_____

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, personally appeared Patricia Ratliff-Huffman, who is personally known to me or who has produced _____ as identification and who execute the foregoing _____, and he acknowledged before me that the matters contained therein are true.

WITNESS my hand and official seal in the County and State last aforesaid, this _____ day of _____, 2013.

_____
Notary Public
Commission Number:

*[handwritten]* There was a fight that occured with Devra Eakins and Amy Drce and no displincey actn was made.

*[signature]* Patricia Ratfl

# EXHIBIT E

## AFFIDAVIT OF DEBORAH LITTLE

STATE OF FLORIDA

COUNTY OF TAYLOR

BEFORE ME, the undersigned notary public, duly commissioned and qualified in the aforesaid state, personally came and appeared, DEBORAH LITTLE, who, after being duly sworn, deposes and states as follows:

1.    My name is Deborah Little. I am a resident of the State of Florida and, am over the age of 21, and competent to give this Affidavit.

2.    The statements made in this Affidavit are based on my personal knowledge of the facts set forth herein and are true and correct.

3.    I am a white female.

4.    I have been employed by the Taylor County School Board ("TCSB") as the Cosmetology Instructor at Taylor Technical Institute ("TTI") since the 2004-2005 school year.

5.    I was Ms. Harris' Cosmetology Instructor during the 2011-2012 school year.

6.    I affirm that I am aware of, have read, have complied with, and have enforced throughout the duration of my employment with the TCSB the following policies:

      a.   TCSB Policy No. 2.18 Prohibition of Harassment;

      b.   TCSB Policy No. 2.19 Unlawful Discrimination Prohibited;

      c.   TCSB Policy No. 5.101 Student Bullying and Harassment; and

      d.   TTI's Sexual Harassment Policy.

7.    In particular, I did not witness any violations of these policies by any TTI employee in their dealings with Kim Harris.  I also complied with these policies at all times when Kim Harris was a student at TTI.

8.    Kim Harris first enrolled in the TTI cosmetology program during the 2009-2010 school year.  However, on October 14, 2009, Ms. Harris was involved in a motor vehicle accident and was unable to complete the program then.

9.    Ms. Harris re-enrolled in the cosmetology program for the 2011-2012 school year, and was credited the salon hours that she had completed during her prior 2009 enrollment.

10.    The injuries that Ms. Harris sustained from the motor vehicle accident in 2009 left her unable to stand for extended periods of time in class, caused her difficulty walking, and required the Florida Department of Vocational Rehabilitation to assist Ms. Harris with workstation and other necessary accommodations that she would need to complete the cosmetology program.

11.    I also provided additional accommodations to Ms. Harris to help her fully and successfully participate in the program including:

a.  Ms. Harris' cosmetology kit was incomplete when she returned to the program for the 2011-2012 school year.  I retrieved the missing items from TTI's storage and provided her with numerous supplies so she would not have to purchase them.  The total cost of the missing items that I supplied to Ms. Harris was approximately $400.00.

b.  I was always willing to work with Ms. Harris around her medical appointments and allowed her to attend them as scheduled as long as she completed the required classwork that was assigned to her

c. During fire drills, I allowed Ms. Harris to sit at the gazebo instead of walking across the street (as required) due to her having difficulties and discomfort walking.

d. When Ms. Harris expressed that she was having trouble walking, I allowed Ms. Harris to utilize the school wheelchair. In addition, I often permitted other students, including fellow-student, Amy Dice, to assist Ms. Harris by pushing her in the wheelchair.

e. When Ms. Harris expressed that she was having difficulty standing for any period of time during the clinic portion of our program, I allowed her to sit.

f. When Ms. Harris needed products, towels, or other salon materials, I often allowed other students to go and get her whatever she needed in order to allow her to remain seated.

12.    Ms. Harris expressed to me over the course of her enrollment in the program that she had numerous personal issues. I was always supportive of Ms. Harris and encouraged her success in the program.

13.    At one point, Ms. Harris expressed to me that she felt a female client, who was waiting for services in the salon area, was racist because the client did not speak to Ms. Harris, but spoke to others. I quickly addressed Ms. Harris' concerns and spoke with this particular client to resolve any issue. The client informed me that she had simply said hello as the students entered and was not racist or unfriendly to any person. I determined that no further action needed to be taken. Notwithstanding my efforts to work with Ms. Harris so that she could be successful in the cosmetology program, she often displayed a negative attitude and made verbal outbursts in the classroom. She would use aggressive language that made other students, clients, and myself uncomfortable. I felt on occasion threatened by Ms. Harris.

14.     Uncertainty regarding whether Ms. Harris would be angry, upset, or happy from day to day constantly loomed over the classroom causing an uneasy feeling amongst myself and my students

15.     TTI is an adult center and therefore I am responsible for preparing my students for employment upon completion of the program.  In order to do this, there are two aspects of the Cosmetology Program, a classroom lecture and a clinic portion.  During the clinic portion of our lesson, the TTI salon area is open to clients.  This caused an extremely difficult position for me as an instructor because I had to read Ms. Harris' mood on a daily basis while also ensuring that my clients were happy with the services being performed.  It wasn't uncommon for Ms. Harris to decline the opportunity to perform services on a client when it was her turn, or be unable to perform the required services all together due to her physical disability.  Nevertheless, I and TTI continued to work with Ms. Harris through the duration of the program and encouraged her success.

16.     Ms. Harris was often willing to perform services for clients with whom she was friendly and decline or cause an issue about performing services on clients whom she did not know or did not wish to service.  Further, all services that were performed by Ms. Harris required assistance from fellow students or myself.  I explained to Ms. Harris many times that this kind of conduct would not be acceptable in the working world outside of school.

17.     Around 2:00 p.m. on November 3, 2011, when my students were supposed to be in class, I noticed that Ms. Harris and a fellow student were not present.  I asked the class if they had seen either of them and no one knew where they were.  I preceded the check the hallway and then the parking lot for Ms. Harris' truck.  When I did not see Ms. Harris' vehicle in the parking

lot, I clocked both Ms. Harris and the other student out of class using our time card punch system so that their attendance for the day would reflect that they were not present at 2:00 p.m.

18.     I was later informed by another student, Amy Dice, that Ms. Harris had asked her to clock Ms. Harris out of class at 3:30 p.m. that day.

19.     Each day, the students are to clock in and out using the time clock punch system. I always made it very clear to my students on numerous occasions that they are supposed to clock themselves in and out of class in order for me to accurately track their completed hours in the program. I have also instructed the class that if there is an inaccuracy on a time card, then they are to come directly to me and ask me to change it. They are not permitted to change it on their own.

20.     Later that afternoon, I gathered the time cards during my office hours to review the students' attendance records. I also noted that Ms. Harris had scratched through the stamped time and written over the time clock records, making it very difficult to read her time card and confirm her attendance time for Monday through Thursday of that week. I wrote on Ms. Harris' time card a reminder for her to clock in and out using the punch system.

21.     On Friday, November 4, 2011, when Ms. Harris arrived to class and noticed that I has clocked her out for 2:00 p.m. the previous say she approached me in the hallway asking "why did you clock me out at 2:00 p.m., you know I was here until 2:20 p.m." I responded to Ms. Harris that she was not here on campus so she was clocked out but that we could address the situation later. Ms. Harris refused to drop the issue and continued to press me on this issue as we walked into the classroom. Once in the classroom, Ms. Harris continued to repeatedly ask why I had clocked her out. It was a normal occurrence for Ms. Harris to challenge my authority in front of the entire classroom. I had attempted to deflect this issue until after class without success.

Therefore, I told Ms. Harris that I had clocked her out after confirming that she was not on campus and told her that I was informed about her plan to have another student clock her out at 3:30 p.m.

22.     Ms. Harris became very argumentative and began using threatening body language such as waiving her hands and going from the sitting to standing position numerous times while speaking loudly to me. At that point, another cosmetology student, Devera Eakins, went to look for help to calm the quickly escalating situation. Mr. Lewis arrived at the classroom, but by that time things had calmed down. Ms. Lewis remained in the classroom until class was dismissed as usual that day.

23.     The entire lecture was disrupted that day and Ms. Harris was angry for the remainder of the class time, creating a very uncomfortable learning environment. I was later informed by many students that they were afraid for me and that they felt as though Ms. Harris was disrupting their education with the constant arguing and unpleasant attitude.

24.     As a result of the time clock incident and Ms. Harris' response, I completed a School Discipline Referral to document Ms. Harris' failure to follow the rules and her disruptive behavior. I also completed a Student Incident Report to document the situation that occurred. The Discipline Referral and Incident Report as attached hereto as Exhibit A.

25.     On Monday, November 7, 2011, Ms. Harris reported to class as usual to take a scheduled exam. At some point during that class period I noticed again that Ms. Harris was not present and did not inform me that she was leaving. However, I believe she may have gone to attend a doctor's appointment because she returned a little later.

26.     Shortly after Ms. Harris returned that day, TTI Custodian Mary Asher entered the cosmetology area and approached me at my desk and asked if she could receive a manicure. I

then walked towards the reception desk to check to see which student was next in line to receive a client. Ms. Harris was next in line.

27.    While I was at the reception area, checking to see which student was next, Ms. Harris made a hostile remark towards Ms. Asher, something to the effect that Ms. Asher should take her ass to empty garbage cans or something instead of making Ms. Harris work. I did not hear this statement, however, I was quickly informed by Ms. Asher of what Ms. Harris had said.

28.    By the time I turned around to walk back to Ms. Asher, she had already begun walking towards the exit. I stopped her to ask her where she was going and Ms. Asher relayed to me what had happened. I informed Kim that her comment was inappropriate and that she did not have the right to talk to any of my students, staff, or clients like that. At that point, I telephoned TTI Director, Mr. Jim Brannan, to come to the cosmetology area. Shortly thereafter, Mr. Brannan and TTI Industry Services Coordinator, George Clayton, arrived.

29.    Mr. Brannan and Mr. Clayton were informed of the statement that was made and Mr. Brannan requested that I ask Ms. Harris to step out of the cosmetology area so he could speak with her. I did as Mr. Brannan asked and was told by Ms. Harris that if Mr. Brannan wanted to speak with her, then he could meet her at her work station. I relayed the information to Mr. Brannan who then entered the cosmetology area, called out Ms. Harris' name and requested that she step into the hallway. Ms. Harris eventually complied with his request.

30.    Mr. Brannan proceeded to ask Ms. Harris what the issue was in an attempt to address the situation. Ms. Harris began speaking loudly and with a disrespectful, argumentative attitude. She began to raise her voice and would not let me, Mr. Clayton, or Mr. Brannan speak. I recall that Mr. Clayton attempted to calm Ms. Harris with no avail. Ms. Harris was disturbing the other classes nearby.

31.    Because Ms. Harris was continuing to yell, Mr. Brannan asked everyone to step outside of the building to prevent further disruptions to other classes in the building.  Once outside, Ms. Harris remained very loud and argumentative.

32.    When Mr. Brannan was able to ask Kim about the statement she purportedly made to TTI Custodian, Ms. Asher, Ms. Harris denied it while using aggressive body language, including waiving her arms up in the air.  I asked Ms. Harris why she had written all over her time card in ink.  Ms. Harris offered no explanation, but remained unable to accept this discipline action and continued to remain loud and disruptive.

33.    Ms. Harris continued to make loud and unfounded statements such as accusing me of being a racist.  Ms. Harris then tried to deny that she had made that statement moments prior.  Mr. Clayton then corrected Ms. Harris and let her know that we all had heard the statement she made.  Nevertheless, Ms. Harris retracted what she had said and confirmed she did not feel that I treated her unfairly.

34.    At this time, I informed Mr. Brannan that I had been having problems with Ms. Harris throughout the duration of the program and that on occasion I felt threatened by Ms. Harris' aggressive and erratic behavior.  I also informed him about the incident that occurred on Friday, November 4, 2011, and the disruption that Ms. Harris caused in the classroom.

35.    Ultimately, Mr. Brannan made the decision that Ms. Harris would be dropped from the cosmetology program due to her rude and disruptive behavior.  He invited her to participate in another program at TTI and Ms. Harris declined his offer.

36.    Mr. Brannan then asked Ms. Harris to retrieve her belongings from the classroom and exit the building.

37.    We allowed Ms. Harris to take the school provided supplies with her.

01/15/2014  15:00     8508382546              TAYLOR TECH                    PAGE  10/10

AFFIANT FURTHER SAYETH NAUGHT.

DEBORAH LITTLE

STATE OF FLORIDA

COUNTY OF _Taylor_

   I HEREBY CERTIFY       that on this day, before me, an officer duly authorized in
the State aforesaid and in the County aforesaid to take acknowledgments, personally appeared
_Deborah Little_, who is personally known to me or who has produced _____ as
identification and who execute the foregoing _____, and he acknowledged
before me that the matters contained therein are true.

   WITNESS my hand and official seal in the County and State last aforesaid, this _15th_
day of _January_, 2014.

Notary Public
Commission Number:

LEEANN TOMLINSON
MY COMMISSION # DD 854748
EXPIRES: January 24, 2014
Bonded Thru Notary Public Underwriters

*aigned*
*and to*
*(WPO)*
*Kim*
*11/10/11*

| Taylor County School Discipline Referral |
|---|
| Taylor Technical Institute |

Student's Name __Kim Harris__   Referred by __Debbie Little__ Date __11/4/11__

**Category (Circle Offense)**
1. Disruptive Behavior
2. Failure to follow rules
3. Horseplay
4. Inappropriate display of Affection
5. Dress code violations
6. Tardy
7. Wandering Halls/campus
8. Wearing Symbols/ Not adhering to dress code
9.
10.
11.
12.
13.
14.
15.

**Category II**
Cheating
Defacing school property
Disrespectful speech/action
Cellular phone
Insubordination
Leaving class/school WO permission
Skipping class
Profanity, Obscene language
Gambling
Stealing

**Category III**
ARS   Arson
BAT   Battery
BHA   Bullying/Harassment
DOC   Maj Disruption on Campus-
FIT   Fighting
WPO   Weapons Possession
BC   Tobacco
SXH   Sexual Harassment
SXB   Sexual Battery
SXO   Sexual Offense
VAN   Vandalism
ALC   Alcohol
DRU   Drug Possession and or Use-
TRE   Threat/Intimidation-
Other

Comments __Kim is not following time card procedures. She became loud and disruptive when I tried to talk to her about her time. She was confrontational and I, as well as the other students in the class felt threatened. I had to seek assistance and im.__

Action Taken: __Lewis came down to help__

Suspension (O): Number of Days ____ From _____ Through _____ Return on _____

Recommendation Expulsion (E) ____ Student Conference(S) ____ Parent Conference (V) _____

Other _____

Action Taken By _____   Date __11/2/11__

Student Signature _____ Date _____ TCBS#0809- 4

__Kim was dropped from class D.__
__Kim was given the opportunity to enroll in another program.__

EXHIBIT
A
TCSB0...

Taylor Technical Institute--Student Incident Report

1. Names: _Kim Harris_, ▮▮▮▮▮▮▮▮▮▮

2. Department of Study: _Cosmetology_

3. Date of Incident: _11/4/11_

4. Location of Incident: _Classroom D Building (TTI)_

5. Explanation of Incident (What happened? Why? What action was taken?): _Kim and_ ▮▮▮▮▮▮ _became very loud and disruptive when told to clock in and out each day. Kim had someone clock her out th. Class and myself_

6. Property Damaged Estimated Value: _became afraid of what was going to happen._ ▮▮▮▮▮▮ _went to front to get help with situation. I had called Mr Dunkle, Mr B and MrC. for back up. Ms Lewis came down and watched the class_

7. Name and addresses of witnesses: _for a few minutes. Several students came to me th. after class and said they feel their learning is being disrupted daily by these students._

| | |
|---|---|
| Student Signature | Date |
| Student Signature | Date |
| Student Signature | Date |

TCSB000943

# EXHIBIT F

**AFFIDAVIT OF JOHN K. MCKAY, PH.D.**

STATE OF FLORIDA

COUNTY OF _Leon_

Before me, the undersigned notary public, duly commissioned and qualified in the aforesaid state, personally came and appeared, John K. McKay, Ph.D., who being duly sworn under oath on this date, did state as follows:

1.      My name is John K. McKay. I am a resident of the state of Florida and am over the age of 21, and competent to give this Affidavit.

2.      The statements made in this Affidavit are based on my personal knowledge of the facts set forth herein and are true and correct.

3.      I have owned the private practice of McKay & Associates and have been an independent rehabilitation consultant since 1980. I am licensed by the State of Florida as a Psychologist, and I am a Certified Rehabilitation Counselor. A copy of my professional resume is attached to the Affidavit as Exhibit "A" and incorporated by reference herein.

4.      I have been retained by the Taylor County School Board (the "School Board") to submit an Expert Report pursuant to Fla. R. Civ. P. 26(a)(B).

5.      My Expert Report was submitted to Defendant in accordance with the Federal Rules of Civil Procedure on September 17, 2013.

6.      A true and correct copy of my Expert Report dated September 17, 2013, is attached hereto as Exhibit "B" and incorporated by reference herein.

AFFIANT FURTHER SAYETH NAUGHT.

John K. McKay, Ph.D.

STATE OF FLORIDA

COUNTY OF _Leon_____

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, personally appeared John K. McKay, who is personally known to me or who has produced _____ as identification and who executed the foregoing Affidavit, and she acknowledged before me that the matters contained therein are true.

WITNESS my hand and official seal in the County and State last aforesaid, this _13th_ day of _January_____ 2014.

_Marian Wagner_____

Notary Public
Commission Number:

MARIAN WAGNER
Commission # EE 135259
Expires October 21, 2015
Bonded Thru Troy Fain Insurance 800-385-7019

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KIM L. HARRIS,

      Plaintiff,

vs.                            Civil Action No. 4:13-CV-171-RH/CAS

TAYLOR COUNTY SCHOOL DISTRICT

      Defendant.

_____/

## EXPERT REPORT OF JOHN K. MCKAY, PH.D.

**Prepared for:**

**David M. Delaney, Esq.**
**Attorney for Defendant**
**Dell Graham, P.A.**
**203 NE 1st Street**
**Gainesville, FL 32601**


EXHIBIT
A

The facts or data considered by the witness in forming these opinions:

| 1. | Plaintiff's Complaint | 4/1/13 |
|---|---|---|
| 2. | Defendant Taylor County School Board's Answer to Plaintiff's Complaint | 5/13/13 |
| 3. | Plaintiff's Amended Complaint (to include a more definite statement) | 6/21/13 |
| 4. | Defendant Taylor County School Board's Answer to Plaintiff's Amended Complaint | 7/12/13 |
| 5. | Plaintiff's Rule 26(a)(1) Initial Disclosures | 7/16/13 |
| 6. | Plaintiff's Answers to Interrogatories | 7/5/13 |
| 7. | Plaintiff's Response to Request for Production with supporting documents | 7/5/13 |
| 8. | Taylor Technical Institute Cosmetology Brochure | |
| 9. | Florida Department of Education curriculum Frameworks for Cosmetology 2011-2012 SY | |
| 10. | Taylor County School Board Policy No. 2.18 – Prohibition of Harassment | |
| 11. | Taylor County School Board Policy No. 2.19 – Unlawful Discrimination Prohibited | |
| 12. | Taylor County School Board Policy No. 5.101 – Student Bullying and Harassment | |
| 13. | Taylor County School Board Policy No. 7.34 – Staff Training | |
| 14. | Taylor Technical Institute Student Handbook and Course Catalog 2011-2012 SY | |
| 15. | Plaintiff's Pell Grant file from Taylor Technical Institute | |
| 16. | Plaintiff's Academic File for the 2011-2012 SY | |

| 17. | Plaintiff's Academic File for the 2009-2010 SY | |
| 18. | FDLE Criminal History Report for Kim Harris | |
| 19. | Perry Police Department Offense-Incident Reports (7) | |
| 20. | Judgments entered against Kim Harris in Taylor County (7) | |
| 21. | Medical Chronology prepared by Dell Graham, P.A. from Plaintiff's medical produced by the Social Security Administration and Tallahassee Orthopaedic Clinic | |

## McKAY AND ASSOCIATES

JOHN K. McKAY, PH.D.

219 DELTA COURT
TALLAHASSEE, FL 32303
**(850) 385-7171**
FAX: (850) 422-1457
E-MAIL: JOHNKMCKAY@EARTHLINK.NET

- *VOCATIONAL EVALUATION*
- *PSYCHOLOGICAL SERVICES*
- *LIFE CARE PLANNING*
- *REHABILITATION COUNSELING*
- *DISABILITY DETERMINATION*

# REHABILITATION REPORT

| | |
|---|---|
| **Regarding:** | **Kim L. Harris** |
| **Date of Birth:** | **April 23, 1973 (40 years, 5 months old)** |
| **Date of Alleged Incident** | **November, 2011** |
| **Claim:** | **Discrimination Based Upon Handicapping Conditions** |
| **Referred By:** | **David M. Delaney, attorney** |
| **Date of Report:** | **September 17, 2013** |

## INTRODUCTION

Kim Harris is a 40 year old, single mother who lives in Perry, Florida. She was born, raised, and educated in Taylor County. Ms. Harris is a high school graduate with a modest work history that is mostly composed of unskilled food service or production occupations. Her history includes considerable difficulties with substance abuse, affective disorders, antisocial behaviors, brief incarcerations, and angry interpersonal conflicts. She has struggled with mental health issues throughout her life. A long list of diagnostic labels have been used intermittently to describe her mental health symptoms as they evolved over time. Apparently psychotropic and antipsychotic medications have not been fully effective to control her various symptoms. Ms. Harris was born with a left shoulder deformity which caused her much unwanted attention throughout her life. She also has chronic asthma. Finally, she acquired impairments to her pelvis, legs, and lower extremities during a motor vehicle accident on October 14, 2009. In essence, she is an individual with multiple nonexertional and exertional impairments that are well-documented.

Kim Harris, with the support of the Florida Division of Vocational Rehabilitation (Florida DVR) enrolled at the Taylor Technical Institute in Perry, Florida, in August, 2011. Ms. Harris was enrolled in the cosmetology program for approximately three months when she was dismissed for a variety of reasons. She is now in litigation, claiming discrimination based upon a handicapping condition or disability. Her allegations include emotional injury, lost earnings, and loss of capacity to enjoy life, among other areas of loss.

The purpose of this report is to look at the totality of Ms. Harris' background to determine if she indeed was a suitable candidate for training in cosmetology at Taylor Technical Institute. Furthermore, I have been asked to evaluate her potential for training, skill development, and potential success as a cosmetologist. This assessment would include investigation of her educational development, skill acquisition, exertional capacities, and the impact upon her potential by both congenital and acquired impairments. Such impairments would include both

1

Rehabilitation Report
Re: Kim Harris
September 17, 2013

physical and nonexertional impairments. Physical impairments would be composed of multiple orthopedic injuries, malformed congenital shoulder impairment, asthma, and other conditions. Nonexertional impairments would include mental impairments, personality disorders, substance abuse, addictive disorders, history of criminality, and persistent behavioral problems. All of these factors can adversely impact upon vocational training, skill development, and potential employment.

A very substantial file has been reviewed regarding Ms. Harris. The opinions expressed in this report are largely based upon reviewing her history as documented in the file. The current file mateirals list will be supplemented by additional materials as they become available. Furthermore, this report is predicated upon my professional training and experience as set forth in the attached resume'. I am a Certified Rehabilitation Counselor (CRC #00055932, licensed psychologist (FL PY 0003015) and Vocational Expert professionally employed in the field of rehabilitation since 1974. I hold a Doctorate in Rehabilitation Services and Counseling Psychology (Florida State University, 1979) and have been actively engaged in continuing education in my field since that time. Opinions expressed in this report are predicated upon my education, professional experience, and expert judgments.

## I.  EDUCATIONAL BACKGROUND

Ms. Harris graduated from Taylor County High School in 1992. She attests that she never enrolled in any ESE classes. Presumably she was a regular diploma student who graduated at age 19-years-old which would likely be with her chronological peers. In 1997 she first enrolled at the Taylor Technical Institute in a nursing program (Patient Care Technician). Information gleaned from a psychological report (7/30/05) by Nina Barnes, Ph.D., clinical psychologist, indicates that Ms. Harris dropped out of the program due to substance abuse or addiction at that time. I do not know if she was enrolled long enough to obtain any grades and produce a transcript of her studies. She was not able to complete the program due to her behavioral problems and chemical dependency.

Ms. Harris enrolled yet again at Taylor Technical Institute in the cosmetology program on August 22, 2011. She was awarded a Pell Grant of $2,269.33 and was supported by the Florida Division of Vocational Rehabilitation. It is not clear how the determination was made to support her as a cosmetologist, considering the social and physical demands of the occupation. Ms. Harris was enrolled for only about three months prior to her departure from the program.

Ms. Harris has not subsequently enrolled in any other educational or technical programs to enhance her employability. She does claim lost earnings, but I am unable to discern whether or not she has made any effort whatsoever towards mitigation of that loss by alternative training or job seeking. In that she has been deemed permanently and totally disabled, she is under no obligation to seek work by the Social Security Administration or any other agency.

Rehabilitation Report
Re: Kim Harris
September 17, 2013

## II.    WORK HISTORY

There is no detailed information regarding her work history. An Adult Disability Report completed with her application for Social Security Disability Insurance (SSDI) on July 23, 2008, provides information of her employment in the 15 years prior to her second claim of disablement. She apparently worked in a variety of fast food restaurants between 1993 and 2008. These positions typically were part-time at low wages. I presume these are unskilled food service occupation typical of the fast food industry. She may have developed some low-level skills toward the bottom of semi-skilled employment. Most food service workers in such positions have limited specific vocational preparation (SVP) and the exertional capacity is typically light, indicating lifting no more than 20 pounds occasionally although there may be frequent standing and walking. Ms. Harris listed her job of longest tenure as with a potato chip producer in Perry (Lance Snack Foods). She was a production worker packaging potato chips while keeping track of production numbers as they bags were mechanically packed. She did operate a machine, but no special technical knowledge was needed. She held that position for approximately 20 months, earning $9.12 per hour in 2007. She described the job as constant standing for eight hours per day, with some walking, climbing, and bending. She had to manipulate both big and small objects with her hands, but there was no carrying, as product was mechanically moved. She described this position as in the light exertional category as well, lifting no more than 20 pounds occasionally and less than 10 pounds frequently. Her description would indicate that the position was relatively devoid of skill development and could likely be performed based upon a brief demonstration or a short interval of vocational preparation.

When Ms. Harris entered the cosmetology program at Taylor Technical Institute in 2011, she was 38-years-old and beginning her first real skill development for future employment. She had been unemployed since 2008.

## III.    MEDICAL & FUNCTIONAL HISTORY

Ms. Harris was born with a congenitally malformed left shoulder and arm. This has caused her considerable emotional distress as well as exertional loss during her entire life. In 2005 a physician described the extremity as having "limited use" but still helpful in light functioning. She is unable to fully straighten the arm and apparently it has always drawn some unwanted attention for which she is very sensitive. At age 32 she complained of right knee pain and loss of function from a fall she had sustained eight years earlier. She was treated by William Henderson, M.D., of the Tallahassee Orthopedic Clinic beginning in 2004. She was found to have a torn anterior cruciate ligament and torn medial meniscus of the right knee, requiring surgery. The procedure also required removal of a bone spur and arthritic development was noted in the knee despite her relatively young age at that time. After the surgery it was determined that she could stand for less than 15 minutes, sit less than 30 minutes, and walk less than 15 minutes. She may have had further improvement regarding her functional capacities after that time, but it is not clearly documented. She did work after that procedure.

Rehabilitation Report
Re: Kim Harris
September 17, 2013

Ms. Harris sustained multiple trauma in an MVA in 2009. She was again treated at TOC, but this time it was Dr. Loucks. She sustained an open right malleolus fracture, Achilles tendon transection, left knee dislocation, and fractured left pelvis. Both ankles were injured. These injuries left her with even greater orthopedic impairment, lower functional capacities, and heightened pain. It was after sustaining the injuries of 2009 that she became an active client of Florida DVR and was sponsored for cosmetologist training and Taylor Technical Institute.

It is notable that Ms. Harris had applied for permanent and total disability benefits as early as 2005, claiming disablement because of her birth defect of her left shoulder and arm as well as the original left knee impairment. Her claim also included mental impairment at that earlier date. The added complaint of the acquired impairments from the 2009 MVA were apparently sufficient for her to ultimately have a Fully Favorable Decision from the Social Security Administration, Office of Disability Adjudication and Review, in a second attempt to obtain benefits. That decision was made on October 29, 2010, ten months prior to entering the cosmetology program.

Ms. Harris had documented limitations of her left upper extremity, right knee, left knee, right foot, right heel, and left pelvis all prior to beginning her training in cosmetology. She also had a history of back pain. It is not clear if the asthma history is germane at all, since she was able to work intermittently with that condition throughout her younger years. Comments on her exertional capacities prior to beginning her cosmetology training would suggest that she was not capable of full-time employment at the light level of exertion. The training itself was in intervals of 3.5 hours with demonstrated lack of standing and endurance capacities by Ms. Harris. This is the reason why she needed the requested accommodation of an ergonomic chair. A major issue is whether or not she could have been reasonably expected to perform the job due to her physical restrictions alone, apart from all of the non-exertional impairments and psychological symptoms which limited her social functioning.

The claim set forth by Ms. Harris as a plaintiff in her litigation states that she was required to stand for two to three hours per day during the training. This requirement was described as extremely painful and that she required a special chair to accommodate her condition. She was noted to be in constant pain on a daily basis despite training requirements which would be less rigorous than the actual requirements of a full day of employment of a hairdresser. It is questionable as to whether or not a special chair would have genuinely reduced her pain while allowing her to perform the usual and customary duties of a hairdresser. She had demonstrated difficulty with prolonged sitting as well. The remedy of the ergonomic chair is of unknown benefit, since she did not receive it. The main point is that she was in very substantial pain with significant exertional limitations in terms of both activity and endurance based upon her own words and claim. It is probable that these conditions would have made it doubtful that she could have accommodated to this particular occupation which required more in practice than in training.

4

Rehabilitation Report
Re: Kim Harris
September 17, 2013

## IV.   BEHVIORAL, PSYCHOLOGICAL & PSYCHIATRIC HISTORY

There have been concerns regarding the mental health of Kim Harris since childhood. There are reports of fighting with teachers and other students during her school years, for instance. Kim herself reports depression throughout her childhood and adolescence. I do not have any documentation of these episodes other than her comments, recorded comments of her mother, and statements by various mental health practitioners who interviewed her regarding her history. There are clear episodes of anger and acting out and it is known that she was hypersensitive about people making fun of her deformed shoulder and arm. Bullying at school can certainly justify a strong reaction. Despite this, she apparently made it through school in a timely manner and graduated with her peers. Her handwriting and filling in a form would suggest that she is capable of basic written communications.

This individual has been variously described as depressed, anxious, irritable, reactive, angry, anti-social, moody, chemically dependent, schizophrenic, and bipolar in her records. In fact, her history is replete with references to issues reflective of mental impairment or a personality disorder. Below is a listing of some of the items picked out of the records for illustration purposes. By no means are these all of the references and admittedly they are out of context. However, this listing does reflect the long and difficult mental health history of Ms. Harris. In some cases, a DSM IV-TR code number is given at the end of the bullet point. These are my added notations for further reference.

- History of Suicide Attempt, Overdose, 1999

- Major Depressive Disorder, 1999 (296.32)

- Cocaine Dependence, 2003 (304.3)

- Cocaine Dependence, 2005 (304.3

- Anti-Social Personality Disorder, 2005 (301.7)

- Suicidal Ideation with Depression, Anxiety, and Bipolar Symptoms, 2006

- Suicidal Ideation, 2007

- ACHS Detox, Adjustment Disorder with Depressed Mood (309.0)

- Reports depressed mood throughout childhood

- Mood Disorder NOS, 2007 (296.9)

Rehabilitation Report
Re:  Kim Harris
September 17, 2013

- Baker Act, involuntary psychiatric admissions X2,  2007

- Psychosis with Visual Hallucinations, 2007 (208.9?)

- Schizoaffective Disorder (Schizophrenic Symptoms Concurrent with Mood Disorder), 2007 (295.70)

- Mood Disorder NOS, 2008 (296.9)

- Schizophrenia NOS, 2008 (295.9)

- Major Depression, 2009 (referred to psychiatrist)

- Bipolar Disorder NOS, 2009 (296.7)

- Bipolar I Disorder, Mixed with GAF 45, 2010 (296.5)

This history denotes instability of behavior and mood.  Individuals with this background are often unable to sustain relationships or long periods of sustained employment.  Ms. Harris has a long history of emotional distress, interpersonal conflicts, and various affective disorders.  At times she has been either delusional or experienced visual hallucinations, but those seem to be relatively brief intervals.  There have been self-destructive behaviors, involuntary admissions, and multiple attempts to control her symptoms with psychotropic medications including anxiolytics, antidepressants, and antipsychotic medications.  Throughout the records, including her applications for SSDI or SSI benefits, she describes herself as having extreme behavioral responses, including rage, because of her bipolar disorder or mood issues.  Many of her behaviors, particularly in earlier years, were strongly suggestive of antisocial personality disorder.

From the standpoint of her psychological and psychiatric history, Ms. Harris would have been a very high risk employee in any business or profession.  She knows enough about herself to realize she has reduced social functioning.  She simply does not get along with most people and conflicts arise.  Unfortunately, hairdressers and cosmetologists find themselves in very close interpersonal contact with their customers.  Success in the profession has an element of social bonding, not just skill at cutting hair or performing pedicures.  Unlike retail sales, fast food workers, and potato chip baggers, hairdressers must necessarily relate well to their customers and co-workers.  From the standpoint of interpersonal relationships, cosmetologists would be a very difficult profession indeed for Ms. Harris.  As far as I can tell, she has very little history of enduring relationships devoid of conflict.  The best sign I can find in her records is the 18 months of employment with the snack food manufacturer, Lance Snack Foods.  Obviously that went badly at the end due to stress and psychological decompensation.  She was not able to sustain that employment.  Lance is now closed in Perry.

6

Rehabilitation Report
Re: Kim Harris
September 17, 2013

## V.   CRIMINAL HISTORY

I am aware that this individual has a criminal history. She passed worthless bank checks and had at least two intervals of incarceration. This is not benign history on the part of Ms. Harris. Employers select job applicants in part based upon a clean record or reputation. Analysis of her criminal history is justified in terms of a determination as to how it might have impacted upon licensure and job placement. Generally speaking, a criminal record is a negative employee characteristic. It can be overcome in many occupations, but not all. Some employers will find it to be a critical factor for declining a job applicant, others won't. A pristine record would be highly favorable in most occupations with high social interaction and desirability of a clean reputation.

## VI.   BARBERS, HAIRDRESSERS & STYLISTS

Barbers, hairdressers, and cosmetologists provide hairdressing and beauty services to the public. Most of them work in salons that are pleasant and well lit. However, physical stamina is important, because cosmetologists are often on their feet for most of their working day. This is a profession with many part-time workers and nearly half are self-employed. There are over 650,000 people in America who identify themselves as hairdressers, barbers, or stylists. Almost all of them are formally trained and licensed. Training includes inspection of hair, face, and scalp. There are decisions to be made regarding treatment options and styles. The hairdresser washes, colors, and conditions the hair before trimming or cutting it. They maintain small business practices and receive payment from their clients. They must keep their surfaces and tools clean and sanitized and they are often subject to inspections. They often sell products to their clients in addition to providing cosmetology services. They are often exposed to chemicals that cause strong skin irritation, so they may wear protective clothing or gloves. There are many "walk in" salons or barbershops that are often busy on evenings or weekends when patrons are most available for their services. Most self-employed individuals set their own schedules and work with a repeat clientele, sometimes for many years duration. The work is classified as exertionally light, usually with no lifting requirements ever above 20 pounds. However, there is frequent standing, constant use of the hands and arms, with frequent fingering, feeling, touching, and small motor activity of the hands.

The earnings of individuals who call themselves "hairstylist" varies greatly. Since many are part-time, annual earnings tend to be rather low. In a few choice salons in most urban communities the operators can make substantial earnings. Those individuals can be the exception rather than the rule. A national survey in 2010 for all cosmetology occupations in the USA determined a median hourly wage of $16.27 per hour. However, hairdressers and hair stylist were listed as only $10.94 per hour nationally. Accordingly, there are considerable individual differences. Occupational and wage data is available now for the rural counties of northeast Florida. The data is composed of surveys from 13 counties, including Taylor County, Florida. Occupational wage data from 2012 has recently been made available indicating

Rehabilitation Report
Re: Kim Harris
September 17, 2013

employment survey of 370 hairdressers, hairstylists, and cosmetologists (Occupational Code 39-5012). A 2012 wage estimate was determined to be a mean of $11.56 per hour. Accordingly, for an individual employed full-time, or approximately 2,000 hours per year, the annualized earnings of the typical hairdresser in rural northeast Florida would be about $23,120.00 per year. On a weekly basis this would be about $462.00 in wage pay for a full-time worker. These figures do not take into account that about half of all such individuals work part-time or at least significantly less than 40 hours per week.

It is represented in this litigation that a hairdresser in Perry, Florida, could earn $1,000.00 per week after completing training. I have no source whatsoever that comes remotely close to that figure for a person so employed in that county. Overall, the job outlook for hairdressers and cosmetologists is fairly favorable, with job growth in the average range. It is likely that each small town has competitive services and at least some job availability over time. The rural counties of northeast Florida are known as low wage areas and it is likely that there are fewer premium clients to be had in those areas as compared to more urban salons.

## VII.   FLORIDA DIVISION OF VOCATIONAL REHABILITATION

I am very familiar with the Florida Division of Vocational Rehabilitation. Early in my own career I worked within that setting as a Vocational Rehabilitation Counselor II. This is the state of Florida agency responsible for identifying, evaluating, training, and placing workers with either mental impairments or physical impairments, if not both. They accept as eligible individuals who are impaired with reasonable chance of success in returning to substantial gainful employment. While there are non-vocational programs for profoundly impaired individuals, like those with brain injury or spinal cord injury, the vocational program is organized to support eligible Florida citizens in returning to work. Florida DVR often focuses upon individuals who are seeking to be eligible for SSDI or SSI. They evaluate those who are interested in returning to work. However, there is a very low success rate among that population and many permanently and totally disabled individuals are deemed ineligible because they are likely to be unsuccessful in any vocational rehabilitation effort. I believe that this agency was well-intended in supporting Kim Harris in a vocational rehabilitation program as a hairdresser at Taylor Technical Institute. However, I do not know the process of specifically evaluating her eligibility and why certain decisions were made for this target occupation. In hindsight, there are major issues of professional judgment. I applaud them for their willingness to assist Ms. Harris, but doubt the decision that she could be a successful vocational client while so completely overwhelmed by psychological and physical impairments.

Rehabilitation Report
Re: Kim Harris
September 17, 2013

## VIII. VOCATIONAL OPINIONS

From review, research, and professional judgment, I have developed a number of relevant vocational opinions regarding Ms. Harris. These pertain to both training, employment, and earnings. It is probable that there will be some elaboration on these opinions in either deposition or trial testimony. My opinions are as follow:

- Kim Harris is a 40-year-old individual with a high school diploma. In terms of academic skills, verbal capacity, and intellect, I assume that she would be otherwise qualified and capable of employment. Those factors are not at issue.

- Kim Harris is indeed an individual with multiple impairments. These impairments represent handicapping conditions that will adversely impact upon any vocational training or job development.

- Ms. Harris had a very limited work history composed of unskilled jobs with limited specific vocational preparation. She primarily worked in food service occupations and at least one production position in a food packaging plant. The records reflect brief stints of employment with modest earnings.

- Ms. Harris had few, if any, transferable skills into jobs available in Taylor County, Florida, or surrounding areas. She would have likely been relegated to positions similar to those she had performed in the past. However, at the time she sustained her alleged discriminatory treatment, she had the added burden of significant physical impairment and functional limitations.

- Ms. Harris primarily worked jobs in the category of **light exertion**. This would imply no lifting beyond 20 pounds and frequent lifting no greater than 10 pounds. However, the light category can include standing and walking for up to six hours of an eight hour work day.

- Ms. Harris had not been employed since 2008 when entering the training program in 2011. She had essentially been untested in work situations for approximately three years. The records and her comments indicate that she was suffering from extensive pain, limitations, and need of accommodation.

- Ms. Harris is a disadvantaged worker who was not able to establish a true career pattern by age 38-years-old. That does not bode well for an individual going forward with even greater physical impairment.

Rehabilitation Report
Re: Kim Harris
September 17, 2013

- This individual has a long history of mental impairment, behavioral issues, and deficits in social functioning that would inhibit successful occupational development. Emotional self-regulation and adequate social functioning are critical for success in both training and employment. I assert that she had enduring deficits in these areas.

- Ms. Harris over time became a multiply impaired person in terms of her physical health. She was born with a malformed shoulder and arm, limiting her bilateral use of the hands and arms. She sustained a knee injury that limited her mobility, but was ultimately surgically repaired. However, she continued to complain of deficits. She developed chronic low back pain. Later she sustained injuries to her lower extremities and pelvis, further reducing mobility and activity. For an individual of low skills, reduced exertional capacity is a major obstacle since most low skill occupations require at least a moderate amount of physical activity including standing, walking, bending, climbing, and handling.

- Temperament is an issue in many occupations, particularly those with relatively high requirements for social interaction. Kim Harris was not temperamentally suited to function as a hairdresser.

- In considering any individual for employment, a combination of exertional and non-exertional limitations should be considered synergistically. This is an individual who clearly had broad-ranging impairments at the time she entered training at Taylor Technical Institute.

- The training program as set forth required 3.5 hours of continuous instruction and activity. This was not tolerated by Ms. Harris. It is my opinion that employment as a hairdresser would be more demanding than the training intervals.

- In years past, criminal conduct led to arrests and incarcerations. This history might have significant bearing on licensure and employment. Further analysis of her criminal record is justified in the context of its adverse implications for employability.

- Kim Harris first applied for SSDI or SSI benefits in 2005, asserting that she was unable to maintain employment at that time. She was found to have antisocial personality disorder, behavioral problems, and cocaine dependence in partial remission at that time.

- Ms. Harris again applied for SSDI or SSI in 2008, now elevating her claim for unemployability with the addition of bipolar disorder, rage reactions, birth defect to the left shoulder and arm, and a right knee impairment. She indicated that she could not cope with other individuals in the workplace. She was not able to stand long enough to work and had to "hop along" rather than walk normally. She worked one month in 2008 and was ultimately fired when she got into a conflict with a co-employee. This would suggest very limited in employability in 2008.

Rehabilitation Report
Re:  Kim Harris
September 17, 2013

- In 2009, Ms. Harris sustained bilateral impairments in to her ankles and feet, leg impairment, and pelvic fracture.  At that point she had so many exertional and non-exertional impairments that she was found Fully Favorable as a permanently and totally impaired individual by the Social Security Administration.  This designation implied that she was not employable in any available position in her area where she could expect to earn substantial gainful income.

- Physician reports indicate that she was functioning within a partial range of sedentary exertion only.  That is, she had severe limits on standing and walking and it is not expected that she could do any substantial lifting or carrying.  These limitations would be inconsistent with successful employment as a hairdresser.

- An ergonomically correct chair may be beneficial for individuals with mobility impairments and pain complains, such as Ms. Harris.  But such a chair does not magically transform a functionally limited individual into a successfully employed hairdresser.  It is difficult to imagine a successful hairdresser who might constantly sit on a stool or chair.  The job is typically performed from a standing posture, although there may be some availability for sitting in cosmetology, such as persons who perform pedicures or manicures.

- Prolonged standing, circular walking around the patron, and extensive use of raised hands and arms would be impossible for this individual to perform unless she had substantially restored exertional capacity.

- It is my opinion that the Florida DVR counselor made an inappropriate referral for this training.  The client had mental impairment and exertional limitations inconsistent with the target occupation.  Accordingly, the vocational plan was destined to failure.

- I believe Ms. Harris was sincere in her effort to become a hairdresser.  She took the initiative to follow the instructions of her DVR counselor and enrolled in the program with their assistance.  Despite her history, overt disablement, and recipient status for SSI, she did indeed make an effort toward training herself to work in the competitive labor market.  Predictably, this turned into a failure experience.

- I agree with the ODD disability examiner who deemed Kim Harris permanently and totally disabled in 2010 due to her combination of nonexertional impairments and exertional loss.

- I hold the opinion that she was permanently and totally disabled at the time she entered the training program at Taylor Technical Institute in 2011.

- Because of the combination of her mental impairments, behavioral issues, and functioning within a partial range of sedentary exertion only, my opinion is that she is still permanently and totally disabled at the date of this report.

Rehabilitation Report
Re:  Kim Harris
September 17, 2013

- Taylor Technical Institute apparently accepted an applicant for training in good faith. Assistance in the form of a grant was processed. She was enrolled despite some gaps in her application. As it turned out, however, no accommodations would have likely been of supreme benefit to her to facilitate successful completion of training followed by successful employment. There were simply too many adverse conditions and limitations for this individual to assume for a favorable outcome of her career development plan as a hairdresser.

- Ms. Harris might have been more successful in other occupations with lower social content, less stress, and purely sedentary exertional requirements. Even so, behavioral and psychological issues would likely be sufficient to have adverse consequences for career development for even the most sedentary and stress-free occupations.

- It is clear that this individual did have handicapping conditions. Those conditions are enumerated in this report and the file materials. It is my opinion that those very conditions which caused her to be handicapped occupationally are the same conditions that would have prevented her from successful training and employment as a hairdresser.

- Hairdressers and stylists in Taylor County do not earn $1,000.00 per week on average. A figure that can be supported would be approximately $12,000.00 per year for a part-time worker and $23,120.00 for an individual employed full-time in that occupation. Benefits would be expected to be low, since many hairdressers are self-employed.

- Ms. Harris has not shown any inclination to mitigate her damages through alternative work. However, in my judgment, she is permanently and totally disabled and mitigation would be unlikely unless she has had some functional improvement and reduction in her handicapping conditions, pain, and psychological impairments.

## IX.   SUMMARY STATEMENT

Kim Harris is a 40-year-old single mother with a dependent daughter. She is a high school graduate who has had a limited vocational history composed primarily of unskilled work activities. She has tried to obtain vocational training at the Taylor Technical Institute on two occasions. Her first effort was in a nursing program which was apparently terminated because of her addictive disorder in 1999. The second effort was in 2011 when she was unable to continue in the cosmetology program. Unfortunately, Ms. Harris has had a relatively chaotic life due to behavioral issues, mental impairment, congenital deformity, and numerous acquired impairments. She was appropriately deemed permanently and totally disabled in 2010 by the Social Security Administration. At the present time, she is a poor candidate for any vocational rehabilitation services. More likely than not, she will remain chronically unemployed for the foreseeable future.

Rehabilitation Report
Re:  Kim Harris
September 17, 2013

I thank you for this referral.  I am sorry I cannot be more favorable regarding Ms. Harris' vocational potential.  Please contact me personally if elaboration on this report is required.


John K. McKay, Ph.D.
Licensed Rehabilitation Psychologist
FL PY 0003015
Certified Rehabilitation Counselor
September 17, 2013

Revised 9/10/2013

# John Keel McKay, Ph.D.
## McKay & Associates
219-A Delta Court
Tallahassee, Florida  32303

|  |  |  |
|---|---|---|
|  |  | Rehabilitation Consultant |
| Office: | 850-385-7171 | Licensed Rehabilitation Psychologist |
| Fax: | 850-422-1457 | Certified Rehabilitation Counselor |
| E-Mail (office): | johnkmckay@earthlink.net | Vocational Expert |
| E-Mail (personal): | jmckay2001@earthlink.net | Life care Planner |
|  |  | Litigation Consultant |

## Educational Background

**Ph.D.**
**(Doctor of Philosophy)**
*1979.*

*Rehabilitation Services, Counseling Psychology and Human Systems, Florida State University, College of Education,*

Program of Study emphasized counseling, testing, and evaluation in rehabilitation settings. Completed requirements in both Rehabilitation Services and Counseling Psychology (counseling internship). Cognate minor in Clinical Psychology, Department of Psychology, FSU. Graduated with high honors (3.9 GPA).

**M.S.**
**(Master of Science)**

*Sociology, Florida State University, 1974.*
Emphasis in Social Psychology.  Graduated with Honors.

**B.S.**
**(Bachelor of Science)**

*Journalism, University of Florida, 1972.*
Kappa Tau Alpha Scholastic Honorary Inductee.

- Dr. McKay graduated from Duncan U. Fletcher High School, Neptune Beach, Florida, in 1968.

- As a licensed psychologist and Certified Rehabilitation Counselor, Dr. McKay has earned hundreds of continuing education credits (CEU's) in his field of expertise since 1980.

## Professional Experience

**1980 to Present**

**Private, independent rehabilitation consultant, McKay & Associates.**

Director of independent rehabilitation consulting service located in Tallahassee, Florida.  Provides the following services to adults and children with physical and/or psychological impairments:

**EXHIBIT**

**A**

Revised 9/10/2013

John K. McKay, Ph.D.
Vita
Page Two

- Rehabilitation consultation services pertaining to matters of physical and mental impairment with special emphasis on catastrophic cases.

- Vocational, intellectual, and psychological testing and evaluation pertaining to employment, academic potential, earning capacity, or planning of vocational rehabilitation programs.

- Life care planning for adults, children, and infants with catastrophic or long-term disabling conditions.

- Psychological and intellectual assessment of medical patients, Social Security applicants, or privately referred individuals.

- Consultation support services in personal injury and medical malpractice civil litigation.

- Psychological assessments for the purpose of disability determination.

- Rehabilitation counseling with individuals experiencing chronic pain, adjustment to permanent impairment, or vocational dislocation due to injury or functional loss.

- Vocational consultant to the Social Security Administration, Office of Hearings and Appeals. Testified in over 800 hearings.

---

**1980 – 1981**

**Assistant Professor, Rehabilitation Services Program, Florida State University, College of Education**

Duties included undergraduate and graduate instruction, community service projects, and supervision of student field experiences and internships. Courses taught by Dr. McKay included:

- **Principles and Practices of Rehabilitation Services** (entry-level course)

Revised 9/10/2013

John K. McKay, Ph.D.
Vita
Page Three

- **Communications & Human Relations** (experiential course in human relationships)

- **Vocational Aspects of Rehabilitation** (vocational counseling and testing of rehabilitation clients)
- **Introduction to Career Development** (career development services, practices, and vocational interest testing)

- **Community Resources in Rehabilitation** (survey of rehabilitation services with field experiences

- **Psychosocial Aspects of Rehabilitation** (graduate course for counselors, pertaining to psychological issues)

- **Practicum in Rehabilitation Counseling** (supervision of students in practicum settings)

- **Internship in Rehabilitation Services** (supervision of graduate students in internship settings

---

## 1982 – 1983

### Adjunct Faculty, Rehabilitation Services Program, Florida State University

Teaching rehabilitation counseling courses on part-time basis while developing counseling and consulting practice. Dr. McKay has been a guest lecturer at Florida State University, Florida A&M University, and the University of Florida on an occasional basis since 1983.

---

## 1978 – 1979

### Coordinator of Counseling and Rehabilitation Services and Assistant Professor, University of Maryland (College Park, MD), Rehabilitation Counseling Program

Developed the initial Disabled Student Services program at the University of Maryland. Administered support services for impaired students, provided counseling, and conducted testing for special needs college students. Duel appointment on instructional faculty, including the following courses:

Revised 9/10/2013

John K. McKay, Ph.D.
Vita
Page Four

- **Principles of Vocational Rehabilitation** (undergraduate course)

- **Introduction to Rehabilitation Counseling** (graduate course)

Functioned as consultant to the Maryland University system on matters of accessibility, accommodation, and recruitment. Liaison to Gallaudet University pertaining to hearing impaired graduate students or duel enrollment undergraduates.

---

## 1977 - 1978

**Graduate Assistant, Research Assistant, Department of Human Services & Studies, College of Education, Florida State University**

Undergraduate teaching and research assignments, Coordinated testing of incoming FSU students with visual disabilities for blindness. Assistant and speechwriter to Associate Dean, Dr. Joyce Chick (Puckett).

---

## 1976 - 1977

**Rehabilitation counselor and Vocational Evaluator, Cathedral Rehabilitation Center, Jacksonville, Florida**

Counselor to catastrophically impaired individuals in a post-acute rehabilitation facility primarily serving spinal cord injured and head injured individuals. Coordinator of "rehabilitation team" to assess potential referrals into facility. Vocational, academic, and intellectual testing of severely impaired individuals (traumatic brain injury, SCI, amputations, orthopedic injuries).

---

## 1974 - 1976

**Vocational Rehabilitation Counselor II, State of Florida, Division of Blind Services, Jacksonville, Florida**

Provided counseling and rehabilitation services to visually impaired and blind clients. Vocational planning, client training, employer development, and job placement services provided.

Revised 9/10/2013

John K. McKay, Ph.D.
Vita
Page Five

## 1973 - 1974

### Research Investigator, Florida A&M University, Tallahassee, Florida

Faculty level social research pertaining to rural poverty in North Florida.
Principal investigator stationed in Franklin County (Apalachicola) while
functioning as social worker/researcher.

## Credentials

- **Certified Rehabilitation Counselor** (CRC),
  Commission on Rehabilitation Counselor Certification
  (#00055932), since 1987

- **Licensed Psychologist**
  Florida Department of Health, Board of Psychological Examiners
  (FL PY 0003015), since 1982

- **Vocational Expert**
  Social Security Administration, Office of Hearings and Appeals
  (certification #2543), 1980 to 2010

  Testimony rendered in approximately 800 SSDI disability hearings.

- **Panel Psychologist,**
  Florida Division of Disability Determinations
  (#F5920548), since 1999

  Conducted over 350psychological or intellectual evaluations for Florida agency
  during last 10 years.

## Professional Memberships

- Florida Psychological Association

- National Rehabilitation Association

- Florida Rehabilitation Association

- International Association of Rehabilitation Professionals

- Florida Association of Rehabilitation Professionals

Revised 9/10/2013

John K. McKay, Ph.D.
Vita
Page Six

## Publications

McKay, J.K., "The Effect of Rehabilitation Counselor Disability Status on Similarly Disabled Clients' Perceptions of Counselor Social Influence and Empathy," **Doctoral Dissertation.**

McKay, J.K., Dowd, E.T., and Rollin, S.A., "Clients' Characteristics as Mediating Variables in the Perception of Counselors' Influence," **Perceptual and Motor Skills**, 1982, 54, 523-526.

McKay, J.K., Dowd, E.T., & Rollin, S.A., "The Effects of Rehabilitation Counselor Disability on Similarly Disabled Clients," **Journal of Applied Rehabilitation Counseling**, 1982.

## Legal Consultation Experience

Dr. McKay receives referrals from both defense and plaintiff referrals.  He has been retained as a rehabilitation consultant in over 2,000 litigated cases involving personal injury, medical malpractice, or product liability.  He has testified in over 40 of the counties in Florida during his career, as well as seven other states and the U.S. Virgin Islands.  He has never failed to qualify as a rehabilitation expert, vocational expert, or rehabilitation psychologist.  Dr. McKay no longer accepts worker's compensation referrals, unless it is a special circumstance involving a catastrophic evaluation.  Dr. McKay has testified in hundreds of hearings involving SSDI eligibility as well as disability hearings for State of Florida employees injured on the job.  Upon request, Dr. McKay's recent testimony list (as per Federal Rule 26 disclosure) will be provided to those with legitimate inquiry.  Dr. McKay has worked on a variety of cases throughout his career, including:

- Severe orthopedic impairment (amputation, spinal cord injuries, multiple trauma).

- Neurological impairments (TBI, central and peripheral nerve disorders).

- Severely to profoundly impaired infants and children (prenatal and birth trauma, brachial plexus impairment, catastrophic disablement).

- Chronic pain cases involving a wide variety of impairments.

- Psychological trauma, mental distress, and coping with disablement.

- Intellectual deficiency, cognitive impairment, or mental impairments.

Legal references upon request.  Dr. McKay does not accept referrals related to dissolution of marriage, employment discrimination, wrongful termination, or criminal defense.

## 2009
## Deposition/Trial Testimony

KEY CODE(S):  D = DEPOSITION; T = TRIAL; DEF = DEFENSE; PTF – PLAINTIFF; PI = PERSONAL
INJURY; MM = MEDICAL MALPRACTICE; PL = PRODUCT LIABILITY; WT = WRONGFUL
TERMINATION; CB = CLAIMS BILL/SPECIAL MASTER; RTMT = RETIREMENT; DISC =
DISCRIMINATION; LL = LIQUOR LIABILITY

| | **Case Reference** | **Testimony Date** | **Attorney Reference** |
|---|---|---|---|
| 1. | Lee Ballard v. Freight Handlers<br>(07-28246 CA 27, Miami-Dade Co.) PI/DEF | D: 1/12/09 | Constantine Nickas<br>[8/7/08] |
| 2. | Thomas Murrow v. Swift Transportation<br>(1-0501-2419-4009, Bradford Co.) PI/DEF | D: 1/19/09 | William T. Stone<br>[3/6/08] |
| 3. | Arielle Rausin v. Susan Rodgers, et. al.<br>(04-CA-1965, Orange Co.) PI/DEF | T: 2/9/09 | Michael A. Romano<br>[10/18/06] |
| 4.. | Michael Sizemore v. University Physician, et. al.<br>(07-C-278, Cabell Co., WV) MM/DEF | D: 2/23/09 | Eric W. Legg<br>[5/21/08] |
| 5. | Moses Rodin v. Fitness First, Inc.<br>(2006 CA 001588, Leon Co.) PI, PLTF | D: 3/25/09 | Stephen L. Spector<br>[2/28/07] |
| 6. | Shuler (dec) v. Solantic of Jacksonville, et. al.<br>(16-2007-CA-010646, Duval Co.) WD/PLTF | D: 4/6/09 | R. Daniel Noey<br>[9/5/08] |
| 7. | Gay Schmidt v. Acousti Engineering Co., Inc.<br>(06-CA-8566, Duval Co.) PI/DEF | D: 4/13/09 | John Viggiani<br>[6/26/08] |
| 8. | Taylor Yakin v. Tallahassee Memorial Hospital<br>(06-CA-2639, Leon Co.) MM/PLTF | T: 4/22/09 | Edwin A. Green, III<br>[2/26/07] |
| 9. | LT v. Judy Mandrell, et. al.<br>(4:08-CV-322-RH/WCS, U.S. Dist Ct, Tallahassee Div.) PI/DEF | D: 4/27/09 | Maria Santoro<br>[3/21/09] |
| 10. | Olga Perminova v. Golden Strand Resort, et. al.<br>(07-25745 CA31, Miami Dade Co) PI/DEF | D: 4/28/09 | Barry L. Davis<br>[9/3/08] |
| 11. | McElroy v. Sells Trucking, LLC<br>(07-296-CA, Jefferson County) WD/PLTF | D: 4/29/09 | Jon D. Caminez<br>[11/4/08] |
| 12. | Miguel Claros v. Total Signs & Lighting, Inc.<br>(07-45860 CA 21, Miami-Dade Co.) PI/PLTF | D: 5/4/09 | Alex Alvarez<br>[3/4/09] |
| 13. | Moses Rodin v. Fitness First, Inc.<br>(2006 CA 001588, Leon Co.) PI/PLTF | T: 5/5/09 | Stephen L. Spector<br>[2/28/07] |
| 14. | Irvin Gardner v. Gemi Trucking<br>(2008 CA 3529, Leon Co.) PI/PLTF | D: 6/8/09 | Paul A. Sha___<br>[12/3/08] |

EXHIBIT

B

| 15. | Laron Harris v. Cigna Healthcare, et. al.<br>(04-07303 CA 13, Broward Co.) MM/DEF | D: 6/9/09 | Hailey A. Goldman<br>[1/29/08] |
| 16. | Lillian Rodriguez v. FL Hospital Fish Memorial<br>(2007 11030 CIDL, Volusia Co.) | D: 6/10/09 | Todd M. Cranshaw<br>[10/22/04] |
| 17. | William Allman v. AT&T Mobility<br>(50 2007CA017915XXXXMBAI, Palm Bch Co.) PI/DEF | D: 6/23/09 | Arthur J. LaPlante<br>[11/13/08] |
| 18. | Elizabeth Knight v. Green Acres of Havana<br>(08-00596, Gadsden Co.) PLTF/PI | D: 7/23/09 | Jon D. Caminez<br>[6/2/08] |
| 19. | Jerome Williams v. Englahard Quincy, et. al.<br>(08-000415-CA, Gadsden Co.) PLTF/PI | D: 7/29/09 | Jon D. Caminez<br>[8/27/08] |
| 20. | Linda Clare v. Dr. Blanton, et. al.<br>(50 2007 020517, Palm Beach Co.) MM/DEF | D: 8/3/09 | Jay P. Chimpoulis<br>[2/23/90] |
| 21. | Cal Miller v. Bethesda Outpatient Surgery, et. al.<br>(50-2005CA-6735, Palm Beach Co.) MM/DEF | D: 8/26/09 | Anthony Corsini<br>[6/9/09] |
| 22. | Linda Clare v. Dr. Blanton<br>(50 2007 020517, Palm Beach Co.) MM/DEF | D: 8/3/09 | Jay P. Chimppoulis<br>[2/23/09] |
| 23. | Barbara Hicks v. FL Dept. of Transportation<br>(08-673-CA, Jefferson Co.) PI/PLTF | D: 8/10/09 | Jon D. Caminez<br>[1/22/08] |
| 24. | Cal Miller v. Lori Miller, M.D., et. al.<br>(50-2005 CA6735 XXXXMB AJ, Palm Bch Co.) MM/DEF | D: 8/26/09 | Steven Y. Leinicke<br>[6/9/09] |
| 25. | Haylee Kroll v. Pediatrix, et. al.<br>(96-004960-09, Broward Co.) MM/DEF | D: 8/27/09 | T. Christine Perez<br>[2/2/05] |
| 25. | Daryl Cannon v. Wilson<br>(2007-981-CA, Taylor Co.) PI/PLTF | D: 9/14/09 | George T. Reeves<br>[7/27/09] |
| 26. | Paula Cribb v. United Parcel Service, et. al.<br>(16-2008-CA-002450, Duval Co.) PI/DEF | D: 9/22/09 | Michael J. O'Bringer<br>[5/2009] |
| 27. | Danielle Miller v. Norris, et. al.<br>(GC 07-700, Highlands Co.) PI/DEF | D: 9/23//09 | Ashley Withers<br>[4/17/09] |
| 28. | Haylee Kroll v. Pediatrix, et. al.<br>(96-004960-09, Broward Co.) MM/DEF | T: 9/24/09 | T. Christine Perez<br>[2/2/05] |
| 29. | Cal Miller v. Lori Miller, M.D., et. al.<br>(50-2005 CA6735 XXXXMB AJ, Palm Bch Co.) MM/DEF | T: 10/22/09 | Steven Y. Leinicke<br>[6/9/09] |
| 30. | Alfredo Cribeiro v. Khouri, M.D., et. al.<br>(04-23694CA 02, Dade Co.) MM/DEF | D: 11/19/09 | Patricia I. Murray<br>[11/4/08] |

| 31. | Xia-Li Liu v. Roadway Express<br>(08CA1542, Leon County) PI/DEF | D: 11/23/09 | Christopher Barkas<br>[6/23/09] |
|-----|------------------------------------------------------------------|-------------|----------------------------------|
| 32. | Cleophus Ware v. Kay Sterling Ford<br>(2008-CA-000876, Leon County) PI/PLTF | D: 12/7/09 | Jon D. Caminez<br>[10/4/09] |
| 33. | Ephraim Bryan v. Louis Sticco<br>(2009CA213NC, Sarasota County) PI/DEF | D: 12/15/09 | Brad Salter<br>[7/31/09] |
| 34. | Willie Cross v. Walgreen Company<br>(08-26389 (25), Broward County) PI/DEF | D: 1/6/10 | Paul J. Gamm<br>[8/20/09] |
| 35. | David Johnson v. Harcon Construction, et. al.<br>(08-CA-1567, Leon County) | D: 1/7/10 | Jon D. Caminez<br>[10/15/08] |

# 2010
## Deposition/Trial Testimony

KEY CODE(S): D = DEPOSITION; T = TRIAL; DEF = DEFENSE; PTF – PLAINTIFF; PI = PERSONAL
INJURY; MM = MEDICAL MALPRACTICE; PL = PRODUCT LIABILITY; WT = WRONGFUL
TERMINATION; CB = CLAIMS BILL/SPECIAL MASTER; RTMT = RETIREMENT; DISC =
DISCRIMINATION; LL = LIQUOR LIABILITY

| | Case Reference | Testimony Date | Attorney Reference |
|---|---|---|---|
| 1. | Willie Cross v. Walgreen Co. (08-26389 (25), Broward Co.) PI/DEF | D: 1/6/10 | Paul J. Gamm [7/20/09] |
| 2. | Cleophus Ware v. Kay Sterling Ford (2008-CA-000876, Leon Co.) PI/PLTF | T: 1/19/10 | Jon D. Caminez [10/4/09] |
| 3. | Cindee Deen v. FL Air Service, et. al. {3:08-cv-1163-J-25-JRK, Midd Dist of FL) PI/PLTF | D: 1/21/10 | Rodney S. Margol [7/28/09] |
| 4. | Eveleen Brooks v. Florence Fuller Child Dev Ctr (50 2009 CA 005080 XXXX MB, Palm Bch Co.) PI/DEF | D: 1/25/10 | Shirley A. DeLuna [12/8/09] |
| 5. | Olivia Simmons v. Good Samaritan Med Center (1052-06084, Palm Bch Co.) MM/DEF | D: 1/27/10 | Timothy J. Murphy [4/23/08] |
| 6. | Jason Woolwine v. Dhaliwal, M.D., et. al. (07-C-996, Raleigh Co., WV) MM/DEF | D: 2/10/10 | David Shuman [8/27/08] |
| 7. | Krystyna Serrano v. Cleveland Clinic, et. al. (CACE 09004413, Broward Co.) MM/DEF | D: 2/17/10 | Anthony J. McNicholas [9/19/09] |
| 8. | Linda Buss v. Mondee Catul, et. al. (50-09-CA-9287 MB-AA, Palm Bch Co) PI/DEF | D: 2/18/10 | Robert C. Bauroth [9/13/09] |
| 9. | Jeffrey Van Wormer v. REA Technologies (2007-000587-CA, Columbia Co.) PI/DEF | T: 3/4/10 | Trudy Innes-Richardson [7/13/09] |
| 10. | Addison Chess v. Halifax Medical Center, et. al. (2004-30861CICI, Volusia Co.) MM/DEF | T: 3/31/10 | Kevin K. Chase [12/20/07] |
| 11. | Rolando Simmons v. Julie Davis & Gavin Peterson (Jefferson County) PI/PLTF | D: 3/9/10 | Hubert R. Brown [7/8/09] |
| 12. | JoeMichael Lanclos v. Lloyd Helms & State Farm (4:0-CV-215, Jefferson County) PI/PLTF | D: 4/19/10 | Jon D. Caminez [4/30/09] |
| 13. | Michael Muyingo v. Norwegian Cruise Line, et. al. (04-16230 CA 08, Dade County) PI/DEF | D: 4/21/10 | Shane Rahavy [2/15/07] |
| 14. | Laura Cornelison v. Ogden Entertainment (2001 CA 002458, Escambia Co) PI/DEF | D: 4/29/10 | Brentt Palmer [7/17/06] |

15.    Rolando Simmons v. Davis & Petersen    D: 5/3/10    Hubert R. Brown
     (2008-0150-CA, Jefferson Co.) PI/PLTF      [7/8/09]

16.    Mark Lynch v. Donna Jones Chapman    T: 5/4/10    Cindy Kinslow-Coats
     (2004-CA-4267 S-GB, Okaloosa Co) PI/PLTF      [5/4/10]

16.    Cortez Williams v. Long & Tamela, M.D., et. al.    D: 5/6/10    Richard Ramsey
     (16-2005-CA-001970 Div. CV-G, Duval Co.) MM/DEF      [10/28/08]

17.    Gary Dunham v. Buca Restaraunts, Inc.    D: 5/19/10    Daniel T. Doyle
     (16-2008-CA-16830, Duval Co.) PI/DEF      [2/24/10]

18.    Rolando Simmons v. Davis & Petersen    T: 5/20/10    Hubert R. Brown
     (2008-0150-CA, Jefferson Co.) PI/PLTF      [7/8/09]

19.    Charles Toplansky v. Outback Steakhouse    D: 5/26/10    Halley B. Lewis
     (09-CA-2439, Leon County) PI/PLTF      [11/12/09]

20.    Cindee Deen v. FL Air Service & Engineering    T: 6/15/10    Rodney S. Margol
     (3:0-cv-1163-J-25JRK, Middle Dist. Of Fl, Jax) PI/PLTF      [7/28/09]

21.    Estate of Margarita Sinclair v. Osceola Regional    D: 8/4/10    Richard B. Schwamm
     (09 CA 1526 MP, Osceola Co.) MM/DEF      [4/21/10]

22.    Jonathan Nutton v. Ventimiglia & McDonald    D: 9/30/10    Zachary B. Taylor
     (08-5550-CA, Bay Co). PI/PLTF      [4/14/10]

23.    Cedric Jones v. State Farm    D: 11/23/10    Jon D. Caminez
     (4:10-CV-00116, N. District of FL)      [5/5/10]

24.    Kenyatta Sanders v. W. Sanders Trucking, et. al.    D: 12/1/10    Kristen M. Van der Linde
     (3:09-CV-1266-J-32TEM, US Dist Ct. Jacksonville) PI/DEF      [8/12/10]

25.    Ryan Fuerst v. Lederhandler, M.D., et. al.    D: 12/6/10    Kelly A. Fernandes
     (08-1005 CA 23, Miami-Dade Co.) MM/DEF      [7/19/10]

# 2011
# Deposition/Trial Testimony

KEY CODE(S): D = DEPOSITION; T = TRIAL; DEF = DEFENSE; PTF – PLAINTIFF; PI = PERSONAL INJURY; MM = MEDICAL MALPRACTICE; PL = PRODUCT LIABILITY; WT = WRONGFUL TERMINATION; CB = CLAIMS BILL/SPECIAL MASTER; RTMT = RETIREMENT; DISC = DISCRIMINATION; LL = LIQUOR LIABILITY

| | Case Reference | Testimony Date | Attorney Reference |
|---|---|---|---|
| 1. | Scott Corbett v. Arctic Cat, Inc., et. al. (01-2009-CA-000501, Alachua Co.) PI/DEF | D: 1/5/11 | Brian Equi [5/3/10] |
| 2. | Wade Smith v. Somes Chandra Guha, M.D. et. al. (09-C-75, Kahawha Co., WV) MM/DEF | D: 1/12/11 | Erik W. Legg [10/19/09] |
| 3. | Peter Pisani v. Prospect of Orlando (48-2008-CA-030451-0, Orange Co.) MM/DEF | D: 1/18/11 | Brian Smith [12/7/10] |
| 4. | Dawn Spooner v. Durham School Services (16-2010-001814, Duval Co.) PI/PLTF | D: 1//20/11 | Renee D. Harrell |
| 5. | Gregory Williams v. Vistar Credit Union, et. al. (06-2010-CA-00824, Duval Co.) PI/PLTF | D: 2/3/11 | Renee D. Harrell [4/23/10] |
| 6. | Avelino Hernandez v. N. Shore Medical Center (08-35751 CA 02, Dade Co.) MM/DEF | D: 2/8/11 | Jonathan C. Abel [8/29/08] |
| 7. | Lissette Cartagena v. Bracero, M.D., et. al. (07-CA-2645, Orango Co.) MM/PLTF | D: 2/16/11 | Thomas J. Brown [9/2/09] |
| 8. | Gregory Williams v. Vystar Credit Union (06-2010-CA-00824, Duval Co.) PI/PLTF | T: 2/18/11 | Renee D. Harrell [4/23/10] |
| 9. | Susan Kalitan v. Barry University, et. al. (08-029706, Broward Co.) MM/DEF | D: 2/23/11 | Jeffrey R. Creasman [9/16/09] |
| 10. | Justin Hazlewood v. Sun Circle, et. al. (2008 CA 005895, Alachua Co.) PI/DEF | D: 3/16/11 | Carl B. Schwait [7/7/10] |
| 11. | Wilson Marrero v. Aentura Hospital, et. al. (10570644, Miami-Dade Co) MM/DEF | D: 2/23/11 | James S. Haliczer [4/6/10] |
| 12. | Travis Adams v. Dr. Markowski (03-CA-2858) MM/PLTF | D: 3/30/11 | Gil Powell, Sr. [1/28/09] |
| 13. | SM v. Florida DCF, et. al. (06-CA-007546, Hillsborough Co) PI/DEF | D: 4/6/11 | K. Scott Jones [10/2010] |

| 14. | Preetha Amaran, M.D. v. Steiner Transocean Ltd.<br>(0830-0001, Miami-Dade) PI/DEF | D: 4/13/11 | James C. Sawran<br>[9/17/10] |
|-----|------------------------------------------------------------------------------------|------------|------------------------------|
| 15. | Travis Adams v. Dr. Markowski<br>(03-CA-2858) MM/PLTF | T: 5/4/11 | Gil Powell, Sr.<br>[1/28/09] |
| 16. | Leslie David Opper v. William A. Exton<br>(31 2009 CA 11536, Indian River Co) PI, DEF | D: 6/6/11 | Robin A. Blanton<br>[5/1/10] |
| 17. | Susan Kalitan v. Barry University, et. al.<br>(08-029706, Broward Co.) MM/DEF | T: 6/10/11 | Jeffrey R. Creasman<br>[9/16/09] |
| 18. | Lissette Cartagena v. Bracero, M.D., et. al.<br>(07-CA-2645, Orango Co.) MM/PLTF | T: 6/15 & 6/17/11 | Thomas J. Brown<br>[9/2/09] |
| 19. | Kelli Woodfin v. Tampa General Hospital<br>(08-31823, Hillsborough Co.) MM/DEF | T: 6/9/11 | Mark Hartig<br>[4/11/11] |
| 20. | James Lowe v. Charles Lago, M.D., et. al.<br>(0943592 (04), Broward Co.) MM/DEF | D: 8/4/11 | Richard T. Woulfe<br>[2/4/11] |
| 21. | Lillie M. Conyers v. Werner Enterprises<br>(09-1174-CA, Jackson County) PI/PLTF | D: 9/13/11 | Thomas Brown<br>[2/3/11] |
| 22. | Anesia Mitchell v. Beth Benson, M.D., et. al.<br>(009941.67, Pinellas Co.) MM/DEF | D: 9/15/11 | Troy J. Crotts<br>[3/28/11] |
| 23. | Anthony Hurge v. Consolidated Container Co.<br>(0007.0530, Orange Co.) PI/DEF | D: 9/20/11 | Lawrence Burkhalter<br>[12/10/09] |
| 24. | Joan Beber v. Metzger, M.D., et. al.<br>(502009 CA 34380 XXXX MB AN, PB Co) MM/DEF | D: 9/29/11 | Kenneth W. Morgan<br>[7/14/10] |
| 25. | Dwight Downs v. United States of America<br>(06-20861-Civ-Huck, US District Court, Southern Dist. of FL) PI/DEF | T: 11/2/11 | Wendy A. Jacobus<br>[10-9-06] |
| 26. | Abigail Sowell v. Karen Reed & GEICO<br>(2009-CA002675, Bay Co.) PI/DEF | D: 11/22/11 | Peter S. Roumbos<br>[8/25/10] |
| 27. | Valerie Francois v. Torres-Rivera, M.D., et. al.<br>(09-CA-1513, St. Johns Co.) MM/PLTF | D: 12/13/11 | Corinne C. Hodak<br>[8/9/11] |
| 28. | Gregory Murphy v. Black and Decker<br>(2008 CA 13886 AH, Palm Beach Co.) PI/DEF | D: 12/14/11 | Bud Kirk<br>[8/23/11] |

**2012**
**Deposition/Trial Testimony**

KEY CODE(S): D = DEPOSITION; T = TRIAL; DEF = DEFENSE; PTF – PLAINTIFF; PI = PERSONAL
INJURY; MM = MEDICAL MALPRACTICE; PL = PRODUCT LIABILITY; WT = WRONGFUL
TERMINATION; CB = CLAIMS BILL/SPECIAL MASTER; RTMT = RETIREMENT; DISC =
DISCRIMINATION; LL = LIQUOR LIABILITY

| | **Case Reference** | **Testimony Date** | **Attorney Reference** |
|---|---|---|---|
| 1. | Roger "Dale" Travis v. Honda<br>(2010 CA 2935, Leon Co.) PI/PLTF | D: 1/5/12 | Halley B. Lewis, III<br>[10-5-10] |
| 2. | Shelby F. Ward v. Memorial Healthcare Group<br>(18-2008-CA-015285, Duval Co.) MM/PLTF | T: 1/13/12 & 1/17/12 | A. Jay Plotkin<br>[10-9-09] |
| 3. | Luis E. Silva v. FL Keys Petroleum Inc., et. al.<br>(08-80407 CA 13, Miami-Dade Co.) PI/DEF | D: 1/19/12 | Herbert C. Andrews<br>[11-7-11] |
| 4. | Abigail Sowell v. Karen Reed & GEICO<br>(2009-CA002675, Bay Co.) PI/DEF | T: 2/7/12 | Peter S. Roumbos<br>[8/25/10] |
| 5. | Elise Lobegeiger v. Yap (Teak, etc)<br>(11-21620-CIV-ALTONGA/SIMONTON, US S. Dist of FL) DEF/MM | D: 2/13/12 | Jacob A. Liro<br>[11/28/11] |
| 6. | Robert Rhodes v. Paul Calise, M.D., et. al.<br>(CACE 08001102 (12), Broward Co.) MM/DEF | T: 2/23/12 | Robert E. Paradela<br>[9/7/10] |
| 7. | James Puckett v. The Plastics Group, et. al.<br>(1:11-CV-1120-TCB, N. Dist. Of GA) PI/DEF | D: 2/29/12 | David I. Matthews<br>[12/12/11] |
| 8. | Benjamin Dilliner v. Leslie Herzog, D.O., et. al.<br>(10-16158 (11); Broward Co.) MM/DEF | D: 3/13/12 | Christine A. Brown<br>[2/14/11] |
| 9. | Charlotte Petrokus v. Delray Medical Center<br>(50-2010-CA-010351, Palm Beach Co.) MM/PLTF | D: 3/28/12 | Casey D. Shomo<br>[1/18/12] |
| 10. | Paula Sermons v. N. Shore Medical Cnt., et. al.<br>(11-3832 MA, Miami-Dade Co.) MM/DEF | D: 4/11/12 | Jonathan C. Abel<br>[3-16-11] |
| 11. | Thomas Flannery v. Silver Slipper<br>(2009 CA 2400, Leon Co.) PI/DEF | D: 5/8/12 | Britt L. Thomas<br>[1-19-12] |
| 12. | Leslie Opper v. William A. Exton<br>(31 2009 CA 11536, Indian River Co.) PI/DEF | T: 5/16/12 | Robin A. Blanton<br>[5/11/10] |
| 13. | Carl Wabnitz v. Dean Sider, M.D., et. al.<br>(11-CA 242-09-W, Orange Co.) MM/DEF | D: 5/24/12 | Thomas E. Dukes, III |
| 14. | Jose Incer v. Juan C. Perez<br>(10-508110 CA 25, Miami-Dade Co) PI/DEF | D: 6/20/12 | Peter A. Diamond<br>[9/22/11] |

15. David Burkett v. Shelton trucking, et. al.          D: 6/26/12          Jay W. Manuel
    (10-2037-CA, Bay Co) PI/PLTF                                            [7/18/11]

16. Kathleen Zeile v. Redding, Kirkland & Leggett       D: 7/12/12          Barry E. Newman
    (2009-CA-5011, Leon Co.) PI, PLTF                                       [3/15/10]

17. Charlotte Petrokus v. Delray Medical Center         D: 7/24/12          Casey D. Shomo
    (10/0025, Palm Beach Co.) MM/PLTF                                       [1/18/12]

18. Charlotte Petrokus v. Delray Medical Center         T: 8/2/12           Casey D. Shomo
    (10/0025, Palm Beach Co.) MM/PLTF                                       [1/18/12]

19. Marol Reak (deceased) v. Baptist Medical, et. al.   D: 8-15-12          R. Daniel Noey
    (06-2010-CA-013557, Duval Co.) WD, PLTF                                 [4-8-10]

20. Dennis Fagan v. NCH Healthcare                      T: 10-11-12         Ashley P. Withers
    (09-8856-CA, Collier Co.) PLTF/MM

21. Michelle Botchey v. Daniel Rombola, et. al.         D: 10-24-12         Chelsea R. Winicki
    (16-2011-CA 008615, Duval Co.) MM/DEF                                   [8/27/12]

22. John Metz v. United States of America               D: 11/1/12         Marilyn Koonce Lindsey
    (12-80084-CIV-DMM. United States District Court) PI/DEF                 [9-21-12]

23. Angel Acosta v. Healthspring of Florida             D: 11-14-12         Jonathan C. Abel
    (10-44640 CA 25, Miami-Dade Co.) MM/DEF                                 [7-13-12

# 2013
## Deposition/Trial Testimony

KEY CODE(S): D = DEPOSITION; T = TRIAL; DEF = DEFENSE; PTF – PLAINTIFF; PI = PERSONAL
INJURY; MM = MEDICAL MALPRACTICE; PL = PRODUCT LIABILITY; WT = WRONGFUL
TERMINATION; CB = CLAIMS BILL/SPECIAL MASTER; RTMT = RETIREMENT; DISC =
DISCRIMINATION; LL = LIQUOR LIABILITY

| | Case Reference | Testimony Date | Attorney Reference |
|---|---|---|---|
| 1. | Marol Reak (deceased) v. Baptist Med. Center (06-2010-CA-013557, Duval Co.) WD/PLTF | T: 1-10-13 | R. Daniel Noey [4-8-10] |
| 2. | Stephen Simpson v. C. Calvin Warriner, III (12-CA-009991-XXXX-MB-AA, Palm Bch) PI/DEF | D: 1-15-13 | Adam Rhys [11-21-12] |
| 3. | Jessica Trochez v. Wal-Mart Stores (10-48824 CA 01, Miami-Dade Co) PI/DEF | D: 1-23-13 | Bryan Brad Walton [11-1-11] |
| 4. | Dale Whyte v. Troy Weidlich, D.C., et. al. (09-007837, Broward Co.) MM/DEF | D: 2-14-13 | Robert S. Covitz [4-13-12] |
| 5. | Brayden Payamps v. Winnie Palmer, et. al. (68850-5, Orange Co.) MM/DEF | D: 3-14-13 | Joseph P. Menello [3-13-12] |
| 6. | Rafaell Harris v. Triple P. Distributing, et. al. (19183.01885, Duval Co.) PI/DEF | D: 3-19-13 | Tashía M. Small [11-8-12] |
| 7. | Randy Leihbeber v. FL Hospital Fish Memorial (2011-11371-CIDL, Volusia Co.) MM/DEF | D: 4-3-13 | Teresa M. Latham [9-20-12] |
| 8. | Barry Turner v. S.C. Rowe (10-2047-CA, Bay Co.) PI/DEF | T: 4-17-13 | Robert C. Crabtree [12-12-12] |
| 9. | Reginald Tillman v. USA (1:12-CV-081-MR/CRJ, Leon Co.) PI/DEF | D: 4-25-13 | Michael J. Harwin [2-27-13] |
| 10. | Darrin Whitaker (11000201CA, Baker Co.) PI/PLTG | D: 6-5-13 | Renee Daigle Harrell [11/2012] |
| 11. | Kathryn Dalgleish v. Walgreen Company, et. al. (16-2010-CA-000176, Duval Co.) PI/DEF | D: 5-28-13 | Arthur J. Laplante [9-27-11] |
| 12. | Thomas Warren v. Buckeye Florida Corp. (12-223-CA) PI/PLTF | D: 5-29-13 | Jon D. Caminez [3-15-12] |
| 13. | Kathryn Dalgleish v. Walgreen Company, et. al. (16-2010-CA-000176, Duval Co.) PI/DEF | T: 6-19-13 | Arthur J. Laplante [9-27-11] |
| 14. | David Stricsek v. Largo Medical Center (44.435, Hillborough Co.) MM/DEF | D: 7/2/13 | J. Russell Smith, Jr. [6/2013] |

15.   Jenney Howell v. Lily Le d/b/a Regal Nails          T:  9-12-13          Robert C. Crabtree
      (57-2010-1776-CA, Santa Rosa Co.) PI/DEF                                 [6/20/13]

Revised 9/10/2013

# McKay & Associates
# 2013 Fee Schedule

All professional time rendered by John K. McKay, Ph.D., will be invoiced at $300.00 per hour, with the exception of a minimum deposition fee.  Staff research, file management, and trial preparation may be billed at $150.00 per hour.

***Evaluations/Interviews:***  Evaluations and interviews with clients will only be conducted if file materials have been received in our office.  The file materials must be received within 7 days of a scheduled evaluation in order for the appointment to go forward.

"No shows" or cancellations without at least a 24 hour notice may be charged for lost time and travel expense, if incurred.  All clients should arrive for their appointments 15 minutes before the scheduled time.  ***If tentative appointment or deposition dates are given, please confirm with us within one week.  Unless our office is contacted, dates not confirmed within that time period will be released.***

Invoices are past due after 30 days.  Past due notices will be sent after 90 days.  The following are guidelines for 2011 services.

- **Retainer**........................................................................$2,000.00 on all cases

***File materials and/or a retainer fee must be received in our office within 30 days of initial case referral in order for the referral to remain active.   If neither are received within 30 days the referral will be considered void.***

- **Professional Time** (Dr. McKay) ... $300.00 per hour (expedited $360.00 per hour)

  - review file materials
  - all conferences
  - report preparation time
  - client interviewing and testing
  - most work-related travel
  - trial or deposition preparation

- **Staff time** ................................. $150.00 per hour (expedited $200.00 per hour)

  - data & information research
  - client interviews
  - organize profiles and summaries
  - case management services

- **Deposition fees**........................................... $600.00 minimum (up to 2 hours) then, $300.00 per hour thereafter

- **Expenses** ....................................................... Billed at cost or as listed below

- **Mileage reimbursement**...............................................................55¢ per mile

- **Lodging, meals, car rental, out of pocket expenses**...........................at cost

- **Copy file materials**.................................................................$.25 per page

- **Fax, telephone, general mailing**.....................................................no charge

- **Express mail, bulk packages**............................................................at cost

***Federal Tax ID #59-2054800***


EXHIBIT
C

# EXHIBIT

# G

*Affirmative Action*

Kim Harris
207 W. Walnut St
Perry, Fl 32348
850-584-2036

## TAYLOR COUNTY SCHOOL DISTRICT

~~Bullying Incident Report Form~~

Victim: _Kim L. Harris_   Grade: _III_

Name of Person Filing Report: _Kim L. Harris_

Relationship to Victim: _myself_

Date and Approximate Time of Incident: _Nov 7, 2011 around 12 or 1o_

When did you learn of this incident? _Yesterday when Mrs. Debbie
Little and Mr. Brandon and also Mr. Clayton_

Description of Incident – include names of those involved with
specific details – what, where, when, how, etc.:

Mrs. Debbie Little Instructor
Mr. Brandon has over the school
Mr. Clayton he sumthing I don't know his title

But I told the castondian Mrs. Mary I wish
she would not stand behind me all the time
dot makes me feel nervs that she need
to be doing her job picking up trash instead of
always standing behind me all the time
So Mrs. Little in front of the hold class yelling
at me saying I don't need to talk to her staff or
need to talk to me like that in front of the class
and she said and I have the right to write you up

List the names of any witnesses to this incident:


Signature _Kim L. Harris_

Date _Nov 8, 2011_


Please return this form to the Building Principal/Designee

15

.So I went back to my station then she comes to me and States to me Mr, Brandon wants me out side and I said if he wants me I'm over here at my station then he comes in the class room and calls my name and then I got up from my station and went out side with him and Debbie Little and George Clayton now at this time I'm crying and up set he said idl said he can come where I'm at in the class room but it all reflects on back on thursday 3, 2011 I went home at 2:20 Mrs. Little clocked me out and Shaneka Thomas out at 2:00 but Mrs Little don't know when I left School she Stated so she took it apon her self and went with 2:00 It wasn't the point she when I left School she stated so she took it apon clocked me out. Friday 4, 2011 I came in and in to school and seen that Mrs. Little had clocked me out at 2:00 instead and I ask her why did she clock me out at 2:00 instead of 2:20 So she in front of the class yelling back and onward with me and Shaneka I was eating my breakfast She called for Mr. Brandon and Dr. Dunkle but they wasn't there Friday and Mr. Lewis came down here to see what Mrs. Little wanted she Stated she wanted Mr. Brandon and Dr. Dunkle so she said she would see them Monday after that every one was with and we went to the other Classroom so we could work on our markins and some clients then we was let out of school at 11:30 no one mad and or argueing so Monday 7, 2011 I clocked in around 7:53 took my my test made a 76 on my test where I'm stressed out with this class I usually make A's and B's So then I clocked out around 8:59 I'm

Then I came back to school. Mrs Kittle and Shaneka is into from what I have been told we had to perform procedures on the stray students so I was in the side in the medi and pedi side and Mrs. Mary the custodian she always come and stand behind me make me uncomfortable and I said passing by Mary she needs to stop always standing behind me all the time that she needs to do her job she always coming in there getting her hair done and also sitting around. So I went on the other side on the floor put some get in a container and her comes Mrs Kittle yelling in front of the class saying I don't need to talk to her staff like that and I told her she don't need to talk to me like that in front of the class. So she called Mr. Brandon and Mr. Clayton down to the corner class and she said she feared for her life after that I told Mr. Brandon she does other students clients hair and do for them and she but want to help the blacks. She has leveled me from day one would tell the class if they get a bad client we gone send them to Kim and it made me feel aweful because she has labeled me and she too pick and choose clients to students also. And at 26, 2011 We started talking clients I was skipped her Katie was the respectionists and she was suppo her Katie to go down the list in ABC order I was the only black that day in class so Megan Hunt went before Kim Harris they gave her the client before me and

Because Megan Client is not from Perry and she don't even know the client but slipped over me and gave him to Megan Client and when I brought it to there attention they wanted to butter up and say that they sorry so I locked out went home and cried and then I came back after lunch at this time Shanika Thomas was there and Mrs. Little knew it was wrong she went to the business class and ask the teacher to send two Clients from there and Mrs. Little made the statement I don't want no one feel like they been slipped and she knew I was but I prefom the pedi and medi on a client and she sends clients to student she favors.

# EXHIBIT

# H

**SOCIAL SECURITY ADMINISTRATION**

Refer To: 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

Office of Disability Adjudication and Review
SSA ODAR Hearing Ofc
Desoto Building, #400
8880 Freedom Crossing
Jacksonville, FL 32256-1224

Date: October 29, 2010

Kim Lasalle Harris
207 W Walnut St
Perry, FL 32348

## Notice of Decision – Fully Favorable

I carefully reviewed the facts of your case and made the enclosed fully favorable decision. Please read this notice and my decision.

Another office will process my decision and decide if you meet the non-disability requirements for Supplemental Security Income payments. That office may ask you for more information. If you do not hear anything within 60 days of the date of this notice, please contact your local office. The contact information for your local office is at the end of this notice.

### If You Disagree With My Decision

If you disagree with my decision, you may file an appeal with the Appeals Council.

### How To File An Appeal

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision. You may use our Request for Review form (HA-520) or write a letter. The form is available at www.socialsecurity.gov. Please put the Social Security number shown above on any appeal you file. If you need help, you may file in person at any Social Security or hearing office.

Please send your request to:

**Appeals Council**
**Office of Disability Adjudication and Review**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

### Time Limit To File An Appeal

You must file your written appeal **within 60 days** of the date you get this notice. The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

The Appeals Council will dismiss a late request unless you show you had a good reason for not

Form HA-L76 (03-2010)

See Next Page

Kim Lasalle Harris (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)                                   Page 2 of 3

filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case. You may also send us new evidence. You should send your written statement and any new evidence **with your appeal.** Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case. It will consider all of my decision, even the parts with which you agree. Review can make any part of my decision more or less favorable or unfavorable to you. The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do. If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal. If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final. A final decision can be changed only under special circumstances. You will not have the right to Federal court review.

**If You Have Any Questions**

We invite you to visit our website located at www.socialsecurity.gov to find answers to general questions about social security. You may also call (800) 772-1213 with questions. If you are deaf or hard of hearing, please use our TTY number (800) 325-0778.

See Next Page

Form HA-L76 (03-2010)

Kim Lasalle Harris (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)                              Page 3 of 3

If you have any other questions, please call, write, or visit any Social Security office. Please have this notice and decision with you. The telephone number of the local office that serves your area is (850)942-8978. Its address is:

> Social Security
> 2002 Old St Augustine
> Building B-12
> Tallahassee, FL 32301-1329

> Stephen C. Calvarese
> Administrative Law Judge

Enclosures:
Form HA-L15 (Fee Agreement Approval)
Decision Rationale

cc:     James Kole
        Law Office Of Proctor
        & Kole
        229 Pinewood Dr.
        Tallahassee, FL 32303

Form HA-L76 (03-2010)

# SOCIAL SECURITY ADMINISTRATION
## Office of Disability Adjudication and Review

### ORDER OF ADMINISTRATIVE LAW JUDGE

**IN THE CASE OF**                         **CLAIM FOR**

Kim Lasalle Harris                          Period of Disability, Disability Insurance
_____                     Benefits, and Supplemental Security Income
(Claimant)

_____                     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
(Wage Earner)                               (Social Security Number)

I approve the fee agreement between the claimant and her representative subject to the condition that the claim results in past-due benefits. My determination is limited to whether the fee agreement meets the statutory conditions for approval and is not otherwise excepted. I neither approve nor disapprove any other aspect of the agreement.

**YOU MAY REQUEST A REVIEW OF THIS ORDER AS INDICATED BELOW**

**Fee Agreement Approval:** You may ask us to review the approval of the fee agreement. If so, write us within 15 days from the day you get this order. Tell us that you disagree with the approval of the agreement and give your reasons. Your representative also has 15 days to write us if he or she does not agree with the approval of the fee agreement. Send your request to this address:

>           Ollie Garmon
>           Regional Chief Administrative Law Judge
>           SSA ODAR R O
>           Suite 20t10
>           61 Forsyth Street S W
>           Atlanta, GA 30303

**Fee Agreement Amount:** You may also ask for a review of the amount of the fee due to the representative under this approved fee agreement. If so, please write directly to me as the deciding Administrative Law Judge within 15 days of the day you are notified of the amount of the fee due to the representative. Your representative also has 15 days to write me if he/she does not agree with the fee amount under the approved agreement.

You should include the social security number(s) shown on this order on any papers that you send us.

/s/ *Stephen C. Calvarese*
_____
Stephen C. Calvarese
Administrative Law Judge

October 29, 2010
_____
Date

Form HA-L15 (03-2007)

# SOCIAL SECURITY ADMINISTRATION
## Office of Disability Adjudication and Review

## DECISION

**IN THE CASE OF**                          **CLAIM FOR**

Kim Lasalle Harris                          Period of Disability, Disability Insurance
_____            Benefits, and Supplemental Security Income
(Claimant)
                                            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
_____            _____
(Wage Earner)                               (Social Security Number)

## JURISDICTION AND PROCEDURAL HISTORY

This case is before the undersigned on a request for hearing dated June 9, 2009 (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*). The claimant appeared and testified at a hearing held on October 21, 2010, in Tallahassee, FL. Robert N Strader, an impartial vocational expert, also appeared at the hearing. The claimant is represented by James Kole, an attorney.

The claimant has amended the alleged onset date of disability to October 14, 2009.

## ISSUES

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through June 30, 2014. Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful review of the entire record, the undersigned finds that the claimant has been disabled from October 14, 2009, through the date of this decision. The undersigned also finds that the insured status requirements of the Social Security Act were met as of the date disability is established.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is

See Next Page

disabled (20 CFR 404.1520(a) and 416.920(a)).  The steps are followed in order.  If it is
determined that the claimant is or is not disabled at a step of the evaluation process, the
evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial
gainful activity (20CFR 404.1520(b) and 416.920(b)).  Substantial gainful activity (SGA) is
defined as work activity that is both substantial and gainful.  If an individual engages in SGA,
she is not disabled regardless of how severe her physical or mental impairments are and
regardless of her age, education, or work experience.  If the individual is not engaging in SGA,
the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable
impairment that is "severe" or a combination of impairments that is "severe" (20 CFR
404.1520(c) and 416.920(c)).  An impairment or combination of impairments is "severe" within
the meaning of the regulations if it significantly limits an individual's ability to perform basic
work activities.  If the claimant does not have a severe medically determinable impairment or
combination of impairments, she is not disabled.  If the claimant has a severe impairment or
combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination
of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part
404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925,
and 416.926).  If the claimant's impairment or combination of impairments meets or medically
equals the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and
416.909), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first
determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)).  An
individual's residual functional capacity is her ability to do physical and mental work activities
on a sustained basis despite limitations from her impairments.  In making this finding, the
undersigned must consider all of the claimant's impairments, including impairments that are not
severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual
functional capacity to perform the requirements of her past relevant work (20 CFR 404.1520(f)
and 416.920(f)).  If the claimant has the residual functional capacity to do her past relevant work,
the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not
have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the
undersigned must determine whether the claimant is able to do any other work considering her
residual functional capacity, age, education, and work experience.  If the claimant is able to do
other work, she is not disabled.  If the claimant is not able to do other work and meets the
duration requirement, she is disabled.  Although the claimant generally continues to have the
burden of proving disability at this step, a limited burden of going forward with the evidence
shifts to the Social Security Administration.  In order to support a finding that an individual is

not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g), 404.1560(c), 416.912(g) and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

1. **The claimant's date last insured is June 30, 2014.**

2. **The claimant has not engaged in substantial gainful activity since October 14, 2009, the amended alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).**

3. **The claimant has the following severe impairments: pelvis fracture; left ankle fracture; right ankle fracture with Achilles tendon rupture; sacroiliac fracture/dislocation (20 CFR 404.1520(c) and 416.920(c)).**

4. **The severity of the claimant's impairments meets the criteria of section 1.03 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d) and 416.925).**

In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-6p and 06-3p.

The claimant's impairments meet listing 1.03, which provides:

1.03 *Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint,* with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

The record reflects that the claimant was involved in a severe motor vehicle accident in October 2009, in which she suffered a pelvic fracture, followed by open reduction internal fixation; a fracture/dislocation of her left ankle, followed by relocation and external fixation; a left fibula fracture; and right ankle fracture with Achilles tendon rupture and repair. The claimant has undergone multiple subsequent surgeries as well as physical therapy. The record reflects that as of April 2010, the claimant was using a walker for ambulation (Exhibits B24F; B25F.) The claimant continues to use a rolling walker, and is unable to ambulate without it.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible.

See Next Page

The State agency medical consultants' physical assessments and psychological consultants' mental assessments are given little weight because the State agency consultants did not adequately consider the claimant's subjective complaints or the combined effect of the claimant's impairments.

**5.  The claimant has been under a disability as defined in the Social Security Act since October 14, 2009, the amended alleged onset date of disability (20 CFR 404.1520(d) and 416.920(d)).**

## DECISION

Based on the application for a period of disability and disability insurance benefits filed on July 16, 2008, the claimant has been disabled under sections 216(i) and 223(d) of the Social Security Act since October 14, 2009.

Based on the application for supplemental security income filed on July 23, 2008, the claimant has been disabled under section 1614(a)(3)(A) of the Social Security Act since October 14, 2009.

The component of the Social Security Administration responsible for authorizing supplemental security income will advise the claimant regarding the nondisability requirements for these payments and, if the claimant is eligible, the amount and the months for which payment will be made.

It is also noted that medical improvement is expected with appropriate treatment.  Consequently, a continuing disability review is recommended in 24 months.

It appears that the claimant's interests will best be served by the appointment of a representative payee.  Accordingly, the undersigned _directs_ the appointment of a representative payee pursuant to Section 404.2001 of Subpart U, Regulations No. 4.


/s/ _Stephen C. Calvarese_
Stephen C. Calvarese
Administrative Law Judge

October 29, 2010
Date

# EXHIBIT

# I

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KIM L. HARRIS,

      Plaintiff,

vs.                             Civil Action No. 4:13-CV-171-RH/CAS

TAYLOR COUNTY SCHOOL DISTRICT

      Defendant.

_____/

## NOTICE OF SERVICE OF PLAINTIFF'S
## ANSWERS TO FIRST INTERROGATORIES

      Notice is hereby given that Plaintiff, Kim L. Harris, has served her Answers to Defendant's

First Interrogatories via U.S. Mail on July   5  , 2013 to counsel for Defendants, David M.

Delaney, Dell Graham, P.A., 203 NE 1st Street, Gainesville, FL 32601.

                           Respectfully submitted,

                           Charlotte Fernee (FBN: 90105)
                           Marie A. Mattox, P.A.
                           310 E. Bradford Rd.,
                           Tallahassee, FL 32303
                           Telephone: (850) 383-4800
                           Fax: (850) 383-4801

                           Attorney for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KIM L. HARRIS,

     Plaintiff,

vs.                             Civil Action No. 4:13-CV-171-RH/CAS

TAYLOR COUNTY SCHOOL DISTRICT

     Defendant.

_____/

## PLAINTIFF'S ANSWERS TO DEFENDANT'S
## FIRST SET OF INTERROGATORIES

Plaintiff Kim L. Harris answers Defendant's First Set of Interrogatories as follows:

1. Identify and state the name(s), address(s) and telephone number(s) of each person who participated and/or assisted in answering these Interrogatories, and, if applicable, the person's official position or relationship with the party to whom the Interrogatories are directed.

**ANSWER:** I am answering these documents myself with the assistance of staff in my counsel's office for formatting only.

2. Please state if you have ever been a party, either plaintiff or defendant, in a lawsuit other than the present matter and if so, state whether you were plaintiff or defendant, the nature of the action, and the date and court in which such suit was filed.

**ANSWER:** Yes, I have been involved in another lawsuit.
I was the Plaintiff, I filed against Lance
Nature: Discrimination
Date: 2007
Location: Perry, FL

3. List all former names you were known by and when you were known by those names. State all addresses where you have lived for the past 10 years, the dates you have lived at each address, your date of birth, and, if you are or have ever been married, the name of your spouse.

**ANSWER:**
I have no other names other than name listed in Number 1.
Date of Birth: April 23, 1973
I have never been married
905 W. Willow Ave., Perry, FL? (I have lived at this address for 3 months)
207 W. Walnut Street, Perry, FL (I lived at this address from childhood until I moved to Willow Ave.)

4. Other than the claims involved in this Lawsuit, have you ever complained either formally or informally to the School District and/or its agents regarding any form or kind of discrimination, filed a claim with the Office of Civil Rights or any other federal, state, or local agency and if so, please describe each complaint including but not limited to the name and address of the person(s) to whom you complained, the relevant date(s), the details of the alleged discrimination, each action taken pursuant to your complaint or claim, and the determination, if any, as to your complaint or claim.

**ANSWER:** No.

5. Describe in detail each act or omission on the part of the School District that you contend constituted discrimination and/or retaliation against you under 1000.05, 29 U.S.C. §794, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d et seq, 42 U.S.C. §1981, and 42 U.S.C. §12131 et seq regarding the claims asserted in this Lawsuit.

**ANSWER:** I was kicked out of school for no reason. I was a good student, passing all my classes. I never had any issues with Ms. Little until I reported to Mr. Brannon and Mr. Clayton that she (Ms. Little) didn't like helping black students do procedures, like she helped the white students. After I said that, Ms. Little told Mr. Brannon to remove me from the class. When I asked her not to do that, she told me she was tired of me crying to her and she was done. Then Mr. Brannon told me to get my things that Cosmetology was not for me.

6. Identify each individual category of damages and the amount thereof, including compensatory damages, special damages, attorney's fees and costs, expert fees and costs, and any other category of damages of which you claim to have suffered and/or incurred as a result of the alleged discrimination and/or retaliation which is the subject matter of the Lawsuit and specify how the amount of each item of damages was computed, including whether you relied on actual costs incurred, estimated costs or any other source of information relied upon for calculating such damages.

**ANSWER:**
**Emotional Damages:** Because of Defendant's actions against me, I have suffered from depression and anxiety. Because of the loss of wages, I have suffered from additional stress because of my inability to meet my financial obligations. I am entitled to damages relating to mental anguish, emotional distress, depression, anger, escalated levels of stress, feelings of helplessness, embarrassment, humiliation, loss of capacity for the enjoyment of life, and illness. It is not my attorney's practice to ask the jury for a set financial award for intangible damages but instead, it is their practice to ask the jury to award an amount of

money for emotional pain and suffering that will fairly compensate me for the mental pain and suffering endured as a result of the unlawful acts of the Defendant. I am asking for the maximum amount allowed by law.

**Wage**: I am currently not working. Had I been able to finish the program with the Defendant, I could have earned up to $1000.00/wk. From July 2011-July 2013, I would have made $104,000.

7.     State the name and address of every person known to you, your agents, or your attorneys, who has knowledge about, or possession, custody, or control of, any documentary evidence, model, plat, map drawing motion picture, videotape or photograph pertaining to any fact or issue involved in this Lawsuit; and describe as to each what item such person has, the name and address of the person who took or prepared it, and the date it was taken or prepared.

**ANSWER:** I am not aware of anyone who would have any such documentation.

8.     Name all instances in which you were excluded from participation in, denied the benefits of: or subject to discrimination under any educational program or activity on the basis of disability or race while enrolled in the cosmetology program at Taylor Technical Institute or by the School District as a whole.

**ANSWER:** I was denied the special chair and station;(this chair would have allowed me to sit while I do my client's hair so I would not have to be on my feet for long periods of time). I was denied graduating from a program I enjoyed. I was denied obtaining my Certificate in Cosmetology. I was denied the opportunity to be working, earning wages in this field.

9.     Name all instances in which you requested from the School District reasonable accommodations for your disability, including the date of each request you made for a "special chair" and to whom those requests were made.

**ANSWER:** I did not make any accommodation requests to the School District. I made an accommodation for a special chair and station request to Carl Schorr with the Department of Education, Division of Vocational Rehabilitation in 2010/2011 when I started the Cosmetology Program. The School District knew about this request however. Brannon knew about this request. When I would ask about when the chair/station was coming, I was told it was coming, it was coming. When I asked Debbie Little about when the chair/station was coming, she told me she knew nothing about the chair.

10.    Name all accommodations the School District provided to enable you to participate in the cosmetology program at Taylor Vocational Institute.

**ANSWER:** The School District never provided me with an accommodation.

11.    Set forth in detail how Vocational Rehabilitation was to assist you in your completion of the cosmetology program at Taylor Technical Institute and what it

means to be a "client" of Vocational Rehabilitation.

**ANSWER:** They helped me pay my child's day care fees which allowed me to be able to go to school. They told me they would be able to get me a special chair/station so I would be able to complete my training and work without out having to stand up for long periods of time.

Being a client of Vocational Rehabiliation, means that I worked with a counselor to make sure that I was able to move into the workforce after having a injury. They met with me to figure out what areas of study I would be interested in and then worked with me to see that I had everything I would need in order to be able to successfully complete this program; from   special chairs, to general assistance with family (ie care for my child while I was in school)

12.     Do you contend that you have lost any income, benefits, or earning capacity in the past or future as a result of the incident described in the complaint? If so, state the nature of the income, benefits, or earning capacity, and the amount and the method that you used in computing the amount.

**ANSWER:** Had I been able to finish the program with the Defendant, I could have earned up to $1000.00/wk.  From July 2011-July 2013, I would have made $104,000.

This is a varying amount in that what I made depends on customers I would have had and what services they would have wanted.

13.     If   you   contend   that   any   person   was   a   witness   to   the   alleged discrimination/retaliation you claim to have suffered by the School District please state as to each and every witness the name, address and title of each witness, the date on which the witness saw or heard of the alleged discrimination/retaliation, the location of each at the time he or she saw, heard or learned about the alleged discrimination/retaliation, the substance of all information or knowledge about the alleged discrimination/retaliation known to each   such witness and whether any such witness gave any statement or account, either orally or in writing, of his/her knowledge of the alleged discrimination/retaliation.

**ANSWER:** I am answering this question to the best of ability and knowledge:

**Debbie Little**-c/o Defendant; knowledge of her comments that she was going to send all the stinky clients to me; knowledge that she treated white students more favorably than me; knowledge that she often yelled at me in front of the class; knowledge of her role in getting me removed from the cosmetology program; may have knowledge of the claims and defenses in this matter.

 **Mr. Brannon**-c/o Defendant; knowledge of my complaints of discrimination; knowledge that he did not look into the investigation; knowledge of his role in having me removed from the cosmetology program; knowledge of Ms. Little's comment that she "did not want to deal with me anymore; may have knowledge of the claims and defenses in this matter.

**Mr. Clayton**-c/o Defendant; knowledge of my complaints of discrimination; knowledge that he did not look into the investigation; knowledge of his role in having me removed from the cosmetology program; knowledge of Ms. Little's comment that she "did not want to deal with me anymore; may have knowledge of the claims and defenses in this matter.

I do not have the addresses' of the following students.  Defendant would have this information on file:

**Amy Dice**-knowledge of her statement regarding the time clocks; knowledge that Ms. Little favored white students over black students; knowledge that Ms. Little assisted white students more often than she assisted black employees; knowledge of my disability and need for a special chair; knowledge that she was a witness to the incident when Ms. Little told me "not to talk to her staff that way" knowledge that she was a witness when Ms. Little kicked me out of the program because she "didn't want to deal with me anymore"; may have knowledge of the claims and defenses in this matter.

**Kelly Young**- knowledge that Ms. Little favored white students over black students; knowledge that Ms. Little assisted white students more often than she assisted black employees; knowledge of my disability and need for a special chair; knowledge that she was a witness to the incident when Ms. Little told me "not to talk to her staff that way" knowledge that she was a witness when Ms. Little kicked me out of the program because she "didn't want to deal with me anymore"; may have knowledge of the claims and defenses in this matter.

**Patricia Huffman**- knowledge that Ms. Little favored white students over black students; knowledge that Ms. Little assisted white students more often than she assisted black employees; knowledge of my disability and need for a special chair; knowledge that she was     a witness to the incident when Ms. Little told me "not to talk to her staff that way" knowledge that she was a witness when Ms. Little kicked me out of the program because she "didn't want to deal with me anymore"; may have knowledge of the claims and defenses in this matter.

**Jennifer Ferguson**-knowledge that Ms. Little favored white students over black students; knowledge that Ms. Little assisted white students more often than she assisted black employees; knowledge of my disability and need for a special chair; knowledge that she was a witness to the incident when Ms. Little told me "not to talk to her staff that way" knowledge that she was a witness when Ms. Little kicked me out of the program because she "didn't want to deal with me anymore"; may have knowledge of the claims and defenses in this matter.

**Shaneka Royal**- knowledge of my statement to her "I wish Mary would go pick up trash and stop standing behind me all the time"; knowledge that Ms. Little favored white students over black students; knowledge that Ms. Little assisted white students more often than she assisted black employees; knowledge of my disability and need for a special chair; knowledge that she was a witness to the incident when Ms. Little told me "not to talk to her staff that way" knowledge that she was a witness when Ms. Little kicked me out

of the program because she "didn't want to deal with me anymore"; may have knowledge of the claims and defenses in this matter.

**LaUntris Simmons**-knowledge that Ms. Little favored white students over black students; knowledge that Ms. Little assisted white students more often than she assisted black employees; knowledge of my disability and need for a special chair; knowledge that she was a witness to the incident when Ms. Little told me "not to talk to her staff that way" knowledge that she was a witness when Ms. Little kicked me out of the program because she "didn't want to deal with me anymore"; may have knowledge of the claims and defenses in this matter.

**Olonda Bishop**-knowledge that Ms. Little favored white students over black students; knowledge that Ms. Little assisted white students more often than she assisted black employees; knowledge of my disability and need for a special chair; knowledge that she was a witness to the incident when Ms. Little told me "not to talk to her staff that way" knowledge that she was a witness when Ms. Little kicked me out of the program because she "didn't want to deal with me anymore"; may have knowledge of the claims and defenses in this matter.

**Paul Dyal**-c/o Defendant; knowledge of my complaint regarding Ms. Little; knowledge that he responded to my complaint; may have knowledge of the claims and defenses in this matter.

14.    Set forth in detail the circumstances/events leading up to Ms. Little's alleged statement "Kim, you don't have the right to talk to my staff like that," including all statements made by you to Ms. Little and the janitor.

**ANSWER:** When I got to school that day, I went to the nail and pedicure side. The janitor came over and stood beside me. She was always watching how I held my arm when I work on clients. I turned to Shaneka and said to her, "I wish Mary would go pick up trash and stop standing behind me all the time".

Later, when I was on the salon side, Ms. Little comes in to the area where I was and yelled at me, "you don't talk to my staff like that". I told her she did not have the right to talk to me like this in front of the class.

15.    Identify with specificity the facts, witnesses or documents that support your allegation in paragraph 20 of your Complaint that Defendant "harbored ill-motives and intent to cause despair and retaliatory treatment of Plaintiff..."

**ANSWER:** After I complained to Mr. Brannon and Mr. Clayton regarding how Ms. Little treated me, refused to work with me and favored her white favorites, Ms. Little told Mr. Brannon that she did not want me in her class anymore. She told me she was tired of my crying and whining.

Instead of Mr. Brannon handling the matter, he told me to gather my things that I was being dis-enrolled from the cosmetology program but that I could re-enroll in another program next year.

I was passing all of my classes and had good grades, but I still got kicked out of the program because Ms. Little requested it.

16.    Identify with specificity the facts, witnesses or documents that support your allegation in paragraph 26 of your Complaint that you "voiced opposition to unlawful practices" during your enrollment In addition to the foregoing, please set forth the specific policies or procedures the School District maintained that you deem unlawful.

ANSWER: I have a memo from Paul Dyal, Superintendent of Taylor County School in response to my complaint, dated December 8, 2011. I have my complaint; dated November 2011.

I think that the Defendant violated its attendance policy. I also think that the Grievance Procedure was violated.

17.    Since the date of the alleged discrimination/retaliation have you undergone or received any treatment of any mental or emotional disturbance or distress? If your answer is in the affirmative, please state as to any such mental or emotional disturbance:

a.    The nature and extent of any such treatment;
b.    The names and addresses of each doctor, psychiatrist, psychologist, practitioner, hospital, clinic or institution treating you;
c.    All diagnoses made concerning any such condition, giving the date of each;
d.    All prognoses made concerning any such condition, giving the date of each;
e.    The date of any such treatment; and
f.    The cost of any such treatment.

ANSWER:
Apalachee Center Inc. Taylor County Clinic-1421 Old Dixie Highway, Perry, Florida 32348; treated for Bi-Polar (mixed-moderate); 2011-current; I don't know the cost; Medicare/Medicaid pays for my visits;

18.    List the names and business addresses of all physicians, medical facilities, or other health care providers by whom you have been examined or treated in the past 10 years; and state as to each the dates of examination or treatment and the condition or injury for which you were examined or treated.

ANSWER: I am answering this question to the best of my recollection.

Tallahassee Orthopedic Center, 3334 Capital Medical Boulevard, Tallahassee, Florida 32308; 2009; car accident

Tallahassee Memorial Hospital-Women's' Pavilion, 1300 Miccosukee Road, Tallahassee, Florida 32308; 2008-2009 (pregnancy care; childbirth)

Doctor's Memorial Hospital- 3/2013; severe side pains; sleep apena (5/2013)

Doctor's Memorial Hospital (Clinic)-Primary Care; well women checks, annual check- up; general cold/flu; 2012-current

Tallahassee Memorial Hospital (ER), 1300 Miccosukee Road, Tallahassee, Florida 32308; 2009; car accident

Premiere Medical-2012 (4 months); well women checks, annual check- up; general cold/flu;

19.     Do you intend to call any expert witnesses at the trial of this Lawsuit? If so, state each such witness's name and business address, the witness' qualifications as an expert, the subject matter upon which the witness is expected to testify, the substance of the facts and opinions to which the witness is expected to testify, and a summary of the grounds for each opinion.

**ANSWER:** It is unknown at this time whether or not experts will be used at the trial.

20.     Please describe in detail each step you have taken to mitigate damages, indicating the dates on which each step was taken and the precise extent to which each step has mitigated the Plaintiff's damages.

**ANSWER**: I am not currently working.
In 9/2012, I started taking online classes with the University of Phoenix

21.     Please describe in detail all complaints, either formally or informally, of disability or racial discrimination made to anyone by you or any of your classmates regarding the educational programs administered by the School District. In addition to the foregoing, identify in detail to whom the complaints were made and all documents in connection with such complaints.

**ANSWER:**   Other than the current matter, I have not made any other complaints regarding the education programs offered by the School District.

22.     Identify the name and address of each employer with whom you sought employment for the past five (5) years, the date of each application to same, and the reason you were given for not being hired and/or the status of each application.

**ANSWER:**
Employer: Pepper Heads
Address: 2715 S. Byron Butler Parkway, Perry, Florida
Date of Application: I do not recall
I was hired and worked for five months

# AFFIDAVIT

_Kim L. Harris_

Kim L. Harris

STATE OF FLORIDA,
COUNTY OF _Leon_ .

The foregoing was acknowledged before me by _Kim L. Harris_ , who

is personally known to me or have produced _FL DL H620-512-73-043-0_ as identification, this

_29th_ day of _June_, 2013.

_Mary Moody_

Notary Public, State of Florida

Printed Name: _____

Commission Expires:

_____

# EXHIBIT

# J

Progress Notes
ACHS 305/05 – Page 1
(Progress Notes Tab)

APALACHEE
CENTER

| Last Name: Harris | First Name: Kim | M.I.: | Client #: 11449276 |
|---|---|---|---|

| Service Date (mm/dd/yy): 8 / 31 / 11 | Setting: Home Visit | Service: TCM |
|---|---|---|

| Start Time: 2 : 30 pm | End Time: 3 : 30 pm | 1.00 |
|---|---|---|

(If Applicable to TCM: *Travel Time*   0   *Distance*   0   )
=                      =

(If Applicable - Last 30   0   *Days Worked*   $   0   Employment Income)
Days:

ASSESSMENT (Reference Target Objectives):

Target Case Management.
Home Visit / Follow up.

S) I am still trying to get vocational rehabilitation they are suppose to buy me a chair for school and some stockings. I have not heard from them. I need to get their number again. They have not heard from them.

O) Kim was happy to see this RS when she came to the home. She had a smile on her face.

A) RS met with Kim and her little girl today in the home because it has been a while since this RS visited her in the home. Kim is making progress with her walking. She is not using the cane not the walker or the crunches. She is still has many more surgeries to perform on her leg and her thigh. She wishes that she could be back the way that she was before she has the wreck with the truck. RS advised her to continue to do what the therapist advises her to do and you will need to take one day at a time. You cannot rush things. I am impress that you are able to drive and an maneuver without assists. She is continues to take care of her daughter and she was able to get in school.

PLAN:   Follow up with Kim on monthly bases.

PROVIDER:   *Wilhelmenia Blue*   *BS / RS*   8/31/11
            Signature            Degree/Title   Date

| Staff Name: Wilhelmenia Blue | Staff Credentials BS / RS |
|---|---|

This information has been disclosed to you from records protected by Federal confidentiality rules (42 CFR part 2). The Federal rules prohibit you from making any further disclosure of this information unless further disclosure is expressly permitted by the written consent of the person to whom it pertains or as otherwise permitted by 42 CFR Part 2. A general authorization for the release of medical or other information is NOT sufficient for this purpose. The Federal rules restrict any use of the information to criminally investigate or prosecute any alcohol or drug abuse patient.

Progress Notes
ACHS 305/05 - Page 1
(Progress Notes Tab)

APALACHEE
CENTER

| Last Name: Harris | First Name: Kim | M.I.: | Client #: 11449276 |
|---|---|---|---|

| Service Date (mm/dd/yy): 10 / 11 / 11 | Setting: Office Visit | Service: TCM |
|---|---|---|

| Start Time: 12 : 30 pm | End Time: 1 : 00 pm | .30 |
|---|---|---|

(If Applicable to TCM: *Travel Time*      0.     *Distance*      0     )
                                                =

(If Applicable - Last 30 Days:      0      *Days Worked*     $   0.     Employment Income)

ASSESSMENT (Reference Target Objectives): Target Case Management
Medication Appointment

S) I came by to let you know that I am back in cosmetology school and I am doing well. I am enjoying what I like doing. I want to someday be able to open my own salon. My daughter is in day care while I attend school by daughter is in day care and she love it. I do heads part time on the side until I can branch out on my own. I came in for my appointment with the doctor. I am feeling good. I hurt but this is to be expected. I like school and I got a brace for my leg just in case standing on it too much or I am allowed to sit down at school they give me no flack about as long as I can get my work done.

O) Kim was well groomed and she had a big smile on her face. She appears to be happy and she is driving again. She was dressed in her outfit for cosmetology school that they have to wear.

A) RS talked with Kimberly briefly because she had to get back to class at TTI. Kim is doing better and she is happy and very positive. She is not that negative and moody person. She is moving on with her life for her child sake. She is not going to any grieving sessions any more according to her she is taking each day by day and she is going to church and praying daily.

PLAN:   Follow up with Kim on monthly bases.

PROVIDER:   *Wilhelmenia Blue*        BS RS                    10/11/11
            Signature                 Degree/Title                Date

Staff Name: Wilhelmenia Blue        Staff Credentials BS / RS

This information has been disclosed to you from records whose confidentiality is protected by Federal law. Federal regulations (42 CFR Part 2) prohibit you from making any further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is NOT sufficient for this purpose. The Federal rules restrict any use of the information to criminally investigate or prosecute any alcohol or drug abuse patient.

Progress Notes
ACHS 305/05 - Page 1
(Progress Notes Tab)

**APALACHEE**
CENTER

| Last Name: Harris | First Name: Kim | M.I.: | Client #: 11449276 |
|---|---|---|---|

| Service Date (mm/dd/yy): 10 / 13 / 11 | Setting: Office | Service: TCM |
|---|---|---|

| Start Time: 3 : 00 pm | End Time: 5 : 30 pm | 2.30 |
|---|---|---|

(If Applicable to TCM: *Travel Time*        0        *Distance*        0        )
=

(If Applicable - Last 30 Days:        0        *Days Worked*   $        0        Employment Income)

ASSESSMENT (Reference Target Objectives):

Target Case Management
File Review / Updated CSP and Authorizations/ Medication List and Questionnaire
S) I am here to complete whatever forms I need to complete. I want to let you know that I was able to get back in school at Taylor Technical Institution. I am taking up cosmetology. I am enjoying this and I wanted to have this opportunity to try to do whatever is required on my own to see I can do it. I am doing well because I like doing hair and this is what I want to do. I am going to give it my all and my best. My child is going to day care and we have to wear uniforms and I have purchased them. Thus far things are going well for me.
O) Kim arrived today and she was dressed in her school uniform and she was smiling.
A) RS met Kim and this RS updated authorizations for: school, probation, pharmacy, PCP. RS assisted with Kim completing the medical questionnaire and obtained update medication list. RS completed the PCP notification and RS updated Kim's client service plan according to what she requested. RS completed and she signed it upon reviewing it. Kim is in school and according to her she is doing well. She drove herself to this appointment. Kim was very helpful in completing everything this RS needed up to update. Kim is being compliant with her medications and she reports that she is taking her medications as prescribe and her mood is making some progress.

PLAN:   Follow up with Kim on monthly bases to see how she is getting along.

PROVIDER: *Wilhelmenia Blue*        BS/RS        10/13/11
Signature                                      Degree/Title                      Date

| Staff Name: Wilhelmenia Blue | Staff Credentials BS / RS |
|---|---|

EXHIBIT

K

00001

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF FLORIDA
 2                       TALLAHASSEE DIVISION
                  Civil Action No.:  4:13-CV-171-RH/CAS
 3

 4    KIM L. HARRIS,
                Plaintiff,
 5
      v.
 6
      TAYLOR COUNTY SCHOOL DISTRICT,
 7              Defendant.
      _____
 8

 9
                          DEPOSITION OF
10
                        WILHELMENIA BLUE
11

12             taken on behalf of the Defendants

13

14    DATE TAKEN:   December 4, 2013
      TIME:         9:30 a.m. – 10:45 a.m.
15    PLACE:        Perry Chamber of Commerce
                    428 North Jefferson Street
                    Perry, Florida  32347
16

17
               Examination of the witness taken before:
18
                    Ashley Brimer, Court Reporter
19          Transcribed by Cassie Minnich, FPR, Court Reporter
                  Notary Publics, State of Florida at Large
20          136 SW Nassau Street, Lake City, Florida  32025

21

22

23
                    THIRD CIRCUIT REPORTERS & VIDEO
24                     Toll-Free:  855-850-7038
                        www.AllCourtReporters.com
25
```

00039
```
 1   verbalize to me and tell me, where somebody else would
 2   probably be judgmental and be more negative toward her.
 3   My thing was to keep her calm and let's stay so that
 4   she would talk to me and have an open communication
 5   with me.
 6       Q   Did Kim have bipolar disorder?
 7       A   I believe that was one of her diagnosis.
 8       Q   What about -- what do you know about Kim's
 9   criminal history?
10       A   Not a whole lot.  I know she went to jail a
11   couple of times.
12       Q   Okay.
13       A   But I never really got into it.
14       Q   Okay.  Is she a felon?
15       A   She has told me she has a felony, yeah.
16       Q   Okay.  There's, in some of these -- in some
17   of your reports you talk about Kim acting violently
18   towards significant others.
19       A   Uh-huh.
20       Q   Do you know anything about that?
21       A   No, because I never known Kim boyfriends, so
22   to speak.  I only know this last young man that she
23   dated.  And to me, whenever he would bring her to the
24   office and she'd come, it was always in a positive
25   mode.  She's never distressed (as spoken) anything to
```

EXHIBIT

L

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO.:   4:13-CV-171-RH/CAS

KIM L. HARRIS,

        Plaintiff,

vs.

TAYLOR COUNTY SCHOOL DISTRICT,

        Defendant.

_____

D E P O S I T I O N

OF

PHILLIP W. CUSHMAN, M.D.
Taken Pursuant to Notice
on Behalf of the Defendant

DATE:       Friday, January 10, 2014

TIME:       1:30 p.m. to 2:50 p.m.

PLACE:      Scribe Associates, Inc.
              201 S.E. 2nd Avenue, Suite 207
              Gainesville, Florida

REPORTER:   Pamela A. Chorlog, R.D.R.
              Certified Realtime Reporter
              Notary Public, State of
              Florida at Large

1   page.

2       Q.      The second page has two lines, and what do

3   those two lines say?

4       A.      "To monitor, encourage and empower her as

5   she could be a harm to herself or potentially child."

6       Q.      And who wrote that, as far as you can tell?

7       A.      Sarah Whiddon.

8       Q.      And do you know where Sarah Whiddon would

9   have gotten the information to write those two lines

10  on that second page?

11      A.      From my note saying that she had postpartum

12  depression and that could cause someone to be a danger

13  to their child.

14      Q.      Okay.  That's good enough.  I'll take that

15  back.  Thank you.

16              I'll hand you this.  Take a look at it and

17  let me know when you're finished.

18      A.      Okay.

19      Q.      And what are we looking at here?

20      A.      This is a Client Service Plan.

21      Q.      For which patient?

22      A.      For Kim Harris.

23      Q.      What's the date of this service plan?

24      A.      This is 4/3/11.

25      Q.      Why don't you read at the top where it says

1    "Diagnosis."  In each of these axes, read each one of

2    those.

3        A.    Axis I:  Bipolar, recent mixed, moderate,

4    296.62.

5              Axis II is deferred.  That's personality or

6    some other related problems.

7              Axis III:  Surgery on left knee.  Several

8    severe body pains.

9              Axis IV:  Housing/education problems.

10             Axis V:  Current GAF is 45.

11       Q.    What does it mean by Axis I, Axis II?

12       A.    Axis I is the primary diagnosis.  And

13   bipolar disorder, recent mixed, moderate, that just

14   tells you that she's had both depression and manic

15   symptoms of moderate severity.

16       Q.    Okay.  And these notes are handwritten?

17       A.    Handwritten.

18       Q.    By whom?

19       A.    By Wilhelmenia Blue.

20       Q.    And what's the date that she wrote these?

21       A.    4/13/11.

22       Q.    And is your signature on here as well?

23       A.    Yes.

24       Q.    What date is by your signature?

25       A.    5/4/11.

Electronically signed by Pamela Chorlog (001-163-854-2520)
Electronically signed by Pamela Chorlog (001-163-854-2520)

c57148cc-1d04-4f03-b8cf-ce2f1a0958a9

Page 38

1     Q.    On the second page it looks like there's a

2  table here.  Will you tell us how this table works and

3  how you read this table?

4     A.    This table is to please the insurance

5  companies.  So it simply describes the problems that

6  the person who is doing the table feels that Kim has,

7  what they see is -- what is needed to help her and

8  what kind of insurance assistance is going to be

9  needed.

10     Q.    Okay.  In this box that's dated 4/13/11

11  there's a number 1 on the top left under the column

12  that says "Problems."  And what does that first box

13  say?

14     A.    Number 1?

15     Q.    Um-hmm.

16     A.    "Kim suffers from unspecified episodic mood

17  by evidence of anger, aggressive behaviors and

18  temper."

19     Q.    Is that the kind of language you would use

20  to describe Kim's condition?

21     A.    No.  I would say bipolar disorder at that

22  point.

23     Q.    Okay.  This is someone else interpreting

24  what you've described as bipolar disorder?

25     A.    Right, or simply expressing the problem

1    areas in a more general term.

2         Q.    Okay.  On the next page, a similar table,

3    would you read what is stated in the top left box

4    under "Problems" dated 4/13/11, Number 1?

5         A.    "Kim has been diagnosed as bipolar mixed by

6    evidence of her mood swings."

7         Q.    And is that more like the language that you

8    would use?

9         A.    Yes.

10        Q.    Down in the same column two boxes, dated

11   4/13/11, Number 3, will you read what that says?

12        A.    "Due to Kim's diagnoses of bipolar make it

13   difficult for her to get along with living with other

14   people.  Kim would like to get her own housing."

15        Q.    And is that something that you would have

16   noted?

17        A.    I don't think I would have noted that.  I

18   don't recall that I noted that.

19        Q.    Is that consistent with what you found with

20   Kim Harris?

21        A.    Well, with her having a major temper

22   problem she is not going to do very well getting a

23   roommate.

24        Q.    What do you mean by major temper problem?

25        A.    She could blow up for no good reason,

1    explode.

2         Q.      Okay.  Explode at whom?

3         A.      Anyone.

4         Q.      Anyone, meaning family?

5         A.      Family, friends.

6         Q.      Strangers?

7         A.      Strangers, coworkers.

8         Q.      And what do you mean by no good reason?

9         A.      Well, if someone came up to her and said,

10   "You're a no-good for nothing blankity-blank-blank,"

11   then that might make someone angry.  But someone might

12   come up -- I'm not speaking specifically about her --

13        Q.      Right.

14        A.      -- but someone might come up and give

15   someone who has a psychiatric disorder a look and they

16   might think, well, they're saying that I am these

17   things, and nothing has been said, and they might

18   explode over that.

19        Q.      Okay.  I can take that back from you.

20   Thank you.

21               I'll just have you look at this.

22        A.      Okay.

23        Q.      And what is this that we're looking at?

24        A.      A Service Plan Review on Kim Harris, dated

25   June 15th, 2011.

1    Q.    And who signed this?

2    A.    This is Jessica Parr.

3    Q.    So this was prepared by Jessica Parr?

4    A.    Yes.

5    Q.    And is it also signed by the patient?

6    A.    By the patient and by me.

7    Q.    On what date was that signed?

8    A.    6/15/11.

9    Q.    By all three?

10   A.    Yes.

11   Q.    Is this Service Plan Review similar to the

12   others, in that it's prepared mainly for insurance, or

13   is it for another purpose?

14   A.    I'd say it's for insurance, yes.

15   Q.    Okay.  And just briefly summarize what is

16   said in the narrative.

17   A.    It's basically just summarizing what's

18   happened to her since she became a patient at

19   Apalachee in 2007.  I don't think it goes into as much

20   detail as my notes did.

21   And then it says she is making progress.

22   Probably I didn't think she was making so much

23   progress as this would suggest.  It recommends that

24   she continue receiving targeted case management,

25   psychiatric/medication management services, and that

Electronically signed by Pamela Chorlog (001-163-854-2520)
Electronically signed by Pamela Chorlog (001-163-854-2520)

1   she be provided some assistance, referred for

2   individual counseling and monitor for suicidal

3   ideation, substance abuse and increasing symptoms that

4   indicate a need for a higher level of care.

5        Q.    And that was dated June 15th, 2011, so that

6   would be a summary of the patient's chart on that date

7   up to that point.

8        A.    Yes.  As interpreted by Jessica Parr.

9        Q.    Thank you.  Would you describe Kim Harris

10  as experiencing paranoia?

11       A.    Yes.

12       Q.    What does that mean?

13       A.    That means that she felt that people were

14  out to get her, they were talking about her.  I don't

15  know that it does this all with her, but she feels

16  that others are not on her side and are working

17  against her in some way.

18       Q.    And are those rational thoughts?

19       A.    They appear so to her, but they are not

20  based on fact.  They are based on her illness.

21       Q.    Okay.  How would you describe Kim

22  physically?

23       A.    As I recall she was a slightly overweight

24  woman who the last time I saw her was somewhat

25  deformed physically from her accident -- I don't

EXHIBIT

M

00001

1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF FLORIDA
2                          TALLAHASSEE DIVISION
              Civil Action No.:  4:13-CV-171-RH/CAS
3

4     KIM L. HARRIS,
              Plaintiff,
5
      v.
6
      TAYLOR COUNTY SCHOOL DISTRICT,
7             Defendant.

8     _____

9

10                            DEPOSITION OF

11                            DEVERA EAKINS

12              taken on behalf of the Defendants

13

14    DATE TAKEN:   December 4, 2013
      TIME:         10:46 a.m. - 12:15 p.m.
15    PLACE:        Perry Chamber of Commerce
                    428 North Jefferson Street
16                  Perry, Florida  32347

17

18              Examination of the witness taken before:

19              Ashley Brimer, Court Reporter
          Transcribed by Cassie Minnich, FPR, Court Reporter
20             Notary Publics, State of Florida at Large
           136 SW Nassau Street, Lake City, Florida  32025

21

22

23

24                  THIRD CIRCUIT REPORTERS & VIDEO
                       Toll-Free:  855-850-7038
25                      www.AllCourtReporters.com

00027
```
 1      Q    Okay.  What were the -- what was the policy for
 2   if somebody forgot to clock in or out?
 3      A    You had to take the card to Miss Debby and have
 4   her to sign you in.
 5      Q    And that would be after the fact if someone
 6   forgets to clock in or out?
 7      A    Right.
 8      Q    They realize their mistake and they have to
 9   take their card to Miss Debby and then they -- how
10   do you determine what time goes on it if you forget
11   to clock in or out?
12      A    Basically we were all -- Miss Debby was there.
13      Q    Right.
14      A    The classroom door was not unlocked until she
15   got there.
16      Q    Okay.
17      A    Okay.  And so usually she would get there about
18   7:45 or so.
19      Q    Before 8:00?
20      A    Before 8:00.  And that would give us enough
21   time -- because you walk in the classroom and right
22   around the corner is the time clock.  So you would
23   walk in, clock in, then go to your station and put
24   down -- or get whatever you needed to get and then
25   go to the classroom.
```

00033

1  herself out, Miss Debby let her know:  Yes.  Well, if
2  you're going to call yourself out like this, yes, I am
3  addressing it to you.
4          And she named -- I believe she called -- must
5  have called Shaneka's name, because Shaneka was like:
6  Whoa, whoa, whoa.  Don't bring me into this.
7          And she just turned her back and at that moment
8  just didn't want to be brought up in it.
9      Q   Okay.
10     A   It was not a situation that I felt was safe.
11     Q   Okay.  Can you explain that?
12     A   Because of the tone of Ms. Harris's voice, I
13  felt as though it could have become an altercation.
14     Q   A physical altercation?
15     A   Possibly, yes.
16     Q   Okay.  So what happened next?
17     A   One of the other students that was sitting
18  beside me, Tabitha Murphy, elbowed me and she's
19  like:  Debby, you need to go get some help.
20         And I'm like:  You go.
21         She said:  I can't.  I have seizures and I'm
22  afraid if I get too excited, I'll have a seizure
23  before I can get the help.
24     Q   Okay.
25     A   So I stepped out of the classroom and I called

00034
1    down to the front office, but no one answered the
2    phone.
3        Q    Okay.
4        A    And so the reason I had the number is because
5    I had the number in my phone checking on my Pell Grant
6    and all.
7        Q    Okay.
8        A    That's why the number was in my phone, because
9    I'm trying to register for school.  And so I ended up
10   having to run down to the front office.  And I get
11   down there, and I ended up -- I believe I was able to
12   get -- I'm trying to think of -- Ruben Lewis to come
13   down to the classroom.
14       Q    Okay.
15       A    By the time we get back, everybody is kind of
16   chilled out.
17       Q    Okay.
18       A    And Mr. Ruben was there to make sure everything
19   was okay.
20       Q    What was Mr. Lewis's role?  I mean, what was
21   his title?
22       A    I know that he worked in the GED lab.
23       Q    Okay.
24       A    But I believe Mr. Brannan was out that day.
25   Mr. Dunkle may have been on another site.  And I

00045
```
 1    and we all tried to make the best of it.  When you've
 2    got that many people trying to learn and one instructor
 3    with that many students, and her trying to be in every
 4    spot -- that's how I perceived the classroom.
 5         Q    Did you ever see any instance when you thought
 6    Ms. Little was treating one of the students differently
 7    because of their race?
 8         A    No, sir.  No, sir.
 9         Q    Did you ever see any instance where you thought
10    Ms. Little was treating someone differently because of
11    their -- or a disability?
12         A    No, sir.  In a conversation that I had heard
13    with Kim and Ms. Little, where Ms. Little had to ask
14    Kim, you know, about the station and they were standing
15    there talking about that station, or there was some
16    kind of fixture that was supposed to be ordered for
17    her.
18         Q    Okay.
19         A    And Miss Debby told her, she said, "I don't know
20    why it hasn't come in yet."  And there was -- she said
21    we -- she may have told Kim to check on it, or she may
22    need to check on it.  One of them had to check on it,
23    but they were concerned.  I don't know what it was that
24    was supposed to be ordered on her behalf, but it wasn't
25    there yet.
```

00057
1       A    She discussed it the next day in class and all
2    about the issue of when you're asked, and I respected
3    her position as the instructor.  I was not going to
4    argue with her.  That's her -- that's her position.
5    And if that's the position she took, I respected
6    that.
7       Q    After Ms. Harris was let go from the class,
8    did you talk to any one of the other students about
9    what had happened with Ms. Harris?
10      A    We basically, between the students, knew that
11   Ms. Harris had been let go because she was not willing
12   to apologize to Ms. Mary because of what she said to
13   Miss Mary.  And I did not hear Kim say it to her.
14   But, like I said, small classroom, gossip goes.  I was
15   told what she said, and so --
16      Q    What were you told by some of your classmates
17   that Ms. Harris had said to Miss Mary?
18      A    Basically that Ms. Harris told Miss Mary that
19   she needed to take her trash can and her ass back out
20   in the hallway and do her job.  She wasn't going to do
21   her.
22      Q    Okay.  Is Miss Mary white or black?
23      A    She's white.
24      Q    Who told you that that's what Ms. Harris said?
25      A    Honestly, I -- we were all just sitting around

# EXHIBIT N

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

Civil Action No. 4:13—CV—171—RH/CAS

KIM L. HARRIS,

      Plaintiff,

vs.

TAYLOR COUNTY SCHOOL DISTRICT,

      Defendant.

_____/


VIDEOTAPED DEPOSITION

of

KIM L. HARRIS

Taken on behalf of Defendant


| | |
|---|---|
| DATE TAKEN: | September 13, 2013 |
| TIME: | 10:00 a.m. — 10:54 a.m. |
| PLACE: | 318 North Clark Street |
| | Perry, Florida |


Examination of the witness taken before:

Cynthia F. Leverett,
Court Reporter
Notary Public, State of Florida
Third Circuit Reporters & Video
Post Office Box 827
Lake City, Florida 32056
386—754—2482
www.AllCourtReporters.com

```
 1   WHEREUPON,

 2                       KIM L. HARRIS

 3   acknowledged having been duly sworn to tell the truth,

 4   and testified upon his or her oath as follows:

 5               THE DEPONENT:  Yes, ma'am.

 6                   DIRECT EXAMINATION

 7   BY MR. DELANEY:

 8       Q.   Will you tell us your name, please, ma'am?

 9       A.   My name is Kim L. Harris.

10       Q.   And have you ever been known by any other

11   names?

12       A.   No.

13       Q.   Either formally or informally, people refer

14   to you as anything else?

15       A.   Well, they call me Hook.  I have a birth

16   defect in my arm.  They call me Hook or Kim; that's

17   how some people recognize me as, maybe.

18       Q.   People that you know, friends or family, have

19   referred to you as that?

20       A.   People that don't like me.

21       Q.   Anybody associated with the Taylor County

22   School District ever call you that?

23       A.   Not to my knowledge.

24       Q.   Ma'am, have you ever been in a setting before

25   where someone has given you an oath to tell the truth
```

EXHIBIT

O

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

Civil Action No. 4:13-CV-171-RH/CAS

KIM L. HARRIS,

      Plaintiff,

vs.

TAYLOR COUNTY SCHOOL DISTRICT,

      Defendant.

_____/

VIDEOTAPED DEPOSITION

of

KIM L. HARRIS

Taken on behalf of Defendant

DATE TAKEN:    October 25, 2013
TIME:          10:37 a.m. - 1:31 p.m.
PLACE:         Taylor County Courthouse
                Perry, Florida

Examination of the witness taken before:

Cynthia F. Leverett,
Court Reporter
Notary Public, State of Florida
Third Circuit Reporters & Video
Post Office Box 827
Lake City, Florida 32056
386-754-2482
www.AllCourtReporters.com

```
 1        A.   Sarah Chilts (phonetic) or Dr. Payne.
 2        Q.   And where is that office located?
 3        A.   In the DMM Plaza.  DMH Plaza.
 4        Q.   Do they provide you psychiatric treatment?
 5        A.   No.
 6        Q.   Okay.  Are you currently under the care of
 7   somebody who helps you with your mental health issues?
 8        A.   No.
 9        Q.   Do you take any -- you do take some
10   prescription medication regarding your mental health
11   diagnosis?
12        A.   Yes.
13        Q.   You've been diagnosed with bipolar disorder?
14        A.   Yes, sir.
15        Q.   Where do you go to have prescriptions filled
16   for that?
17        A.   CVS.
18        Q.   What physician is prescribing your mental
19   health medication?
20        A.   My doctor at Apalachee.
21        Q.   Apalachee Center?
22        A.   Yes.
23        Q.   Is that the main place that you go to for
24   mental health treatment?
25        A.   Yes, sir.
```

1      Q.   Okay.  And how long has that been the case?
2   How long have you been going?
3      A.   Ever since 2007.
4      Q.   Prior to 2007, where were you getting your
5   mental health treatment?
6      A.   That's when my mental health really started
7   kicking in.
8      Q.   That's where you started to have it treated?
9      A.   Yes.
10      Q.   Prior to that, had you seen anyone who is a
11   psychiatrist or psychologist?
12      A.   Not that I remember.
13      Q.   How long have you been a patient at
14   Dr. Payne's office?
15      A.   I would say about like -- well, Dr. Payne, I
16   just started seeing her.  So I would say about a good
17   month with her.
18          And Sarah Chilts, I've been seeing her over a
19   year.
20      Q.   Who were you seeing for your general health
21   care prior to going to see Sarah Chilts?
22      A.   Anyone that will see me.
23      Q.   And who would you most often see in the last
24   ten years?
25      A.   Probably the emergency room.

1      Q.    Where?

2      A.    Doctors Memorial Hospital.

3      Q.    And where is that located?

4      A.    I know it's on Highway 19.

5      Q.    In Perry?

6      A.    Yes, sir.

7      Q.    Okay.  Was there another office practice or

8    office physician that you would go to for day-to-day

9    medical needs other than the emergency department at

10   Memorial Hospital in Perry?

11     A.    All the places I go is to DMH and to the

12   emergency room.  And they -- the people at DMH Plaza

13   will instruct me to go get blood work or whatever, to

14   another physician or whatever.

15     Q.    So your records from DMH would provide the

16   best information about your general medical care over

17   the last ten years?

18     A.    Yes, sir.

19     Q.    Other than your records from Apalachee

20   Center?

21     A.    Correct.  And maybe TLC where -- when I was

22   in my accident, orthopedics in Tallahassee, Florida.

23     Q.    I appreciate that.

24           In addition to bipolar, have you been

25   diagnosed with any other mental illnesses?

```
1        A.   No, sir.

2        Q.   How does your bipolar condition affect you?

3        A.   My bipolar disorder affects me when people

4   with authority tries to belittle me to make me feel

5   like I'm nothing or they try to throw their power

6   away.  That's when my mind will just go into another

7   level.  I meant, when you offend my emotions or

8   something like that, then that's when it occur.

9             But other than just bothering people and

10  going off on people, no, I don't.

11       Q.   So when your feelings are hurt or when you

12  feel offended, what do you do in response to that?

13       A.   I normally say what I got to say, and that's

14  that.

15       Q.   Sometimes you'll raise your voice?

16       A.   Yes, sir.

17       Q.   Sometimes you'll curse?

18       A.   Yes, sir.

19       Q.   Sometimes you'd act in a way that would be

20  inappropriate for an environment like we're here

21  today?

22       A.   It -- now, it just depends on what the

23  situation is.  I mean, I'm not no person -- no mean

24  violent person or like that there.

25            If you say something to me that is going to
```

```
1        A.    What, now?

2        Q.    I want to make sure I'm understanding.   Is

3    that what occurred?   Ms. Little came to you and said:

4    You shouldn't talk to my staff that way?

5        A.    Yes.

6        Q.    Okay.   Why did Ms. Little come to you and

7    say:   Don't talk to my staff that way?

8        A.    Because Ms. Mary, the janitor, was standing

9    behind me.   She always standing behind me, watching me

10   do my clients' hair.

11             I was like:   She need to go put -- pick up

12   trash or do something.   And by that time, when I got

13   to the salon where -- salon station where we do

14   clients' hair and that, here come Ms. Little.

15       Q.    All right.   And how did you talk -- did you

16   feel that Ms. Asher was disrespecting you?

17       A.    Yes.

18       Q.    By looking at you?

19       A.    Yes.

20       Q.    And that caused you to be upset?

21       A.    Yes.

22       Q.    And you raised your voice with her?

23       A.    I wasn't talking to her.   I was talking to

24   Shaneka Thomas and Olanda Bishop (phonetic.)

25       Q.    So did you raise your voice?
```

```
 1        A.   Yes, I did.

 2        Q.   All right.  Did you use any profanity?  Did

 3   you curse?

 4        A.   No, I did not.

 5        Q.   Okay.  Even if you didn't direct it at Mary

 6   Asher, did you use any profanity --

 7        A.   No, sir, I did not.

 8        Q.   -- in describing what you thought Mary Asher

 9   needed to go do?

10        A.   No, sir.

11        Q.   But nevertheless, Ms. Little was your teacher

12   at the time.

13        A.   Correct.

14        Q.   And she came over and said you shouldn't talk

15   to her staff that way.

16        A.   Correct.

17        Q.   Is that right?  Okay.

18             Was Ms. Little in the room when this event

19   occurred?

20        A.   Ms. Little was -- I don't know where -- to be

21   honest and truthful, I don't know where Ms. Little

22   was.

23        Q.   Okay.  She has an office that's connected to

24   the cosmetology --

25        A.   Correct.  The office --
```

1       A.   So when Mr. Brannan arrived, he calls me

2   outside.   Ms. Little came outside.   Mr. Clayton,

3   George Clayton, was to assist Mr. Brannan.   And we

4   discussed about the time clock, saying procedures of

5   what -- what I did wrong and stuff like that there.

6            And I proceeded on telling them that

7   Ms. Little don't like to help color people -- color

8   people to do their clients' hair versus who -- she got

9   picks that she will go and help them with no problem.

10  But if someone else asks her, she gets like a

11  little -- she'll help you, but she gets like a little

12  attitude with it.

13           Because I had asked her would she help me do

14  a man's cut.   I'm not just going to give him no -- I

15  don't know how to do a man's cut.   I'm not just fixing

16  to get in nobody's head and just mess nobody's head

17  up.

18      Q.   I didn't understand the last part of what you

19  said there.   "I'm not" --

20      A.   I'm not going to get in no one's head and cut

21  their off and make -- make mistakes.   Even though that

22  make -- practice makes perfect, I just didn't -- I

23  meant, I needed help with it and she had a problem

24  with it.

25      Q.   Before that conversation that was taking

1    place outside the classroom, had you ever made any

2    complaints about Ms. Little to anyone who worked at

3    TTI?

4         A.   Uh-uh.

5         Q.   Is that a no?

6         A.   No.

7         Q.   All right.  So the first time that you made

8    any complaints about Ms. Little as your teacher was to

9    Mr. Brannan on November 7th, 2011?

10        A.   When we had that altercation, yes.

11        Q.   And the altercation you're referring to is

12   between you and Ms. Little?

13        A.   Yes.

14        Q.   And when Mr. Brannan had to be called down to

15   the cosmetology department?

16        A.   Yes.

17        Q.   And you said that you went outside.  Was this

18   out -- did you go out in the hallway initially?

19        A.   Yes.

20        Q.   After going out to the hallway, did you

21   subsequently go outside?

22        A.   Yes, we did.

23        Q.   Okay.  Were you still upset when you were in

24   the hallway talking to Mr. Brannan?

25        A.   Yes, I was crying.  Yes, I was.

```
 1        Q.   Did you raise your voice?
 2        A.   No, not to my knowledge.  They may think I
 3   was, but I feel like I was calmly.
 4        Q.   But you were crying?
 5        A.   Yes, I was.
 6        Q.   Did you use any profanity?
 7        A.   No, sir.
 8        Q.   You didn't, or not that you remember?
 9        A.   No, I didn't cuss.
10        Q.   Okay.  Prior to November 7th, 2011, has any
11   employee of TTI, any administrator or teacher ever
12   reprimanded you for using profanity?
13        A.   No.
14        Q.   Did you understand that that was against the
15   rules at TTI, for students to walk around loudly using
16   profanity?
17        A.   Yeah, it's against the rules, but I didn't do
18   that.
19        Q.   Okay.  But you understood in -- between
20   August and November of 2011, that would -- was against
21   one of the rules at TTI?
22        A.   Well, in the handbook it says -- it says not
23   to, but I didn't.
24        Q.   I understand.  But you received a handbook
25   when you became a student there that included the
```

1 rules?

2  A. Yes, sir.  I got the handbook right here.

3  Q. Okay.  And that's something that you received

4 when you became a student there?

5  A. Correct.

6  Q. And you understood that you were required to

7 follow the rules that were in the handbook?

8  A. Uh-huh.

9  Q. Is that a yes?

10  A. Yes, sir.

11  Q. What else do you remember about the

12 conversation between you and Mr. Brannan and

13 Mr. Clayton and Ms. Little in the hallway outside the

14 cosmetology class?

15  A. It was based on about the procedures of

16 clocking in and clocking out, which, yes, it was

17 wrong.

18   I asked Amy Dice to clock me out, which

19 everybody -- the whole class does it.  If you got

20 friends, they'll clock each other in and out.

21   And I reported this to Ms. Little, that I had

22 clocked Amy Dice in when -- the same day she was

23 running late, but she didn't -- they didn't do

24 anything to her.

25  Q. Okay.  There's a time clock in the

1    cosmetology department?

2         A.   Yes.

3         Q.   And the time clock is supposed -- clocking in

4    and clocking out is how the procedures are supposed to

5    work for that class so there will be a record of when

6    each student is actually present in the classroom.

7         A.   Correct.   That's how you determine your

8    hours.

9         Q.   All right.   And you understood that it was

10   against the rules for someone to clock you in or out

11   other than you?

12        A.   Yes.

13        Q.   And you understood that that was against the

14   rules before November 7th, 2011?

15        A.   Yes, I know.

16        Q.   Now, when you were talking to Mr. Brannan,

17   did you tell him that other -- excuse me.   Did you

18   tell him that Amy Dice had been clocked in or out by

19   another student?

20        A.   Yes.

21        Q.   What did he say about that?

22        A.   They didn't say nothing.

23        Q.   What's Ms. Dice's race?

24        A.   Caucasian.

25        Q.   She's white?

1        A.   Uh-huh.

2        Q.   Yes?

3        A.   Yes.

4        Q.   Are there any other African American students

5   in the classroom that had been clocked in or out by

6   someone other than themselves?

7        A.   Yes.

8        Q.   Who?

9        A.   Olanda Bishop and Shaneka Royal.   And -- I

10   don't remember her last name.   Basically, everybody

11   done this.   Even though it was against procedures to

12   do this, everybody basically in the classroom done

13   this.

14        Q.   Do you know if Ms. Little addressed this

15   issue with any other students besides you?

16        A.   I don't know.   I was terminated from the

17   program.

18        Q.   All right.

19        A.   I don't know what was said after I left.

20        Q.   George Clayton.   He's a -- he was an

21   administrator in November of 2011 at TTI?

22        A.   Yes.

23        Q.   He's a black man?

24        A.   Yes.

25        Q.   What do you recall Mr. Clayton saying when

1    you were having that meeting out in the hallway?

2        A.   Mr. Clayton just kept on saying:  I know your

3    momma, I know your momma.  And when Mr. Brannan say:

4    I don't think the program for you and all this here,

5    he was just like pretty much cosigning with what

6    Mr. Brannan was saying.

7        Q.   Anything else you remember Mr. Brannan saying

8    when you were still in the hallway?

9        A.   When I told Mr. Brannan about Ms. Little

10   doesn't like to assist people, black people with

11   helping do clients' hair, this is when Ms. Little

12   wanted me to dismiss out of the program.

13            And I was like:  Ms. Little, I got my baby.

14   Why is you kicking me out of class?  I'm passing your

15   class.  I haven't did anything wrong.  Why is I'm

16   being dismissed?

17            Get out of here.  I'm done.  I'm done with

18   her.  Give her her hours and let her go.

19            I'm like:  Ms. Little, please.

20            She say:  I'm tired of all of your whining

21   and crying and stuff.

22       Q.   Anything else you remember Ms. Little saying

23   in the hallway?

24       A.   That was pretty much it.  I couldn't talk to

25   her, compromise.  Mr. Brannan told me, say:  Pack your

1    stuff.  That's it.  You're terminated.  You can come

2    back next year and enroll in another program.  I don't

3    think cosmetology is for you.

4        Q.  Now, did that occur in the hallway?  Or did

5    that occur --

6        A.  That occurred outside.

7        Q.  All right.  Let's talk about just the hallway

8    right now.

9            As best you can recall, Mr. Brannan said what

10   to you when you were still in the hallway?  Let me

11   back up a second.  I want to make sure I understand

12   the scene.

13           You were sitting in your cosmetology chair.

14       A.  Yes.

15       Q.  Mr. Brannan came in the classroom.

16       A.  Uh-huh.

17       Q.  Is that right?

18           And he asked you to come outside and talk

19   with him?

20       A.  Yes.

21       Q.  All right.  Did he treat you -- was he

22   talking with you in a professional manner when he

23   asked you to come outside of the classroom?

24       A.  I really don't know what his attitude were

25   when he was in the classroom -- I mean, when we was on

```
1    the outside, but it wasn't no -- I think -- I don't

2    think it was no real harsh, harsh matter that he was

3    talking to me.

4              He was basically trying to get to the story,

5    of the bottom of what's going on.

6         Q.   Did Mr. Brannan ever use any profanity

7    towards you?

8         A.   No.

9         Q.   Did he ever raise his voice towards you on

10   November 7th, 2011?

11        A.   No.

12        Q.   Did he ever call you any kind of racial slurs

13   or names or anything like that?

14        A.   No.

15        Q.   Did anybody ever use that type of language

16   with you, call you a racial name when you were a

17   student at TTI?

18        A.   Not that I know of.

19        Q.   Including Ms. Little?

20        A.   Not that I know of.

21        Q.   All right.  And Ms. Little never used any

22   profanity directed at you, did she?

23        A.   No.  Ms. Little -- Ms. Little labeled me from

24   the get-go.  She said that when they get a stinky

25   client or a bad client, we going to send them to Kim,
```

1    we going to send them to Kim, we going to send them to

2    Kim.  And that got on my nerves, because I am a

3    person -- yes, I done been through the system.  And

4    this little girl right here is my motivation to change

5    my life and do the right thing the productive way.

6            Hair is what I know and hair is what I do.

7        Q.   And you were enrolled in the cosmetology

8    program so you could get your cosmetology license and

9    do that professionally.

10       A.   Yes.

11       Q.   Okay.  And then you understood that it was

12   important that you complete all the requirements that

13   the State of Florida lays out for somebody to get

14   their cosmetology license.

15       A.   Yes, sir.

16       Q.   All right.  And that includes finishing a

17   certain number of procedures --

18       A.   Yes, sir.

19       Q.   -- during the time you were involved with the

20   program?

21       A.   Yes, sir.

22       Q.   And it's a 12-month program?

23       A.   Yes, sir.

24       Q.   Do you know how many procedures you have to

25   do during that 12 months in order to get your

1   cosmetology license?

2       A.   I don't really -- I think it like 1500

3   credits that you have to have, hours that you have to

4   have.

5       Q.   It's not just the number of hours that you're

6   there, it's also the number of procedures you have to

7   complete.

8       A.   Yes.

9       Q.   Is that correct?

10      A.   Yes.

11      Q.   Do you know how many procedures that you had

12  completed?

13      A.   I forgot.  I don't recall how many -- how

14  many procedures that I done and how many hours that I

15  got.  I mean, I don't -- I don't remember that.

16      Q.   We would need to go to the TTI records to

17  determine that?

18      A.   Yes, sir.

19      Q.   Okay.  Do you have any reason to believe that

20  those records are not accurate?

21      A.   Well, they supposed to added my '09 hours.  I

22  was in cosmetology in '09, 2009, prior to when I got

23  in my accident.

24      Q.   But I'm talking about for the time period

25  between August of 2011 and your last day in the

1    since I couldn't get my -- the transportation from

2    back and forth, so there was no need to complete it.

3         Q.   Have you filled out any applications at

4    Tallahassee Technical Institute?

5         A.   Yes, I have.

6         Q.   Were you accepted?

7         A.   I don't know.  I didn't -- didn't get no

8    feedback on it.  After I -- like I say, I wasn't able

9    to get no ride, no transfer back and forth.  I just

10   left it alone.

11        Q.   Did you fill out an application to obtain a

12   cosmetology license anywhere else other than with

13   Tallahassee Technical Institute since November 7th,

14   2011?

15        A.   No.

16        Q.   Now, I want to go back to the discussion in

17   the hallway outside the cosmetology room on November

18   7, 2011.  Do you understand what I'm asking you about?

19        A.   You ain't asked the question yet.

20        Q.   Okay.  After Mr. Brannan asked you to step

21   out of the classroom and into the hallway, that's the

22   time period I want to ask you about now.  Okay?

23        A.   Uh-huh.

24        Q.   Do you understand?

25        A.   Uh-huh.

1      Q.   Is that a yes?

2      A.   Yes.

3      Q.   I think I understood your testimony so far

4   that no one raised their voice with you during that

5   time period; correct?

6      A.   Yes, Ms. Little raised her voice in the -- in

7   the classroom.

8      Q.   Okay.  Ma'am, I'm asking you about when

9   you're in the hallway with you and Ms. Little,

10   Mr. Brannan and Mr. Clayton.  Those are the four

11   people standing in the hallway outside the cosmetology

12   room.

13           Do you understand?

14      A.   Yes.

15      Q.   Is that a yes?

16      A.   Yes.

17      Q.   All right.  During the time that you were

18   discussing what had happened, procedures for clocking

19   in and out and so forth, did any of those people raise

20   their voice with you?

21      A.   Not to my knowledge.  It's just when we got

22   outside is where it all blow up at.

23      Q.   I'm going to ask you about that, but we're

24   not there yet.

25           No one called you any racial slurs or racial

```
 1    names.  Is that true?
 2        A.  No.
 3        Q.  Okay.  Did anyone call you any racial slurs
 4    or racial names?
 5            MS. KIMBRELL:  Objection.  Asked and
 6        answered.
 7    BY MR. DELANEY:
 8        Q.  You can answer the question.
 9        A.  Did anyone call me a racial name?
10        Q.  Yes, ma'am.
11        A.  No.  I done told you that over and over.
12        Q.  And no one used profanity with you; correct?
13        A.  No.
14        Q.  Is that correct?
15        A.  That's correct.
16        Q.  All right.  You were upset during that time
17    frame?
18        A.  Yes, I was.
19        Q.  Okay.
20        A.  I was crying.
21        Q.  So why did the conversation move from the
22    hallway to outside?
23        A.  I guess because I was crying.
24        Q.  There were other classes that were going on?
25        A.  Yes, the business class next door.
```

1          Q.   All right.  And do you think that you being

2    upset was loud enough for people to hear in there?

3               MS. KIMBRELL:   Object to the form.

4    BY MR. DELANEY:

5          Q.   Or do you know?

6          A.   I don't know.

7          Q.   All right.  So then you and Ms. Little,

8    Mr. Brannan and Mr. Clayton moved outside?

9          A.   Yes.

10         Q.   To finish the conversation?

11         A.   Yes.

12         Q.   All right.  Anybody use any profanity with

13   you once you stepped outside?

14         A.   No.

15         Q.   Anybody use any racial inappropriate names?

16         A.   No.

17         Q.   Anybody ever at any time that you were

18   enrolled at TTI, at Taylor Technical Institute, say

19   anything inappropriate about your disability?

20         A.   When I first -- you talking about in the

21   hallway?

22         Q.   I'm talking about at any time you were a

23   student at Taylor Technical Institute between August

24   of 2011 and November 7th, 2011.

25         A.   When I first enrolled in the program, they

```
 1   wasn't going to take me because of my disabilities.
 2   Vocational rehab was supposed to assist me with a
 3   special chair and a station.  That's how I got in the
 4   program, because at first they wasn't going to take me
 5   because of my disability.
 6       Q.   Who is "they"?
 7       A.   TT -- Vocational -- this same place.  Taylor
 8   Tech.
 9       Q.   Vocational Rehabilitation is a State of
10   Florida program.
11       A.   Yes.
12       Q.   You understand they're separate from Taylor
13   Technical Institute?
14       A.   Uh-huh.
15       Q.   Do you understand that?
16       A.   Yes.
17       Q.   Were there some conversations with people
18   involved with the Vocational Rehabilitation program
19   about supports that you would need in order to be
20   successful in the cosmetology program?
21       A.   I don't understand.  Can you say it another
22   way?
23       Q.   Yes, ma'am.
24            Did you talk with employees of the Vocational
25   Rehabilitation program about supports that you might
```

 1   need, assistance that you might need in order to

 2   successively complete the cosmetology program?

 3         A.   Yes, sir.

 4         Q.   Okay.  Did you have conversations like that

 5   with anybody who worked for Taylor Technical

 6   Institute?

 7         A.   Yes.

 8         Q.   Who did you talk to about that?

 9         A.   Mary Moody.

10         Q.   Okay.  What was Mary Moody's job?

11         A.   All I know, she work in the office.  I done

12   forgot.  I think her title is like enrollment, people

13   that do the enrollment.  Once they do the financial

14   aid part, she does the paperwork on the classes of

15   being enrolled in.

16         Q.   Mary Moody helped you enroll in the

17   cosmetology program?

18         A.   Yes.

19         Q.   Did Mary Moody ever tell you that you were

20   not allowed to enroll in the cosmetology program?

21         A.   When I first went and -- when school time

22   started, we got ready to start and everything, you had

23   to go in and do your paperwork and everything, she was

24   like:  Well, I don't see your paperwork.

25              And then she said:  Well, I know what it

```
 1   was.  They wasn't going -- because of your
 2   disabilities, they don't think that you going to be
 3   able to do the program, because they will lose money
 4   if they was to take me in and I was to quit the
 5   program.
 6        Q.   Okay.  My question to you is, Did Mary Moody
 7   ever tell you that you weren't allowed to enroll in
 8   the cosmetology program?
 9        A.   Oh, no.
10        Q.   Did anybody at Taylor Technical Institute
11   tell you that you were not allowed to enroll in the
12   cosmetology program?
13        A.   Only for what I just told you.  Nobody was --
14   Carl Shore said that he was going to assist me with
15   the special chair and the special station, then that's
16   how I was going to be able to get enrolled.
17        Q.   And Carl Shore works for Vocational
18   Rehabilitation?
19        A.   Yes, sir.
20        Q.   So what happened is you came to Taylor
21   Technical Institute.  And did someone at Taylor
22   Technical Institute talk with you about your
23   disability?
24        A.   Ms. Mary Moody is the one told me about it.
25        Q.   Did she help you get in touch with Carl
```

```
 1          Q.   And at times you've shared with them that you
 2   feel aggressive?
 3          A.   Yes.
 4          Q.   You've told your doctors at Apalachee Center
 5   that you have mood swings?
 6          A.   Yes.
 7          Q.   A bad temper?
 8          A.   Yes.
 9          Q.   Bipolar disorder?
10          A.   Yes.
11          Q.   Mood instability?
12          A.   Yes, sir.
13          Q.   You've said that these problems create
14   conflicts at home?
15          A.   Yes.
16          Q.   You've told your doctors at Apalachee Center
17   that you struggle to cope with your anger?
18          A.   Yes.
19          Q.   And you've told your doctors at Apalachee
20   Center that this makes it difficult for you to have
21   friends?
22          A.   No.
23          Q.   Did you ever tell your doctors at Apalachee
24   Center that you wanted to hurt your mother?
25          A.   No.
```

```
1        Defendant's Exhibit 1.
2             (The document referred to was marked and
3        attached hereto as Exhibit 1.)
4    BY MR. DELANEY:
5        Q.   Ma'am, did you apply for social security
6    disability?
7        A.   Yes.
8        Q.   Did you receive social security disability?
9        A.   Yes.
10       Q.   How much do you get in compensation or
11   disability payments?
12       A.   $730.
13       Q.   This is every month?
14       A.   Yes.
15       Q.   And the reason that you -- well, explain,
16   just in your own words, why did you apply for social
17   security disability?
18       A.   Because of bipolarness at the time.
19       Q.   When did you apply for SSD?
20       A.   When I got in my car accident.  The -- my
21   lawyer up there, James Cole, he did all the applying.
22       Q.   Do you recall what year that was?
23       A.   2009.  2010, maybe.
24       Q.   And during that time frame -- this is before
25   you were at Taylor Technical; right?
```

1      A.   Yes.

2      Q.   And during that time you had been diagnosed

3   with bipolar disorder?

4      A.   Yes.

5      Q.   And schizoaffective disorder?

6      A.   Not to my knowledge.

7      Q.   You also have the problem of the birth defect

8   with your left arm.

9      A.   Yes, sir.

10      Q.   Did your asthma limit your ability to work?

11      A.   No.

12      Q.   Did you have problems with one of your knees?

13      A.   Yes.

14      Q.   Did you think that you needed a partial

15   replacement of your right knee?

16      A.   Yes.

17      Q.   And this is all the case before 2010?

18      A.   Yes.

19      Q.   Why do you say that your asthma didn't have

20   any ability -- didn't have any effect on your ability

21   to work?

22      A.   My asthma don't attack me until I get upset,

23   and that's when I can't hardly breathe.  Or if I get

24   real, real emotional and everything, that's when my

25   asthma will occur.

1      Q.   Do you recall filling out paperwork to
2  explain to the government why you needed to be on
3  social security disability?
4      A.   Yes.
5      Q.   And problems that you would have that would
6  prevent you from working?
7      A.   Yes.
8      Q.   Did you tell them that you can't cope with
9  other people in the workplace?
10     A.   For the record, I wasn't the one filling out
11  my papers.  Ms. Blue, Ms. Wilhelmenia Blue was the one
12  filling my paperwork out.
13     Q.   Did you ever look it over?
14     A.   No, I didn't.
15     Q.   You didn't sign any documents that were
16  submitted to the government about why you needed
17  disability?
18     A.   Only what James Cole sent me.
19     Q.   Is it true that you have trouble coping with
20  other people in the workplace?
21     A.   How can I -- you want a yes or no answer;
22  right?  Because --
23     Q.   I want a truthful answer, ma'am.
24     A.   I will get upset if anyone is belittling me.
25  But other than me just -- just going off on anyone,

1      Q.   Your injuries and illnesses were causing
2  pain?
3      A.   Yes.
4      Q.   And that had been interfering with your
5  ability to work since October 22nd of 2007?
6      A.   Say what, now?  Can you repeat that?
7      Q.   Yes, ma'am.
8           Weren't you telling the government that your
9  illnesses and your injuries interfered with your
10 ability to work going back to at least October 22nd,
11 2007?
12     A.   Yes.
13     Q.   And that's -- and you had not been able to
14 work since October 22nd, 2007?
15     A.   I haven't been able to work since 2009.
16     Q.   Well, you told the government in 2007 that
17 all of your medical problems had interfered with your
18 ability to work and made you unable to work going back
19 to October of 2007.
20     A.   This is --
21     Q.   Isn't that what's on this form, ma'am?
22     A.   This is what is on this form.  But my
23 thing -- they saying I'm bipolar, then
24 schizoaffective.  Which one am I?  It says that I'm
25 bipolar mix, whatever.

1          And at the time, no, I wasn't able to do --
2     do anything.  And I felt like if I worked with people
3     and stuff like this here, people would try to provoke
4     you to do things.
5          Q.   Ma'am, I'm not trying to provoke you.  I'm
6     not trying to be disrespectful to you.  I'm trying to
7     get at the truth.
8          And what I read on this form -- and I want to
9     know whether you agree that it is true or not true --
10    in Section 2, Question E says:  When did you become
11    unable to work because of your illnesses, injuries or
12    conditions?
13         Did I read that right?
14         A.   When did I become unable to work because of
15    my illness?  In 2009, that's when I really become
16    disabled, because this was up going -- it hadn't -- I
17    haven't went to court or anything.
18         This is what I put on the paper, or told
19    Ms. Blue to put down.  And this is what -- it is the
20    truth.
21         Q.   And what you put down was October 22nd, 2007,
22    is the answer for that.
23         A.   Yes.
24         Q.   A little bit lower on the form you told the
25    government that you had only worked for one month,

1    Q.   You were enjoying the program?

2    A.   Yes, sir.

3    Q.   Did you state that you were feeling good?

4    A.   Yes, sir.

5    Q.   You liked school?

6    A.   Yes.

7    Q.   You had gotten some equipment to help you

8  with the program?

9    A.   I never got any equipment to -- for the

10  program.

11   Q.   Did you tell Ms. Blue on October 11th, 2011:

12  I like school and I got a brace for my leg just in

13  case standing on it too much?

14   A.   The brace that I have come from the

15  orthopedic clinic.

16   Q.   That equipment was helping you while you were

17  standing in the program?

18   A.   I never -- never did wear -- bring -- I mean,

19  wear the boot, waiting on Carl Shore to do what he say

20  he was going to do.

21        But the boot come from the orthopedic clinic

22  in Tallahassee.

23   Q.   You were allowed to sit down in school?

24   A.   Yes, sir.

25   Q.   And the people at school didn't give you any

1    flack about that, did they?

2        A.   No.

3        Q.   And that's what you shared with your doctor

4    on that date; correct?

5        A.   Correct.  Yes, sir.

6        Q.   This is less than one month before you were

7    dismissed from the program?

8        A.   Uh-huh.

9        Q.   Yes?

10       A.   Yes.  Yes, sir.

11       Q.   Then it looks like you came back two days

12   later on October 13th, 2011.

13       A.   What's the month of -- this October; right?

14       Q.   It says the service date is 10/13/11, month,

15   day, year.  So that's October 13, 2011; right?

16       A.   Yes, sir.

17       Q.   Let me ask you with the start time.  It says

18   your appointment started at 3:00 and ended at 5:30.

19   Do you see that?

20       A.   Uh-huh.

21       Q.   Is that right?

22       A.   It may be and it may be not.  I don't -- I

23   don't know.  I don't recall, don't remember.

24       Q.   You don't have any reason to disagree with

25   that, do you?

```
 1        A.   No, sir.

 2        Q.   So you had plenty of time with Ms. Blue to

 3   tell you (as spoken) how your program was going,

 4   didn't you?

 5        A.   Yes.

 6        Q.   Over two hours?

 7        A.   Yes.

 8        Q.   And you told Ms. Blue on October 13th, 2011,

 9   that you were enjoying the program at Taylor Technical

10   Institute.

11        A.   Yes, sir.

12        Q.   This is about three weeks before you were

13   dismissed from the program, was it not?

14        A.   When was the date where I was -- was it in

15   November?

16        Q.   November 7th, 2011.

17        A.   Okay.  Yes.

18             MR. DELANEY:  Let's make that the next

19        exhibit to your deposition, please.

20             (The document referred to was marked and

21        attached hereto as Exhibit 11.)

22             THE DEPONENT:  And I want to say for the

23        record.  I see something about some PCP.  I never

24        been on no PCP.

25             MR. DELANEY:  And, ma'am, I'll represent to
```

```
 1    discriminated against the first time you were in --

 2         A.   No, sir.

 3         Q.   -- Ms. Little's class.  Is that correct?

 4         A.   Correct.

 5         Q.   How long were you in the program before you

 6    had to quit with the car accident?

 7         A.   My car accident happened October the 9th

 8    of -- October 14th of 2009.  That's when my accident

 9    happened.

10         Q.   So you'd been in the program since August up

11    until October 14th?

12         A.   Yes, sir.

13         Q.   About six weeks?

14         A.   Yeah.

15         Q.   So why do you think Ms. Little was treating

16    you differently the second time you enrolled in the

17    program?

18         A.   I don't know why Ms. Little did what she

19    did.  And that's the thing about it, me and

20    Ms. Little, we had the perfect -- I felt was the

21    perfect student and teacher relationship.

22              I sat to the front of the class, not in the

23    back where -- being disrupted.  I was really there to

24    get my education and get my certificate.  I wasn't

25    there to play around.
```

1      Q.   Up until the time -- up until the day that
2   you were dismissed, did you think that Ms. Little was
3   treating you differently?
4      A.   Yes.   I seen the things that Ms. Little was
5   doing versus of her picks or her favorites.   She would
6   assist her favorites before she would want to get a
7   little attitude if someone that's not her favorite
8   would do.
9      Q.   Who were some of her favorites?
10     A.   Thio, Deborah --
11     Q.   You got to give me first and last name, if
12  you know it.
13     A.   I can't remember they last names.
14     Q.   Okay.
15     A.   But her name is Thio.
16     Q.   How do you spell that?
17     A.   I think it's T-H-I-O, Thio.
18     Q.   Okay.
19     A.   And Ms. Deborah -- I don't know the -- I
20  can't -- I don't know.   I just go by they first
21  names.
22     Q.   Okay.   Who else were her favorites?
23     A.   And -- let's see.   Who else hanging with
24  Miss Deborah and them?
25          I know it was Thio, Ms. Deborah, and what's

1    her name?  What was her name?  Megan Rowell

2    (phonetic).

3        Q.    Any others that you thought were her

4    favorites?

5        A.    It could have been some more, but I know

6    those -- those was the main ones.

7        Q.    Any people that you think were not her

8    favorites?

9        A.    I know Shaneka Thomas Royal.  I think Olanda

10   Bishop.  And those two I know -- I know for sure.

11       Q.    Are you saying that Ms. Little picked on only

12   black students in the class?

13       A.    I wouldn't say she picked on the black

14   students, but she didn't care to really be bothered up

15   with them.

16       Q.    What do you mean by "she didn't care to be

17   bothered up with them"?

18       A.    They attitudes or the drama that they brings

19   along and stuff.  I mean, she -- I mean, if they're --

20   if you there to learn, then she's there.  But if you

21   not showing no interest in the program and stuff, then

22   she really, you know, don't care too much.

23       Q.    Sure.  So Ms. Little was there to help the

24   people that were there to learn?

25       A.    Yes.

1       Q.    Regardless of their race?

2       A.    Not to my knowledge.  That's what I -- my

3  assumption until the incident of the 2011, the

4  incident that occurred.

5       Q.    Up until the day you were dismissed from the

6  program you thought that Ms. Little was there to help

7  whoever wanted to learn in class?

8       A.    Yes.

9       Q.    Okay.  And the only thing that changed your

10  mind about that is that you were dismissed from the

11  program?

12      A.    And not only that.  When my first -- when I

13  first started the program, she gave us a little red

14  marble, a representative of Jesus' blood.  So I

15  thought maybe, you know, she was a Christian-hearted

16  person and everything.

17            In my -- 2011, she didn't give us the -- but

18  she stated that she does -- does that every year, give

19  the little symbol of the rock, red rock saying it's

20  Jesus' blood.

21      Q.    Okay.  And she'd already given you that

22  before you started class.

23      A.    Yes.

24      Q.    Because you'd been enrolled in her class

25  before.

1    A.   (Nods head.)

2    Q.   So up until the date you were dismissed from

3    the program, you didn't believe that Ms. Little was

4    picking on you because you were black.

5    A.   No, sir.

6    Q.   Is that a true statement?

7    A.   True.

8    Q.   Up until the day you were dismissed from the

9    program, you thought that she was treating you fairly;

10   true?

11   A.   On the occasion when I asked her to help me

12   assist along with the man high and tight haircut is --

13   when we opened up to start doing procedures on our

14   clients and stuff, and when I asked her, she was like

15   (makes gesture,) and then she came on.

16   Q.   Other than that --

17   A.   Other than that, no.

18   Q.   And she still gave you the help that you

19   needed?

20   A.   Yes, she did.

21   Q.   Did you ever enroll in any other technical

22   program or institute since leaving Taylor Technical?

23   A.   Only program that I enrolled in is my online

24   class for psychology at University of Phoenix.

25   Q.   Did you ever enroll at a Lively Technical

1    exercising and losing a little bit of weight, and that

2    might help assist with my bone structures, assist in

3    my bone structures.

4         Q.   Your birth defect that you have with your

5    arm, does that affect your ability to cut hair?

6         A.   No, sir, it don't.  I use -- if I'm fixing to

7    cut your hair or anything -- now, for -- like, to cut,

8    like, at a zero-degree angle or at a 45-degree angle,

9    now, it might be where I have to hold the scissors a

10   certain way to try to cut, because this here arm is

11   limitate (phonetic) -- you know, versus that right

12   there.

13        Now, I can put my hand in y'all's head and do

14   hair.  But I have to take my arm and assist and put on

15   my own head.

16        Now, I don't have no problem by -- if you

17   sitting in the chair, I can do your hair.

18        Q.   Okay.  I appreciate that explanation.

19        A.   Yes, sir.

20        Q.   Are there any procedures that you can't do as

21   a cosmetologist because of any of your injuries or

22   your birth defect?

23        A.   No, sir.  I can put on chemical relaxers.  I

24   can put on color treatments.  I can cut hair.  I don't

25   see no limitations at all.

1     Q.   How about things like manicures or pedicures?

2     A.   I didn't get to that part.

3     Q.   So whether you'd be able to offer that

4    service or not, you don't know?

5     A.   I don't -- I can't -- no, I won't be able,

6    because I never -- she didn't -- I was kicked out of

7    the program.  So I didn't go through that -- that

8    phase.

9     Q.   When you worked at Hardee's and you were let

10   go for having a problem with another employee --

11    A.   Uh-huh.  Yes, sir.

12    Q.   Do you recall that?

13    A.   Yes.

14    Q.   This was in 2008?

15    A.   Yes.

16    Q.   Did you have a weapon with you?

17    A.   No, sir.

18    Q.   Did you pull a knife during that incident?

19    A.   No, sir.

20    Q.   What was the last time you had employment,

21   the last time you had a job?

22    A.   My last one was -- that I can remember was

23   when I was pregnant and I was working at -- I think it

24   was Chester Fried or -- what's the name of that?  I

25   think it was Chester Fried.  And I was -- had to let

# EXHIBIT

# P

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KIM L. HARRIS,

   Plaintiff,

vs.           Case No: 4:13-CV-171-RH/CAS

TAYLOR COUNTY SCHOOL DISTRICT,

   Defendant.

_____/

DEPOSITION OF
TABITHA MURPHY

Taken on Behalf of the Defendant

DATE TAKEN:  January 7, 2014
TIME:      12:44 p.m. - 1:07 p.m.
PLACE:    Taylor County
          Chamber of Commerce
          428 N. Jefferson Street
          Perry, Florida  32347

Examination of the witness taken before:
Melissa Anderson, Court Reporter,
Notary Public, State of Florida at Large
136 SW Nassau Street, Lake City, FL  32025

Third Circuit Reporters & Video
Toll-Free 855.850.7038
www.allcourtreporters.com

9

1  confident enough in your memory when I ask you things

2  like do you feel like Ms. Little was a good teacher or

3  not a good teacher?

4    A  I felt like she was a good teacher.

5    Q  Okay.  And do you feel confident in that answer?

6    A  Uh-huh.

7    Q  Okay.  Is that a yes?

8    A  Yes.

9    Q  All right.  If I ask you do you recall Ms.

10  Little discriminating against anyone on the basis of

11  their race, is that a question that you feel confident

12  in your memory about?

13    A  I don't -- no, I do not think she was racist.

14    Q  Okay.  And do you feel confident in your memory

15  on that topic?

16    A  I mean, that's my personal opinion, yes.

17    Q  Sure.  Do you remember any examples of her using

18  -- or putting somebody down because they were black?

19  Do you remember that ever happening in the class?

20    A  No.

21    Q  Do you ever recall Ms. Little treating Kim

22  Harris differently because she was black than the other

23  students in there?

24    A  I know her and Kim had a disagreement, but I

25  don't think it was because she was a certain color.

# EXHIBIT

# Q

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KIM L. HARRIS,

  Plaintiff,

vs.              Case No: 4:13-CV-171-RH/CAS

TAYLOR COUNTY SCHOOL DISTRICT,

  Defendant.

_____/

DEPOSITION OF
LA'UNTRICE SIMMONS

Taken on Behalf of the Defendant

DATE TAKEN:  January 7, 2014
TIME:      12:10 p.m. - 12:41 p.m.
PLACE:    Taylor County
         Chamber of Commerce
         428 N. Jefferson Street
         Perry, Florida  32347

Examination of the witness taken before:
Melissa Anderson, Court Reporter,
Notary Public, State of Florida at Large
136 SW Nassau Street, Lake City, FL  32025

Third Circuit Reporters & Video
Toll-Free 855.850.7038
www.allcourtreporters.com

8

1   A   No.

2   Q   All right.  How is Ms. Little as a teacher?

3   A   She's a very good teacher, very good instructor.

4   Q   Okay.  Did you see her treat Kim unfairly when

5   she was a student?

6   A   Not while I was there at first.  I didn't see

7   any of that kind of animosity at that time.  At first,

8   no.

9   Q   Okay.  Did you ever see (sic) Ms. Little use any

10   racially discriminatory words towards anybody in the

11   classroom?

12   A   Words?

13   Q   Yes, ma'am.

14   A   No.

15   Q   Anybody working at TTI, either as a teacher or

16   an administrator, did you ever hear them, like Mr.

17   Brannan, Mr. Clayton, anybody else that was in

18   administration, did you ever hear them use any racially

19   discriminatory words?

20   A   No.

21   Q   Ms. Harris has some physical problems.  Is that

22   a fair way to describe it?

23   A   Yes.

24   Q   She was born with some problems with her arm?

25   A   Right.

10

1  and clock in.  We'll help her get in, because we know

2  with her leg and everything it was time consuming, so

3  we would help her get in and get out.  Help her

4  practically with everything as far as that goes;

5  getting in, getting out, and moving around.

6    Q   Okay.  Did you ever see Ms. Little treat Kim

7  differently because of her disability?

8    A   No.  Not because of her disability, no.

9    Q   Did Kim ever talk about the fact that she would

10  need to sit down in the salon chair in between doing

11  procedures?  Do you remember her discussing that with

12  you?

13    A   I don't recall at this time.  As far as what you

14  mean, standing in the salon every day when we started

15  going in the salon and having to do the procedures?

16    Q   Yes, ma'am.

17    A   She would sit down.  I don't recall having that

18  conversation with her, but from time to time, yeah, she

19  would sit down.  Me being me understood the reason for

20  sitting down, so...

21    Q   Okay.  Did you see Ms. Little treat Kim unfairly

22  at any time when she was a student in the program?

23    A   I didn't right offhand, because I don't really

24  look for that.  I'm there for a reason, and my reason

25  is to be doing what I need to do, so I wasn't really

28

1 correctly.  So is it fair to say that Ms. Little was

2 lax on the time clock rules at the beginning of the

3 class?

4    A   Yes.

5    Q   The first few weeks it --

6    A   The first few weeks of class, yes.

7    Q   And then at some point she started to clamp down

8 on the rules?

9    A   Right, exactly, because we had to clamp down.

10 Like I say, this is a federal government time clock and

11 what we put on our time clock sheets, that is actual

12 time.  We can't even go back and change the time,

13 because that was also a part of the play.  We had some

14 say, well, I clocked in at this time and I was here at

15 this time, or this ain't right, the time for the week

16 ain't right, I need you to readjust my time for me, and

17 she would go back at that time and readjust it, but

18 over the period of time that had to cease, because she

19 can't write on those time clocks -- cards, so that ---

20 I mean, she got stricter over time.

21    Q   All right.  And she got stricter for everybody

22 --

23    A   Everybody.

24    Q   -- in the class?

25    A   Right.

EXHIBIT

R



# TAYLOR TECHNICAL INSTITUTE

STUDENT HANDBOOK & COURSE CATALOG 2011-2012

TAYLOR
TECHNICAL INSTITUTE
WORK-READY EDUCATION

## Message from the Director

On behalf of our faculty, staff, and the Taylor County School District, it is a pleasure to welcome you to Taylor Technical Institute (TTI) where we live by our motto "We can Help!".

You will find that we are committed to providing quality educational and technical training along with support services that will assist you in attaining your career-related goals. At TTI, you will also find well-qualified faculty and staff who care about you and are willing to assist you attain your personal goals.

TTI collaborates with business, industry, and our community in promoting economic development in our ever-changing workforce. We look forward to you becoming a part of our TTI family.

I wish you much success in your education and career-related endeavors,

Sincerely,

Jim Brannan
Vocational Coordinator





1

TCSB000979

# STUDENT INFORMATION





## Rules of Conduct

- Students will keep work areas clean and in good order.
- Profanity and rudeness will not be allowed.
- Students will be dressed appropriately for the program in which they are enrolled. At the discretion of the instructor or other staff, student may be asked to leave in order to change into more appropriate attire. See dress code on page 36
- Public display of affection or sexually explicit conduct will not be permitted on campus.
- Sale, purchase or possession of non-prescribed drugs, alcohol, or other controlled substances will not be tolerated. Law enforcement will be contacted.
- Fighting will not be allowed on campus. Law enforcement may be called.
- Horseplay in classrooms or shops will not be tolerated.
- Firearms, knives, razors, and other cutting instruments and/or weapons will not be allowed on campus.
- Cell phones, CD players, radios, sunglasses, etc., will not be used inside buildings.
- Loitering in entry ways will not be allowed.
- Any adult student leaving or returning to the Technical Institute is required to sign in/out. High school students must be checked out by a parent or guardian, in person, and also sign out at Taylor County High School attendance office. Photo ID is required for the person checking out a high school student.
- Students who willfully destroy or abuse property will be required to pay for damages and discipline matrix will be utilized.
- No open food/drink containers will be allowed in classrooms without instructor approval. All litter will be placed in containers.

TCSB001023



# ATTENDANCE POLICY

nine-weeks before financial aid will be reinstated.

- In calculating absences for withdrawal purposes, excessive absences in any one period of instruction will constitute withdrawal from all classes. Three tardies , will constitute an absence for that period.
- Absences for pre-approved school-related activities or active military duty will not be counted as part of the allowed five days. (Documentation may be required.) It will be the responsibility of the student to complete classroom and/or clinical training that is missed due to absences.

## Tardies/Early Dismissals

1. Students entering class after the designated start time will be marked tardy. Three tardies equal one absence.
2. Students who leave class prior to dismissal without prior instructor approval before the end of class will be marked absent for the entire period.

## Administrative Excused Absences

If a student experiences a life-altering event and provides documentation within two days of returning to school, the student will be administratively excused for the following reasons:

- Hospital confinement for the adult student, spouse, or children,
- Court appearances,
- Death in the immediate family (spouse, children, parents, siblings), or
- Extended illnesses (example: chemotherapy, severe diabetes, an illness that may require numerous trips to the doctor and can be documented).

**Documentation is defined as:**

- For hospital stay: a statement from the doctor and/or hospital indicating the date of the admission and the date of dismissal.
- For court appearance: a subpoena or a letter from the attorney representing the student.
- For death in the immediate family: an obituary, a funeral program, or newspaper article about the deceased.
- Your Administrative Excused Absences and Leave of Absence will affect your financial aid status. Pell disbursement is calculated on days present.



48

# EXHIBIT S

**Taylor County
School District**

# Memo

RECEIVED
DEC 0 8 2011
BY:

**To:** Kim Harris, 207 W. Walnut St., Perry, Fl. 32348

**From:** Paul Dyal, Superintendent

**CC:** Jim Brannan, Vocational Coordinator, Taylor Technical Institute

**Date:** 12/8/2011

**Re:** Affirmative Action Complaint

---

I have received from TTI, the statements from the individuals that were involved with your affirmative action complaint. I have reviewed the statements, compared them to your written complaint and I do not see where any Board Policy or TTI Student Handbook directives have been violated.

The actions taken by TTI over the incident was within the scope of both Board Policies on student management and the expectation of student behavior in the TTI student handbook. I hope that you may consider another course of study and enroll in the future.

1

# EXHIBIT T

# DEPARTMENT OF EDUCATION
## DIVISION OF VOCATIONAL REHABILITATION
### CASE NOTES

**Name:** KIM L HARRIS          **ID:** VR0383933          **Case:** 03

---

**Date: 04/22/2011 Type:** General          **Approved By:**
                                            **Entered By:** Carl Schorr

Ms. Harris and the VRC agreed to meet for an initial interview on 5-4-2011 @ 3:00

**Date: 05/04/2011 Type:** General          **Approved By:**
                                            **Entered By:** Carl Schorr

Ms. Harris is a 38 y/o female that presents with a torn left knee ligaments, bilateral ankle
damage and bipolar disorder.  She was involved in an MVA in October 2009.  She has
reconstructive knee surgery last week.    Her Bipolar disorder is controlled via
medication.
Orthopedic Services are being provided @ TOC and Mental Health Services are
provided @ Apalachee Center.  Both are funded by Medicaid.
Ms. Harris was a cosmetology student at TTI prior to the MVA and she has a desire to
return to cosmetology school.
She has difficulty standing for long periods of time and walking.
Without her medication Ms. Harris is aggressive and has difficulty communicating with
supervisors and coworkers.
The VRC provided Ms. Harris with a copy of the VR Handbook and reviewed the
contents of the handbook with Ms. Harris.  He stressed the importance of informed
choice and Ms. Harris indicated she understood informed choice.
Ms. Harris read and signed the following intake documents, VR Application, voter
registration form, release of information, waiver of confidentiality and VR Handbook.

**Date: 05/12/2011 Type:** Comparable Services          **Approved By:**
                                                        **Entered By:** Joseph Rapisardo

Comparable benefits - consumer provides her own transportation.  JR/vrt

**Date: 05/12/2011 Type:** General          **Approved By:**
                                            **Entered By:** Joseph Rapisardo

SET UP FILE - JR/vrt

**Date: 07/05/2011 Type:** Analysis          **Approved By:**
                                             **Entered By:** Carl Schorr

Justification for Status 10:
Ms. Harris presents with Bipolar Disorder and a left leg disability.  Currently she is
attending the cosmetology program at Taylor Technical Institute and is currently not
employed.

**DEPARTMENT OF EDUCATION**
**DIVISION OF VOCATIONAL REHABILITATION**
**CASE NOTES**

**Name:** KIM L HARRIS                 **ID:** VR0383933          **Case:** 03

Ms. Harris' impairment hinders her ability to become employed by creating conflicting situations with coworkers and supervisors. She has a history of not accepting directives from supervisors and participating in verbal and physical altercations.
Physically Ms. Harris has difficulty standing while she is performing cosmetology work. She is required to take frequent breaks or use a chair, when possible.
Mr. Harris has a criminal conviction for Grand Theft and Concealed Weapon. She remains on probation felony until November 2012.

Ms. Harris requires Vocational Rehabilitation Services to assist with physical restoration and mental health services when Medicaid is unable to provide funding, provide guidance and counseling and assist with her vocational training at Taylor Technical Institute.
Ms. Harris will be placed on the Order of Selection Waiting List at a level two. The VRC anticipates VR Services will be in effect for a period of time of at least six months.

**Date:** 07/06/2011 **Type:** Customer Contact          **Approved By:**
                                                         **Entered By:**   Joseph Rapisardo

IPE letter, IPE packet and appointment letter was mailed to consumer. IPE date set for 08/10/2011 @ 10am at TTI.  JR/vrt

**Date:** 08/05/2011 **Type:** Customer Contact          **Approved By:**
                                                         **Entered By:**   Joseph Rapisardo

VRT spoke with consumer who confirmed her appointment set for 08/10/2011 @ 10am. JR/vrt

**Date:** 08/10/2011 **Type:** IPE Planning              **Approved By:**
                                                         **Entered By:**   Carl Schorr

Ms. Harris met with the VRC to participate in the design of her IPE. Ms. Harris has a desire to become employed as a cosmetologist. She will begin cosmetology classes at TTI on August 22nd. She attended the cosmetology program prior to her MVA.
Ms. Harris has difficulty standing for more than several minutes and walks with an abnormal gait. She will require rehabilitation engineering services to assist with the

**DEPARTMENT OF EDUCATION**
**DIVISION OF VOCATIONAL REHABILITATION**
**CASE NOTES**

**Name:**   KIM L HARRIS                     **ID:** VR0383933          **Case:** 03

modifications to her workstation.
Physical restoration services continue to be provided by Tallahassee Orthopedic Clinic
and funded by Medicaid.  Apalachee Center will continue to provide mental health
services and funding will be provided by Medicaid.
Ms. Harris inquired about funding for childcare services while she is attending school.
The VRC provided her with a contact to a program that offers childcare assistance to low
income students.
The VRC reiterated to Ms. Harris the importance of cooperation on behalf of VR
Services and herself.  He discussed the requirements of a successful VR Case.
Ms. Harris receives SSA benefits and is not required to financially participate in the VR
Program.

**Date:** 08/18/2011 **Type:**General                 **Approved By:**
                                                **Entered By:**   Joseph Rapisardo

VRT faxed Connie Golden the consumers ticket to work and mailed the original.  JR/vrt

**Date:** 09/07/2011 **Type:**Customer Contact        **Approved By:**
                                                **Entered By:**   Joseph Rapisardo

VRT spoke with consumer and discussed the consumers concern for child care services
and having them become a vendor.  VRT spoke with the child care agency and cleared
up everything and verified the vendor application was mailed to them and once it gets
there to follow the directions on it.  Consumer felt satisfied with the information given and
is going to contact VRC on Friday to discuss other issues in more detail.  JR/vrt

**Date:** 09/16/2011 **Type:**Customer Contact        **Approved By:**
                                                **Entered By:**   Joseph Rapisardo

Consumer contacted VR in attempt to reach VRC.  VRT informed consumer VRC was at
lunch and to try again after 1pm.  Consumer said will try at a later time today.  JR/vrt

**Date:** 09/19/2011 **Type:**Vendor Contact          **Approved By:**
                                                **Entered By:**   Carl Schorr

The VRC left a voicemail with Dr.Thompson in reference to a prescription for pressure
socks.

**Date:** 09/19/2011 **Type:**General                 **Approved By:**
                                                **Entered By:**   Carl Schorr

Ms. Harris has been prescribed compression stockings.

**DEPARTMENT OF EDUCATION**
**DIVISION OF VOCATIONAL REHABILITATION**
**CASE NOTES**

**Name:** KIM L HARRIS          **ID:** VR0383933          **Case:** 03

---

**Date:** 09/19/2011 **Type:** Authorizations and Payments   **Approved By:**
**Entered By:**   Joseph Rapisardo

VOIDED Auth# EKNU4287 because prosthetics and orthotics need to be added to the
IPE. VRC is aware of this. JR/vrt

**Date:** 09/19/2011 **Type:** IPE Amendment Justification   **Approved By:**
**Entered By:**   Carl Schorr

Ms. Harris presents with bilateral ankle disability. Dr. Thompson has prescribed
compression stockings.
Prosthetics/Orthotics at TOC will be amended to the IPE.

**Date:** 09/28/2011 **Type:** Vendor Contact          **Approved By:**
**Entered By:**   Joseph Rapisardo

VRT left a voicemail with vendor certification requested an update on Austin Family
Daycare. JR/vrt

**Date:** 10/11/2011 **Type:** IPE Amendment Justification   **Approved By:**
**Entered By:**   Carl Schorr

Ms. Harris is attending the Cosmetology program at Taylor Technical Institute. While
attending the training Ms. Harris is in need of childcare assistance. Her child is
attending Austin's Family Childcare.

**Date:** 10/13/2011 **Type:** Authorizations and Payments   **Approved By:**
**Entered By:**   Joseph Rapisardo

AUTHORIZATION - #EKPB026 (TOC / Prosthetics and Orthotics) DOS: 10/13/2011.
Authorization is for one pair of ankle compression stockings. VRC approved services.
JR/vrt

**Date:** 10/13/2011 **Type:** Vendor Contact          **Approved By:**
**Entered By:**   Joseph Rapisardo

VRT faxed authorization #EKPB026 to TOC for consumers stockings. TOC will contact
the consumer once received to have her come in for a fitting. JR/vrt

**DEPARTMENT OF EDUCATION**
**DIVISION OF VOCATIONAL REHABILITATION**
**CASE NOTES**

**Name:** KIM L HARRIS               **ID:** VR0383933          **Case:** 03

---

**Date: 10/17/2011 Type:**Authorizations and Payments   **Approved By:**
                                        **Entered By:**  Joseph Rapisardo

ATF - Auth#EKPC349 (Austin Family Child Care Home) DOS: 8/22 - 9/30/2011. ATF because vendor was not certified until recently. Authorization is for child care services and a cot. VRC approved all services for the amount of $233. JR/vrt

**Date: 10/18/2011 Type:**Vendor Contact          **Approved By:**
                                        **Entered By:**  Joseph Rapisardo

VRT spoke with Phyillis from TOC who will be contacting consumer to schedule her to come in for her stockings. JR/vrt

**Date: 11/04/2011 Type:**Authorizations and Payments   **Approved By:**
                                        **Entered By:**  Joseph Rapisardo

AUTHORIZATION - #EKPM198 (Austins Daycare) DOS: October 2011. Authorization is for day care services. VRC approved services. JR/vrt

**Date: 11/04/2011 Type:**General             **Approved By:**
                                        **Entered By:**  Carl Schorr

Payment Justification:
Ms. Harris is currently a student at cosmetology school. She is in need of a workstation and stool to accommodate for her orthopedic disability.

**Date: 11/04/2011 Type:**IPE Amendment Justification   **Approved By:** SUZANNE BRADLEY
                                        **Entered By:**  Carl Schorr

Ms. Harris is in need of a Salon Station and Mobile Stool while she is attending cosmetology training at Taylor Technical Institute.
The Salon Station and Stool will be ordered by Advanced Driving.

**Date: 11/08/2011 Type:**Authorizations and Payments   **Approved By:**
                                        **Entered By:**  Joseph Rapisardo

AUTHORIZATION - #EKPN382 (Advanced Driving Systems) DOS: 11/8/2011. Authorization is for a salon station and stool. VRC approved services in the amount of $789.00. JR/vrt

**DEPARTMENT OF EDUCATION**
**DIVISION OF VOCATIONAL REHABILITATION**
**CASE NOTES**

**Name:**  KIM  L HARRIS                     **ID:** VR0383933        **Case:**  03

---

**Date:** 11/15/2011  **Type:**Authorizations and Payments   **Approved By:**
                                                              **Entered By:**   Joseph Rapisardo

CANCELLED - Auth# EKPN382 because consumer was removed from the program because of a conflict with the instructor.  JR/vrt

**Date:** 11/16/2011  **Type:**Authorizations and Payments   **Approved By:**
                                                              **Entered By:**   Leticia Bauer

After the Fact: AUTH #EKPX089 to Austin's Daycare for October, 2011 in the amount of $138.60 was generated ATF and replaces AUTH #EKPM198 due to RIMS issues. TFB, Admin. Sec.

**Date:** 11/28/2011  **Type:**Authorizations and Payments   **Approved By:**
                                                              **Entered By:**   Joseph Rapisardo

ATF- Auth# EKQ3007 (Austins Family Child Home)  DOS: 11/1 - 11/8.  Authorization is for 8 days of child care.  ATF because invoice was received after services were provided.  VRC approved services in the amount of $52.80.  JR/vrt

**Date:** 12/05/2011  **Type:**Authorizations and Payments   **Approved By:**
                                                              **Entered By:**   Leticia Bauer

AUTH #EKPX089 to Austin's Family Child Care Home for DOS October, 2011 was mailed to vendor for vendor signature. TFB, Admin. Sec.

**Date:** 01/03/2012  **Type:**Authorizations and Payments   **Approved By:**
                                                              **Entered By:**   Joseph Rapisardo

CANCELLED  - Auth# EKPB026 because consumer said she did not pick up her stockings which was authorized.  JR/vrt

**Date:** 03/08/2012  **Type:**Customer Contact     **Approved By:**
                                                    **Entered By:**   Joseph Rapisardo

VRT left a voicemail with consumer requesting she contact VRC to update her case due to a no case activity alert.  JR/vrt

**Date:** 05/23/2012  **Type:**Customer Contact     **Approved By:**
                                                    **Entered By:**   Joseph Rapisardo

VRT spoke with consumer who was contacting VR in regards to a no case activity letter.  VRT emailed VRC to contact consumer when she returns from Perry to discuss her case.  Consumer expressed her interest in school despite her situation with past attempts. JR/vrt

**Date:** 05/24/2012  **Type:**Guidance and Counseling     **Approved By:**
                                                           **Entered By:**   Regina Rice

# DEPARTMENT OF EDUCATION
## DIVISION OF VOCATIONAL REHABILITATION
### CASE NOTES

**Name:  KIM L HARRIS**          **ID:** VR0383933          **Case:** 03

Walk-in. She said that I sent her a letter and she needs help with housing in Tallahassee. She explained that she needs a place that fits into her budget. She is not asking for VR to pay her rent she just needs a place that she can afford. She explained that currently she is getting SSI and SSA and needs to make a better life for her child. She wants to go to school in Tallahassee and take up cosmetology. She apparently got dismissed from TTI because she threatened someone. She said that it was not true. She is currently on probation for assault. She is interested in attending Lively and attempting to get her cosmetology certificate. She was counseled regarding the potential loss of benefits. She also has a charge for passing worthless bank checks. She was also counseled regarding calling and not just coming in so that she will not have to wait.  Plan: review her case and let her know that I would see what we can do.

**Date:** 08/28/2012 **Type:** Guidance and Counseling          **Approved By:**
                                                                **Entered By:**   Jennifer Stovall

A WIPA referral has been generated for this consumer. It will be signed at next VR contact.

**Date:** 09/17/2012 **Type:** Case Closure Summary          **Approved By:**
                                                             **Entered By:**   Jennifer Stovall

VRC has tried to make contact with the consumer to no avail. She also did not respond to her ten day letter for file closure. There has been no contact since the day she was a walk in with Regina in the spring. Consumer may reapply in the future.

**Date:** 04/30/2013 **Type:** Case Closure Summary          **Approved By:**
                                                             **Entered By:**   Allison Gill

This file has never been closed. An attempt was made on 03/07/13 once again to see if she would like to remain in the program but she did not call back.
A. Gill, VRAS